**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDWARD and MARLA BINIEK, h/w | : | |
| 121 Maffet Street | : | |
| Plains, PA. 18705 | : | No. 3:14-CV-1154 |
|          Plaintiffs | : | |
|     vs. | : | |
| | : | |
| T.J. MAXX/THE T.J. MAXX COMPANIES, INC. | : | |
| 770 Cochituate Road | : | JURY TRIAL DEMANDED |
| Framingham, Massachusetts 01701 | : | |
|        And | : | |
| JOFRAN, INC. | : | |
| One Jofran Way | : | |
| Norfolk, Massachusetts 02056 | : | |
|          Defendants | : | |

## PLAINTIFFS' PRETRIAL MEMORANDUM

Date of Conference: August 26, 2015 at 1:30 p.m.

**A.**     **BRIEF STATEMENT AS TO FEDERAL COURT JURISTICTION**

Diversity of Citizenship.

**B.**     **SUMMARY STATEMENT OF FACTS AND CONTENTIONS AS TO LIABILITY**

This diversity, products liability and negligence action arises out of an accident that occurred on March 11, 2013 when Plaintiffs Edward and Marla Biniek went to the T.J. Maxx store in the Arena Hub Plaza in Wilkes-Barre  for the purpose of purchasing kitchen chairs.  Plaintiff Edward Biniek sat on a chair on display for the purpose of feeling the comfort of said chair when, suddenly and without warning, the right front leg separated and broke away from the underside of the seat causing Plaintiff-Husband to suddenly fall and violently strike his back, neck and head on the hard tiled floor at the T.J. Maxx store causing serious injuries. consisting of  cervical disc displacement, including C4-C5, C5-C6 and C6-C7 disc herniation, cervicalgia, cervical facet syndrome, cervical radiculopathy, brachial radiculitis and superscapular neuropathy.

**C.**     **STATEMENT OF UNDISPUTED FACTS AS AGREED BY COUNSEL**

1 .     On March 11, 2013 Plaintiffs Edward Biniek and his wife Marla Biniek along

with their son Edward J. Biniek, III went to the T.J. Maxx store located in the Arena Hub Plaza

in Wilkes-Barre.

2.      While in the T.J. Maxx store on March 11, 2013 Plaintiff Edward Biniek, his wife and son decided to look at floor displayed dining chairs.

3.      On Mach 11, 2013 Plaintiff Edward Biniek was 5'8" and weighed approximately 175 lbs.

4.      Defendant Marmaxx Operating Corporation d/b/a T.J. Maxx ("Marmaxx") is a retail department store chain which product line inventory includes clothing apparel and home furnishings including chairs, stools and tables.

5.      Defendant Jofran Sales, Inc. ("Jofran") is a domestic importer of home furnishings including casual dining sets, consoles, accent chairs and tables.

6.      The dining room/kitchen chair involved in the incident giving rise to the lawsuit filed by Plaintiffs is a 2-tone antique white chair identified as a Bradford Side Chair – KD.

7.      The initials KD stand for "Knocked Down."

8.      The Bradford Side Chair generally comes only partially assembled and can either be assembled by the importer/distributor Defendant Jofran or the end user/the retail consumer.

9.      Defendant Marmaxx was a customer of Defendant Jofran and in the past had purchased "lots" (bulk amounts) of Bradford chairs from Defendant Jofran.

10.     For any Bradford Side Chairs that were sold by Defendant Jofran to Co-Defendant Marmaxx, Defendant Jofran employees would prior to shipment fully assemble any Bradford Side Chairs ordered/purchased by Defendant Marmaxx d/b/a T.J. Maxx.

11.     The subject Bradford Side Chair involved in Plaintiff Edward Biniek's accident was assembled by Defendant Jofran and shipped in a corrugated box to one of Defendant Marmaxx's Distribution Centers.

2

12.     The subject Bradford Side Chair in its corrugated box along with other Marmaxx merchandise would be reshipped by Defendant Marmaxx from one of its Distribution Centers to a Regional Distribution Center in Pittston, Pennsylvania.

13.     Upon request, Bradford Side Chairs would be delivered via commercial tractor/trailer to Marmaxx store locations such as the Arena Hub store in Wilkes-Barre.

14.     The commercial tractor/trailer driver would unload all merchandise, including the corrugated boxes in which the Bradford Side Chairs were located onto a conveyor which Defendant Marmaxx employees would then take off the conveyor.

15.     Defendant Marmaxx employees would remove the Bradford Side Chairs from their corrugated boxes and write code numbers on the underside of the seat and observe any aesthetic defects.

16.     The Bradford Side Chairs would be stocked on the display floor by Defendant Marmaxx employees.

17.     The components of the Bradford Side Chair consist of a chair back, box seat and two front legs.

18.     Per the Assembly Instructions and Parts Identification sheet, each front leg is connected by two screws sized 0M6X75MM in length along with a flat washer, lock washer and a nut.

19.     On February 15, 2013 a Bill of Lading confirming the shipment of 400 Bradford Side Chairs was shipped by Defendant Jofran to Defendant Marmaxx destined for its Distribution Center in Evansville, Indiana.

20.     In March 2013, the Bradford Side Chair was delivered to the T.J. Maxx store located at the Arena Hub Mall facility and unloaded from the trailer by the commercial

tractor/trailer driver and then placed onto a conveyor which Defendant Marmaxx employees took off the conveyor and later placed on the display floor for sale.

21.     Upon Plaintiff-Husband sitting on the Bradford Side Chair that was on display inside the T.J. Maxx store, the right front leg broke.

22.     Following the incident involving Plaintiff Edward Biniek, the chair involved in Plaintiff-Husband's accident along with a similar Bradford Side Chair was secured by Defendant Marmaxx employees.

23.     At some undetermined point after Plaintiff-Husband's incident and prior to the filing of the lawsuit, the front left leg of the incident chair, which was not the leg involved in the incident, also broke.

24.     Plaintiff Edward Biniek has incurred $20,316.77 in medical expenses for medical treatment he claims was necessary to treat him for the injuries he suffered in the accident. Defendants do not contest the amount of medical charges just whether they are in fact related to the injuries Plaintiff-Husband claims to have suffered in the accident, which gives rise to this lawsuit.

## D.     BRIEF DESCRIPTION OF DAMAGES

(1)  **PLAINTIFF-HUSBAND'S INJURIES:**  Cervical disc displacement, including C4-C5, C5-C6 and C6-C7 disc herniation, cervicalgia, cervical facet syndrome, cervical radiculopathy, brachial radiculitis and superscapular neuropathy.

(2)  **HOSPITALIZATION:**  Emergency Room treatment on March 12, 2013 at Geisinger Urgent Care, GWV Heart Hospital.

(3)  **PRESENT DISABILITY:**  Ongoing and unresolved radiating neck pain and pain into the right shoulder; paresthesias with numbness into both hands and fingers.

(4)  **MONETARY DAMAGES:**  Past medical expenses: $20,316.77 as paid by the health insurance carrier, First Priority Life Insurance Company.  Past loss of earnings: A minimum of approximately $7,698.57.  Future medical expenses: $3,190.00 (Advanced Pain Management).

(5) **ESTIMATED VALUE OF PAIN AND SUFFERING:** Unknown. For jury to assess and evaluate.

(6) **SPECIAL DAMAGES:** $31,205.34 (past medicals $20,316.77, page wage loss, $7,698.97 and future medicals, $3,190.00).

E.    **PLAINTIFFS' WITNESS LIST**

1.    Edward Biniek, 121 Maffet Street, Plains, Pennsylvania 18705

2.    Marla Biniek, 121 Maffet Street, Plains, Pennsylvania 18705

3.    Edward Biniek, III, 121 Maffet Street, Plains, Pennsylvania 18705

4.    Jeffrey G. Keefer, Class Cabinetry, 301 Mulberry Hill Road, Barto, Pennsylvania 19504. Mr. Keefer is an expert in the professional woodworking industry.

5.    Dr. Albert D. Janerich, 667 North River Street, Plains, Pennsylvania 18705. Dr. Janerich is a Board Certified physician in Physical Medicine and Rehabilitation.

6.    Dr. William F. Newhart, Newhart Chiropractic Center, 225 South River Street, Plains, Pennsylvania 18705. Dr. Newhart is a chiropractor focused on the diagnosis and treatment of neuromuscular disorder with an emphasis on treatment through manual adjustment and/or manipulation of the spine.

7.    Dr. Harold J. Einsig, 11 Gallagher Drive, Plains, Pennsylvania 18705. Dr. Einsig is a Board Certified physician specializing in Pain Management.

8.    Jarrod Fanelli, 29 Perkins Street, Plains, Pennsylvania 18705

9.    Rebecca Bowers, 225 East Swedesford Road, Wayne, Pennsylvania 19087

10.   Tara Hughes, 394 East Washington Street, Nanticoke, Pennsylvania 18634

11.   Emalee Klinefelter, 172 Jones Street, Wilkes Barre, Pennsylvania 18702

12.   Daryle Agrella, 21 Ambrose Street, Pittston, Pennsylvania 18640

13.   Joffrey Aaron Roy, 1 Jofran Way, Norfolk, Massachusetts.

14.   Mary Lucille Murtha, 661 Tioga Avenue, Kingston, Pennsylvania 18704.

15.   Custodian of Records of Geisinger Urgent Care and Geisinger Medical Center, Wyoming Valley, 1000 East Mountain Boulevard, Wilkes Barre, Pennsylvania 18705

16.   Custodian of Records of Newhart Chiropractic Center, 225 South River Street, Plains, Pennsylvania 18705

17. Custodian of Records of Valley Open MRI & Diagnostic Center, 451 Third Avenue, Kingston, Pennsylvania 18704

18. Custodian of Records of Albert Janerich, MD, 667 North River Street, Plains, Pennsylvania 18705

19. Custodian of Records of Orthopedic Consultant of Wyoming Valley, 390 Pierce Street, Kingston, Pennsylvania 18704

20. Custodian of Records of Advanced Pain Management Specialists, 11 Gallagher Drive, Plains, Pennsylvania 18705

21. Custodian of Records of Hershey Medical Center, 500 University Drive, Hershey, Pennsylvania 17033

22. Custodian of Records of Wilkes Barre General Hospital, 575 North River Road, Wilkes Barre, Pennsylvania 18764

23. Custodian of Records, Geisinger Health Systems, 100 North Academy Avenue, Danville, Pennsylvania 17822

24. Custodian of Records, PM Medical Products, Ltd, 301 Pine Lane, Mountain Top, Pennsylvania 18707.

In light of Stipulation entered into by all parties (**See** C above), Plaintiffs do not anticipate nor expect to call witnesses # 14-23 above.

**F.   SUMMARY OF TESTIMONY OF EACH EXPERT WITNESS**

1. Jeffrey G. Keefer, Class Cabinetry,  301 Mulberry Hill Road, Barto, Pennsylvania 19504.  (**See** report marked Exhibit A).

2. Dr. Albert D. Janerich, 667 North River Street, Plains, Pennsylvania 18705.  (**See** report marked Exhibit B).

3. Dr. William F. Newhart, Newhart Chiropractic Center, 225 South River Street, Plains, Pennsylvania 18705.  (**See** report marked Exhibit C).

4. Dr. Harold J. Einsig, Advanced Pain Management Specialists, PC, 11 Gallagher Drive, Plains, Pennsylvania 18705 (**See** report marked Exhibit D).

**G.   SPECIAL COMMENT ABOUT PLEADINGS/DISCOVERY/DEPOSITIONS/MEDICAL REPORTS**

None.

**H.   SUMMARY OF LEGAL ISSUES AND AUTHORITIES**

1.     Under the recent Pa Supreme Court decision in _Tincher v. Omega Flex, Inc._, 64 A3d 626 (Pa. 2013), 2014 WL 647 4923 (PA 11/19/14), did subject chair have a manufacturing defect (improper assembly).

2.     Under the recent Pa Supreme Court decision in _Tincher v. Omega Flex, Inc._, 64 A3d 626 (Pa. 2013), 2014 WL 647 4923 (PA 11/19/14), was the subject chair defectively designed and unsafe.

3.     Under the recent Pa Supreme Court decision in _Tincher v. Omega Flex, Inc._, 64 A3d 626 (Pa. 2013), 2014 WL 647 4923 (PA 11/19/14), is the subject chair in a defective condition under the Consumer Expectations Standard?

## I.     STIPULATIONS DESIRED

Authencity of records produced during discovery by the parties.

## J.     ESTIMATED NUMBER OF TRIAL DAYS

Three days.

## K.     OTHER MATTERS PERTINENT TO THE CASE

None at this time.

## L.     LIST OF EXHIBITS

See List of Exhibits (pursuant to Local Rule 16.3) attached as Exhibit E.

## M.     SPECIAL VERDICT QUESTIONS

See Exhibit F.

N.   **CERTIFICATE UNDER LOCAL RULE 30.10**

<u>See</u> Certification attached as Exhibit "G".

Respectfully submitted,

**GALFAND BERGER, LLP**

BY: _____

RICHARD M. JUREWICZ, ESQUIRE
Attorney for Plaintiffs
Attorney I.D. No.: 39436
1835 Market Street, Suite 2710
Philadelphia, PA  19103
215-665-6829
rjurewicz@galfandberger.com

Dated: 8/19/2015



BRADFORD CHAIR REPORT    April 6, 2015

BY Jeffrey Keefer

Edward Biniek Case

On March 11, 2013 Mr. Edward Biniek suffered an injury as a direct result of the collapse of a dining chair on display at the TJ Maxx store located in Wilkes-Barre, PA

This writer was retained by Richard M. Jurewicz, Esquire in connection with his legal representation of Mr. Edward Biniek regarding the incident (chair collapse) that is the subject of the lawsuit filed by Mr. Biniek and his wife. This writer was requested to evaluate the design, workmanship and assembly of the incident dining chair to determine if the design, workmanship quality and assembly were contributing causes of the chair collapse.

As set forth in my Curriculum Vitae more fully, I am the owner of Classic Cabinetry. I have had more than 25 years of professional experience in the woodworking industry. In my professional experience I have designed residential and commercial office furniture. My design experience includes conference tables, chairs, desks and office tables. In addition, my professional woodworking experience includes the selection of hardware and fastening devices for the residential and commercial furniture that I have designed. Classic Cabinetry is also responsible for assembling and installing commercial and residential furniture it designs. This writer is very familiar with the design, chosen hardware and assembly required for the dining chair involved in Mr. Biniek's accident.

INFORMATION AVAILABLE FOR REVIEW:

1. Deposition of Edward Biniek taken on February 4, 2015
2. Deposition of Marla Biniek taken February 4, 2015
3. Deposition of Joffrey Aaron Roy taken October 23, 2014
4. Deposition of Tara Hughes taken October 8, 2014
5. Deposition of Mary Lucille Murtha taken October 8, 2014
6. Deposition of Jarrod Fanelli taken October 8, 2014
7. Affidavit of Edward J. Biniek, III
8. My inspection of the chair on March 11, 2015
9. Photographs produced by the parties during this litigation
10. Exhibits marked and identified in the depositions listed above

THE INCIDENT:

On March 11, 2013 Mr. Edward Biniek, his wife, and son were in the TJ Maxx store looking at floor displayed dining chairs. Upon sitting on the display chair the right front leg buckled under the seat snapping the wooden leg in the area where hangar bolts were used to fasten the leg to the seat. The unexpected failure of the chair sent Mr. Biniek to the floor and caused him to be injured.

THE PARTIES:

According to its website and description from the Internet, Jofran, Inc. is a manufacturer of home furnishings. Its products and services include "furniture manufacturers." A list of various collections it offers, including dining chairs, describe it as a manufacturer. The corporate representative of Jofran, Inc. qualifies its website products and services as an importer of home furnishings primarily casual dining sets, consoles, accent chairs and tables. Its products are imported primarily from Vietnam, Malaysia and China.

T.J. Max is a retail department store chain with stores located throughout the United States. While a good portion of T.J. Maxx product line inventory is clothing apparel and shoes, it does offer for sale home furnishings including chairs, stools and tables.

From materials reviewed by this writer, the Bradford Side Chair Line was imported by Jofran, Inc. from Thanh Phu Phat, a company located in Vietnam. Prior to deciding to carry the Bradford Side Chair line of products, Jofran, Inc. representative Joffrey Aaron Roy had reviewed and evaluated Bradford Side Chair line exemplars. Jofran, Inc.'s evaluation included not only the design of the chair but the knowledge and understanding of the quality and type of wood species selected for that type of chair and its manner of construction. Although intended to be a "knocked down" chair (partially assembled) for most of its customers, the arrangement with T.J. Maxx, was that the Bradford Side Chairs would be assembled at Jofran, Inc.'s facility. Jofran, Inc. would also be responsible for the packing of these chairs in corrugated boxes for shipment to T.J. Maxx's Distribution Centers.

T.J. Maxx would then have a supply of Bradford Side Chairs shipped from its Distribution Centers to a Regional Distribution Center for delivery to local retail stores serviced by the Regional Distribution Center. The chairs would be delivered with other merchandise via a commercial tractor/trailer to the store location. The corrugated boxes containing the chairs and other merchandise would be off loaded and processed by T.J. Maxx store employees. Once removed from their corrugated boxes, the chairs would receive a cursory inspection to look for aesthetic defects that would render the chair undesirable for purchase. Otherwise, the chairs would be stocked on the display floor in accordance with inventory replenishment policies of T.J. Maxx.

THE CHAIR:

The chair is described by Jofran (the manufacturer / importer / distributor) as a "Bradford Side Chair – KD" The KD stands for "knock down". This chair generally comes only partially assembled and can either be assembled by the distributor ( Jofran ) or the end user ( retail consumer )  The chair consists of the following components:

1. Seat back / back leg assembly
2. Seat box and attached seat
3. (2) Front Legs
4. Hardware pack and 1 page assembly instructions (ROY-8)

Referencing ROY-4, the Jofran Product Specification sheet states that the chair is made from Solid Rubber Wood. Rubber wood is a tropical hardwood originating from countries such as Brazil and Southeast Asia and has also been cultivated in other tropical climates and is commonly used in low end or economy furniture.

Referencing ROY-8, the Jofran Assembly Instructions, the chair is assembled by attaching the seat box / seat assembly to the chair back assembly using machine bolts that run through the seat box rails and corner blocks into threaded inserts in the seat back assembly. The front legs have hangar bolts preinstalled that protrude from the legs. These bolts are guided through predrilled holes in the seat box corner blocks and secured with washers, lock washers, and machine nuts.

KD FURNITURE:

KD or "knock down" furniture is not rare, especially in economy furniture imported from abroad. It keeps shipping costs down and is especially popular with tables and chairs. With the proper design, assembly, hardware, and maintenance these chairs can be safe and functional. These types of chairs, however, rely heavily on the hardware used during assembly in the absence of traditional joinery and adhesives. Proper and correct assembly is critical to the integrity and safety of the chair.

Proper chair assembly was acknowledged by the Jofran, Inc. corporate representative in his deposition when he testified that the safety of the Bradford Chair is dependent upon its proper assembly. If the chair is not assembled in accordance with the Assembly Instructions there

exists potential for one of the legs to separate causing a failure in the chair. Consequently, it is imperative that the Assembly Instructions are strictly adhered to ensuring that these chairs are properly assembled. Other than testifying that the Bradford Chairs would have been assembled by Jofran employees for the T.J. Maxx account, the Jofran corporate designee was not intimately familiar with what tools would have been used by his employees for assembly of these chairs. The Jofran Assembly Instructions call out the use of an Allen wrench and key wrench as the only tools needed for assembly.

THE INSPECTION:

On March 11, 2015 I was able to inspect and photograph the chair involved in the incident and 3 exemplar chairs of the same construction and style. The chair involved in the incident was found to have both front legs broken from the seat box. I was informed that the right front leg was the leg that was broken as a result of the incident and it had been marked with an "A". The other front leg was supposedly damaged during the transportation of the chair from the store to wherever it was stored before this inspection. It was the left front leg and it was marked with a "B".  For the purposes of this report I will only be referring to the leg marked "A" when discussing damage to this chair involving the front leg.

When the damaged chair is handled this writer's first observation is the severe amount of lateral movement between the seat box and the back assembly. In photograph 14F the (6) machine screws that hold the entire seat box, wooden seat, and front legs to the back assembly can be seen. They are black in color and are arranged so that the two in the center go directly through the seat box frame rails into threaded inserts in the seat back stretcher. At each corner a pair of bolts arranged vertically pass through wooden corner blocks, then through the seat box frame and into the back assembly where it's presumed there are threaded inserts. The most obvious flaw in the design of this area are the corner blocks. Unlike the 45 degree corner blocks that are used to attach the front legs to the seat box these are actually a wedge cut of solid wood with the grain running parallel to the seat box back rail. Wood screws are used to attach the wedge to the seat box frame rails. No adhesives are apparent. There are serious flaws in the design and attachment of these wedges. The wood screws that attach the wedge to the side rails of the seat box are too close to the edge of the wedge shaped block and are also drilled parallel to the grain of the block. Screw holes should be perpendicular to the grain of the wood or splitting is almost certain and can clearly be observed in photos 14F, 14G, 14H, and 14I. To further add to the design flaw the black machine screws are drilled only a fraction of an inch from the wood screws further weakening and contributing to the splitting of the wooden

wedge. This is significant because as soon as the wedge shaped blocks crack and fail the entire seat, seat box, and front leg assembly become loose and are relying on just the two black center bolts for structural integrity. This area where the seat box attaches to the seat back is supporting the bulk of the weight of the occupant.

In general the wood used in the chair involved in the incident seems to have coarse "curly" grain and seems to be prone to cracking. See referenced pictures.

EXEMPLAR CHAIRS:

At the time of inspection on March 11th, 2015 I was able to not only inspect the chair that was damaged as a result of the incident but also 3 chairs that were undamaged and preserved by T.J. Maxx following the Biniek incident. Upon inspection these chairs were found to have front leg and also seat box joints with excessive amounts of play and lateral movement. The bolts that connected the seat box to the back assembly were not properly and securely tightened and allowed a remarkable amount of lateral movement. With the chair upside down and resting on a conference table in the room, this writer naturally also checked the front legs for lateral play. Several of the (6) front legs on the (3) exemplar chairs had an alarming amount of side to side play in the area where the legs attach to the seat box. With just this writer's thumb and forefinger I could easily turn the (4) machine nuts that hold the two front legs in place. The nuts were clearly not properly and securely tightened. It is my opinion that these chairs were not properly assembled in accordance with the Jofran Assembly Instructions and industry custom and practice and prone to future failure if put into service.

FRONT LEG JOINT:

Unlike traditional chair joinery that would feature mortise and tenon joints with adhesives or wooden dowels and adhesives this Bradford KD chair used no adhesives or wooden joinery between the leg and seat box rails.

Legs are drawn into the corner through tightening ordinary machine nuts on hangar bolts that pass through the corner blocks and are supported completely by the pressurized contact between the leg and the seat box rails. The integrity of this joint relies completely on the constant pressure the nuts apply to the corner block. If either of the two nuts are not properly

and securely tightened during assembly the leg is immediately able to move laterally. As the leg tilts the hangar bolts make contact with the corner blocks putting vertical pressure on them. The bolts generally will not fail (shear off) and the wooden leg splits as it did in the incident.

The holes drilled in the blocks for the hangar bolts to pass through were observed to be much larger than the bolt. If these holes were drilled to the nominal diameter of the bolts then lateral movement of the leg would be minimized and loosening of the nuts would be far less likely to occur.

Given the fact that this front leg joint heavily relies on these two nuts to keep constant pressure on the corner block, the choice of hardware by Jofran to perform this function is an inadequate one. While flat and lock washers are included they are light duty, thin, and ineffective. When a standard machine nut isn't properly tightened or begins to loosen over time during use the lock washer does nothing to prevent the nut from freely spinning on the bolt. When a nyloc type locking nut is secured it never gets loose. Even if space between the wood and the nuts were created the nut never spins freely. Locking nuts are readily available worldwide and there use could have easily been specified by Jofran to the manufacturer for nearly no cost increase.


WOOD EXPANSION AND CONTRACTION:

Anyone who manufactures wood furniture has to understand the cause and effect of expansion and contraction in furniture design and build and how it could affect the performance of the furniture during its life cycle. All wood absorbs and releases moisture based on the surrounding humidity or lack thereof. When wood is exposed to high humidity it absorbs moisture and expands or swells and when exposed to low humidity or dry air moisture is sucked out of the wood and the wood contracts or shrinks. In climates like the northeast United States furniture goes through cycles as we go through the seasons. In the humid summer months wood expands and in the dry winter months it contracts.

In the United States most furniture wood is kiln dried to 6-8% moisture levels before manufacturing. At these low levels of moisture if the furniture is put into service in dry climates the moisture loss would be minimal and shrinking minimal as well. In humid areas the wood will certainly absorb moisture and swell some but the thinking is that the swelling is better than shrinking as at least joints tend to tighten rather than loosen.

According to the Jofran quality audits marked ROY-6 and ROY-7 moisture readings on the chairs checked and passed ranged from 10.1% to 14.4%. Certainly the 14.4% reading is high and furniture with this level of moisture put into service in dry winter climates would be expected to suffer from contracting or wood shrinkage.

As this subject relates to these chairs my observations are as follows.

The design of the wedge shaped corner blocks and the method of attachment don't allow for expansion and contraction and could contribute to cracking of the blocks as they are "pinned" in place by the screws that attach them. There are also multiple layers of wood that the corner bolts pass through and when that wood contracts loose bolts are predictable.

When the wood shrinks in the front leg area the metal nuts and washers are simply no longer applying the needed pressure to keep the leg firmly against the seat box rails and not only do you get slop or movement of the leg but the nut can spin freely and continue to loosen more and more as the chair is used eventually leading to the failure of the wood leg as was seen in this incident. This is again where the locking type nuts provide huge benefits both in safety and structural integrity over standard nuts. The shrinkage of the wood could still allow some movement but the nuts will not spin and further loosen so the movement is minimized. If the front leg hanger bolts are installed in wood with a high moisture content, such as with the incident chair, wood shrinkage will inevitably occur leading to cracking around these bolts which in turn will weaken the legs in the area that eventually failed on the incident chair.

SUMMARY:

These chairs rely on 6 bolts to attach and safely hold the seat to the back / leg assembly and the poor design of the corner blocks and machining of the holes render 4 of these bolts nearly useless when the corner blocks predictably fail. The front legs rely on 4 hanger bolts that mount to corner blocks with excessively large holes and ineffective lock washers and nuts. For less than 10 cents per chair nyloc (locking) nuts can be used that cannot loosen without tools. It's also clear from inspecting 3 exemplar chairs that the assembly by Jofran was not done properly as these brand new chairs had loose sloppy joints and leg nuts that could be loosened without tools. When the nuts that hold the front legs loosen, they spin freely and easily just through the vibration of normal usage of the chair. The farther the nuts spin away from the joint the more the leg moves laterally applying leverage to the hanger bolts and eventually causing the leg to split and fail.

Based on my review of the file materials, inspection of the failed chair and other chairs of T.J.
Maxx made available at my inspection of March 11, 2015, I offer the following opinions within a
reasonable degree of certainty in my experience in woodworking design and assembly:

1.      The blocks through which the front leg hanger bolts were inserted and passed
through were excessive in size allowing for lateral movement of the front legs that would
compromise the structural integrity of the incident chair;

2.      Failure to implement the use of readily available locking nuts and failing to
properly secure and tighten the lock washer and nut to the hanger bolts will result in the chair
legs losing their structural rigidity with the seat box compromising the structural integrity and
safety of the incident chair;

3.      During the examination of the three exemplar chairs this writer could see a clear
disregard for competent and consistent assembly practices. Loose hardware and the resulting
lateral motion prevalent in both the front leg joints and the joints between the seat box and the
chair back shows a lack of adherence to the Jofran Assembly Instructions by Jofran assembly
personnel;

4.      Mr. Biniek did not misuse or abuse the chair and sat on it in a manner and
method that would be expected. Further, the incident chair was not overloaded by Mr. Biniek
sitting on it;

5.      The incident chair demonstrated poor workmanship in the pattern, location and
position of the pre-drilled holes for the wood screws and machine bolts that connect the entire
seat box and front leg assembly to the chair back. When the poorly designed and constructed
corner blocks cracked and split apart, 4 of the 6 bolts connecting the seat box to the chair back
were no longer applying the pressure required to maintain a rigid connection. This entire
connection point became excessively loose and allowed the chair to rock back and forth putting
excessive lateral force on the front legs and compromising the structural integrity of the chair;

6.      The failure of the rear corner blocks based on the design alone is predictable and
this design should have been rejected by Jofran at time of initial Quality Audits. You simply
cannot drill wood screw holes this close to the edges of the blocks and in the direction of the
wood grain and not expect the blocks to crack and fail. Aside from the wood screw holes being
drilled in a manner destined for failure the bolt holes were then drilled only a fraction of an inch

away from the outside wood screws further weakening the blocks and nearly guaranteeing the cracking and failing of these blocks. These blocks are critical to maintaining a rigid connection between the seat and the chair back.

7.      While Jofran lot inspected chairs as reflected by its Quality Audit Reports, no such Quality Assurance was followed with respect to inspecting the Bradford KD chairs that were assembled for its customer T.J. Maxx. Had an effective Quality Assurance Program been implemented at the time of the incident chair was assembled and prior to it being boxed for shipment, Jofran would have discovered the cracked and failing rear corner blocks and any loose front leg hardware that clearly led to the failure of this chair to reliably support the body weight of an average sized occupant during normal usage.

8.      Similarly, had the same Quality Assurance Inventory evaluation been done by T.J. Maxx upon receiving the chair after it was removed from its corrugated container and again when it was placed on the display floor, an inspection would have determined that the rear corner blocks were cracked and broken and the hardware for the failed leg was not properly and securely tightened. This chair should have never made it to the display floor;

9.      That the use of lock nuts was a far superior and safer choice of hardware to maintain the integrity of pressure between the chair legs and seat bottom and would not have impaired the function or utility of the incident chair had lock nuts been utilized.  Lock nuts would not have backed out or loosened like the standard hardware nuts Jofran used to assemble the subject chair.  Incorporating lock nuts would have prevented the incident chair leg from separating.

10.      Excessive moisture levels in the wood used to manufacture the Bradford chairs led to shrinking of the chair parts and contributed to the cracking and failure of these parts.

The above design flaws, poor workmanship, improper assembly and lack of Quality Control Inspection Procedures caused the chair collapse and Mr. Biniek's accident.

I reserve the right to supplement this report upon receipt of further file materials.

Sincerely yours,

Jeffrey Keefer







CRACKING OF WOOD RAIL
IN AREA OF FRONT LEG "A"







WEAK LOCK WASHERS



DIPLOMATE
PHYSICAL MEDICINE AND REHABILITATION
ADDICTIVE DISEASES
PERIPHERAL NEUROPHYSIOLOGY
## ALBERT D. JANERICH, M.D.
### and Associates

667 NORTH RIVER STREET, PLAINS, PA 18705 570-824-4111 FAX 570-824-3167

January 26, 2015

Richard M. Jurewicz, Esquire       FEB 1 8 2015
Law Offices
Galfand Berger, LLP
1835 Market Street, Suite 2710
Philadelphia, PA 19103

Re: Edward Biniek

Dear Attorney Jurewicz:

This communication is in reference to a letter received from your office dated January 12, 2015, surrounding our ongoing involvement in the care and treatment of Mr. Edward Biniek, especially as it relates to serious personal injuries sustained March 11, 2013 when a chair upon which he sat at TJ Maxx, collapsed resulting in injuries to his spine.

As you may know, I have been involved in the care and treatment of Mr. Biniek since October 16, 2002 when he first presented.

At that time, he was the 37 years young, and reported being in his usual state of health, referable to his spine until October 1, 2002 when he was involved in a motor vehicle accident.

His chief complaints at that time, October 15, 2002, included neck pain predominately left sided but also involving the right which varied from sharp to dull, was constant and localized.

He was also complaining of mid lumbar pain, predominately left sided, varying from sharp to dull, near constant and localized.

His past medical history was negative as it related to any previous problems, referable to his spine, like those which developed and followed the October 1, 2002 incident.

Richard M. Jurewicz, Esquire                          January 26, 2015
Re: Edward Biniek
Page 2

His diagnostic work up included an MRI of the cervical spine conducted October 7, 2002, the results of which revealed a disc herniation at C3/4 left sided.

An MRI of the lumbar spine revealed some degenerative changes in the absence of any structural abnormalities that could better be helped with surgery.

With care and treatment which was non-operative, he reported improvement to about 50% of normal, was capable of working and remained on medication which included non-steroidal anti-inflammatories. Restrictions were applied which included no lifting, carrying, pushing or pulling loads greater than 20 pounds.

He remained about the same up until May 7, 2004 when and while working for a school district, developed severe back pain after lifting tables.

The pain was accompanied by numbness down the right lower extremity.

At that time, we had recommended an MRI of the lumbar spine which was conducted May 18, 2004, the results of which being compared to a previous study conducted in 2002.

That study revealed no disc herniations and was essentially similar to his prior study, as referenced above.

With care and treatment, which was non-operative, he improved to a point where he was about 60% of normal, was capable of working as a Custodian/Maintenance individual for the Solomon School in Wilkes Barre, in a light duty capacity.

His medications at that time, included Flexeril 10 mg 3x a day and as needed, Percocet 7.5 2x a day and as needed, and Mobic 7.5 mg bid as needed.

In summary, through January 31, 2007, the date of his last visit in our office, prior to an incident taking place March 11, 2013 (see below), Mr. Biniek remained symptomatic in the neck and low back area related to injuries sustained October 1, 2002 and again May 7, 2004 which resulted in a musculoligamentous strain to the cervicothoracic and thoracolumbar spine, with spasm and a small lateral disc herniation at C3/4, left sided, with a stable left L4/5 radiculopathy as evidence on an EMG/NCV conducted July 13, 2004.

He remained in need of medications and was reportedly working in a light duty capacity as reflected in our clinic noted dated January 30, 2007.

Richard M. Jurewicz, Esquire                           January 26, 2015
Re: Edward Biniek
Page 3

He was then seen in our clinic April 19, 2013 when he reported being in his usual state of
health until March 11, 2013 when and while shopping for a chair, fell when the front leg
broke. This occurred at TJ Maxx. More specifically, he was sitting in a wooden chair,
testing it out in anticipation of a purchase, when the leg broke. He fell on his right side
injuring his shoulder and neck area primarily.

At that time, April 19, 2013, he had indicated that his low back eventually completely
resolved since his last visit in our office in 2007.

Following the incident of March 11, 2013, he was seen at an urgent care center at GWV
where he was evaluated.

He has since been seen by Dr. William Newhart, a chiropractor, prior to our involvement
in his care and treatment on April 19, 2013.

His chief complaint, upon initial presentation, was that of left upper quarter pain, described
as dull, near constant and with periods of sharpness and with radiating pain down his right
arm and numbness and tingling involving same.

His past medical history is as referenced above though he is quick to say the pain which he
is experiencing now (April 19, 2013) was unlike the pain which he had had previously.

X-rays of his cervical spine revealed a straightening of the usual cervical lordotic curve
with narrowing at C3/4. These x-rays were conducted March 20, 2013.

A subsequent MRI of the cervical spine, done April 15, 2013, revealed deterioration from
a prior study conducted January 22, 2005. There was now straightening of the cervical
lordotic curve and increased degenerative joint and degenerative disc changes.

Varying degrees of neural foraminal encroachment were also apparent.

I then conducted a physical examination during which palpable spasm in the neck area,
more on the right than on the left side, was appreciated with myofascial tenderness over
the trapezius and levator scapulae. Range of motion about the neck was restricted in
extension and rotation to the right. Flexion and rotation to the left were better preserved.
Pain and guarding precluded an accurate assessment of the complete clinical neurologic
examination.

Since that initial visit, April 19, 2013, Mr. Biniek has been seen subsequently on April 23rd,

Richard M. Jurewicz, Esquire                                    January 26, 2015
Re: Edward Biniek
Page 4

June 21st, August 8th and October 28, 2013; January 2nd, February 11th, April 28, 2014 and most recently January 16th of this year with his next scheduled appointment being April 20th of this year.

At no time during our involvement in this gentleman's care and treatment has a full and complete recovery resulted from injuries sustained March 11, 2013.

His care and treatment through January 16th of this year included completing the diagnostic work up by conducting an EMG/NCV of the upper extremities. This was conducted April 23, 2013, the results of which were in keeping with a right C7 radiculopathy and carpal tunnel syndrome.

He was seen by Dr. William Charlton, an Orthopedic surgeon who felt that the underlying cause for his right upper quarter pain was more related to his neck than his shoulder.

Indeed, surgery was not advised to the shoulder area but further therapy directed at his neck.

He was also seen by Dr. Nguyen, a Neurosurgeon with Milton Hershey Medical Center on April 24, 2014. Dr. Nguyen felt that surgery would be ill advised and further non-operative management considered.

With care provided in the interval of time referenced above, a full and complete recovery has not resulted.

Indeed, as of his most recent evaluation, January 16th of this year, the degree of improvement noted did not exceed 40% of normal. This was despite an exhaustive course of non-operative management in the form of physical therapy, chiropractic and pain management or injection therapy.

He remained symptomatic despite medication which now included Mobic 7.5 mg bid, Flexeril 10 mg at bedtime and Ambien to assist with a more restful sleep. He was also taking a neuroleptic medication, Gralise 2 x a day and as needed to try and minimize the radiating pain he had been experiencing down the right arm.

All throughout our care and treatment, this gentleman has exhibited varying degrees of pain, muscle spasm, and a reduction in normal cervicothoracic range of motion.

Richard M. Jurewicz, Esquire                                    January 26, 2015
Re: Edward Biniek
Page 5

Because a full and complete recovery has not resulted, despite an exhaustive course of non-operative management, he was advised against using his upper extremities at or above shoulder height, the repetitive use of his upper extremities even below shoulder height, or lifting, carrying, pushing or pulling loads greater than 5 pounds with the right arm or 10 pounds with the left arm.

To the extent that his condition is chronic and permanent, so too are the above aforementioned restrictions.

In summary, Mr. Biniek remains symptomatic from injuries sustained in an incident taking place at TJ Maxx on March 11, 2013 as described above.

His specific injuries include the following:
1.     A musculoligamentous strain to the cervicothoracic spine with spasm.
2.     An aggravation of pre-existing degenerative joint and degenerative disc disease of the cervicothoracic spine with the development of a right C7 radiculopathy.

These above aforementioned traumatic injuries are manifesting themselves in Mr. Biniek as neck pain, described as a dull near constant ache with periods of sharpness and with radiating pain down his right arm and weakness related to same.

He is currently not a surgical candidate and a full and complete recovery has not resulted.

His prognosis for same is guarded, indeed doubtful and our treatment focus is geared toward minimizing his condition from getting worse. Toward that end, he was advised to honor wherever possible, the above aforementioned restrictions, take the medication as prescribed, follow up in our office at regular intervals perhaps 2 to 3x a year, involve himself in a home program of cervicothoracic conditioning to include exercises to better improve the circulation, strength, endurance and performance about the cervicothoracic spine without and at the same time, increasing the physical stress on those same areas.

If our treatment focus is successful and we can keep his condition at bay, I would not expect the medication prescribed nor the restrictions set forth, to be liberalized or discontinued.

If and on the other hand, his condition were to worsen, he may go on to require further diagnostic studies with or without further management efforts to include possibly, even surgery.

All the above opinions have been made to within a reasonable degree of medical certainty.

Richard M. Jurewicz, Esquire                                    January 26, 2015
Re: Edward Biniek
Page 6

If I can be of further assistance as it relates to matters set forth in your letter directed to me
and dated January 12th of this year, please communicate same with me at your earliest
convenience.

I remain,...

ADJ/jp

Albert D. Janerich, M.D.





# Newhart Chiropractic Center

**Dr. William F. Newhart**

December 10, 2014

Atty. Richard M. Jurewicz
1835 Market St.
Suite 2710
Philadelphia, PA      19103

## Re: Edward J. Biniek, Jr.

SSN: 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
DOB: 6/16/1965
Onset: 03/11/2013

Dear Attorney Jurewicz:

Mr. Biniek has been treating with me for injuries as a direct result of an accident at T.J.Maxx. He presented on 3/13/2013 with neck pain, head and midback pain. He was also experiencing pain radiating down his arm to his fingers. Mr. Biniek initially, rated his symptoms as a 6. This was on a 0 to 10 scale.

## MEDICAL HISTORY

Mr. Biniek has in the past had occasional low back pain and neck pain as well as asthma. These incidents were not related to his current symptoms.

Family history: Mr. Biniek's father had cancer. Mr. Biniek's mother has arthritis.

## CONSULTATION

Mr. Biniek indicated his major symptoms developed as a result of an injury on 3/11/2013 when he was at T.J. Max testing a chair to purchase, the leg broke, causing it to collapse while sitting on it. He reports that he fell to the floor and the symptoms have been constant since. He said these or similar

symptoms he has not experienced previously. The symptoms are constant and are consistent throughout the day with nonactivity. However, activity does increase the intensity of the pain and numbness. Activities that aggravate the symptoms are bending, coughing, lifting, reaching, sitting and turning head. Mr. Biniek reports he is on medication. Following the fall, he went to the ER where he was examined; x-rays were taken, and he was released. Additional to the major complaints, Mr. Biniek noted the following symptoms were at times present: head seems too heavy, numbness in fingers and stiff neck. The patient reports no bowel nor urinary symptoms. Past medical history is non contributory.

## EXAMINATION - 3/13/2013

### PHYSICAL

Review of Systems:

General: recent weight loss or weight gain - negative; Skin: rashes, hives or lesions - negative; HEENT: hay fever or post nasal discharge - negative; Cardiovascular: chest pain or palpitations - negative; Pulmonary: shortness of breath, wheezing or coughing   - negative; Gastrointestinal: nausea, vomiting, or diarrhea - negative; Genitourinary: frequency or urgency - negative; Lymphatic: lymphadenopathy   - negative; Endocrine: polyuria or polydipsia- negative and Neurological: history of seizures or headache- negative.
Social History: Tobacco usage - moderate. Alcohol usage - light. Drug usage - none. Exercise - seldom.
The patient is a 47 year old male, height: 68 in., weight: 155 lbs.

### INSPECTION

On inspection, the following was noted:
Patient was walking in stiff and guarded manner.

### RANGE OF MOTION

Cervical flexion - normal range of motion is 60 degrees, today's result: 25 degrees, with pain.
Cervical extension - normal range of motion is 45 degrees, today's result: 30 degrees, with pain.
Cervical left lateral flexion - normal range of motion is 45 degrees, today's

result: 25 degrees, with pain.
Cervical right lateral flexion - normal range of motion is 45 degrees, today's
result: 30 degrees, with pain.
Cervical left rotation - normal range of motion is 80 degrees, today's result:
40 degrees, with pain.
Cervical right rotation - normal range of motion is 80 degrees, today's
result: 50 degrees.

Lumbar flexion - normal range of motion is 60 degrees, today's result: 30
degrees, with pain.
Lumbar extension - normal range of motion is 25 degrees, today's result:
25 degrees, with discomfort.
Lumbar left lateral flexion - normal range of motion is 25 degrees, today's
result: 25 degrees, with pain.
Lumbar right lateral flexion - normal range of motion is 25 degrees, today's
result: 25 degrees, with discomfort.
Lumbar left rotation - normal range of motion is 25, today's result: 25
degrees, with discomfort.
Lumbar right rotation - normal range of motion is 25, today's result: 25
degrees, with pain.

## PALPATION

On palpation, Edema noted in the cervical region at C-5 bilaterally through
C-7 bilaterally. In the lumbar
region at L-4 bilaterally, L-5 bilaterally, Sacrum - right, Ilium - right.
On palpation, Taut/Tender Fibers noted in the cervical region at C-2 right
through C-7 right. In the lumbar
region at L-3 bilaterally through Sacrum - bilaterally.
On palpation, Tenderness noted in the cervical region at C-4 right, C-5
right, C-6 right, C-7 right. In the lumbar region at L-4 bilaterally, L-5
bilaterally, Sacrum - right, Ilium - right.

## ORTHOPEDIC EXAMINATION

Distraction Test: positive. Shoulder Depression: positive bilaterally. Soto
Hall Test: positive. Jackson Compression Test: positive right. Spurling's
Compression Test: positive right. Maximum Compression: positive right.
O'Donahue Maneuver: positive. Maimum Foramina Encroachment Test:
positive. Lasegue's Test: positive right. Valsalva's Maneuver (sitting):
positive. Minor's Sign: positive. Kemp's Test: positive. Ely's Heel to
Buttocks Test: positive right. Straight Leg Raise: positive right. O'Donahues

Maneuver: positive.

## NEUROLOGICAL EXAMINATION

Deep Tendon Reflexes: Biceps (C5/C6): left: normal; right: normal. Brachioradialis (C5/C6): left: normal; right: normal. Triceps (C7/C8): left: normal; right: normal. Patellar (L2/L4): left: normal; right: normal. Hamstrings (L4/L5): left: normal; right: normal. Achilles (S1/S2): left: normal; right: normal.

## DIAGANOSTIC TESTING
**Patient sent for x-rays on 03/13/2013.**

**Cervical Views Taken:**

A-P, A-P Open Mouth, Lateral, Right Oblique and Left Oblique.

Cervical General Impressions;

C5: PR; C6: PR; C7: PR
Osteoarthritic changes noted at posterior end plates of C3 and C4. Both spurs are extending posteriorely into the canal. Narrowed disc spacing noted at C3/C4. Mild scoliosis noted with apex at C5.

**Thoracic Views Taken:**

A-P and Lateral:
Thoracic General Impressions:

Generalized osteoporosis: mild. Listings - T1: PR; T3: PR
Mild scoliosis noted with apex at T10.

**Cervical MRI:**
**Date of study: 4/15/2013**

Cervical General Impressions:

Straightening of the Cervical Lordosis, Dessiccation of the Cervical Discs, Narrowing of Cervical Discs. Narrowing of C3-C4 Disc space. No intrinsic cord abnormalities were noted.

C2-C3 disc space had no findings.

C3-C4 disc space shows a moderate osteophyte more prominent in the left paramedical location originating from the uncinate apophysis and creating encroachment of the neural foramen on the left and more moderate on the right. This is creating mass effect on the dural sac and cord which is displaced posteriorly.

C4-C5 shows a right paramedical protrusion creating minimal indention on the neural foramen on the right. Minimal prominence of the uncinate apophysis creating mild narrowing of the neural foramen on the left. The cord is slightly flattened but there is no stenosis.

C5-C6 disc space presents with a broad-based shallow disc protrusion with marked encroachment of the neural foramen on the right. There is no central stenosis.

C6-C7 there is a shallow broad-based protrusion with bilateral encroachment of the neural foramen. There is no central stenosis.

C7-T1 disc had no findings.

## TREATMENT

During treatment, which began on 3/13/2013, Mr. Biniek was treated with: spinal manipulation, mechanical traction, PNF/ART stretching and attended ultrasound/electrical muscle stimulation combination. The goals were to decrease pain, decrease swelling/inflammation, decrease muscle spasm, increase range of motion, increase ability to perform activities of daily living, increase function, increase strength, increase flexibility, stabilize pathological joint motion and allow him to return to normal ADL's at home and work. Due to the severity of his pain and activity causing exacerbations of his symptoms, it was necessary for Mr. Biniek to be off of work. During treatment, it was also necessary to send him for consultations and treatment with other specialists. Mr. Biniek's treatment was more frequent initially, and tapered down as he was having both subjective and objective improvement. Mr. Biniek reached a point of stabilization. He was neither improving nor getting worse with non activity. However, he did, and continues to have flare-ups with activity.

## REFERRAL HISTORY

During the course of treatment it was necessary to refer Mr. Biniek for additional treatment.

In September 2013, the patient was referred to Dr. Pravin Patel, M.D. Patient was sent to Dr. Patel for evaluation and treatment as a result of his injuries that he sustained after the collapse of the chair at T.J.Maxx. Mr. Biniek's treatment has been ongoing for his pain. Mr. Biniek continued with follow up treatment with Dr. Harold Einsig, M.D. at the same Pain Management facility.

Mr. Biniek also went for a consultation with a neurosurgeon at Hershey Medical Center. The M.D. did injections and recommended that if his symptoms continued and worsened, he may be a candidate for surgery.

## CONCLUSION

Mr. Biniek initially entered the office for neck, mid back, shoulder and numbness radiating into his fingers. He reported the pain/numbness being a 6 on a 1-10 scale with activity causing an increase to his symptoms. The symptoms were interfering with both his home life and work. These symptoms were as a direct result of the injury he sustained when the chair collapsed under him at T.J.Maxx.

Prior to this injury, he had treated with me for occasional pain and stiffness on a as needed basis. He would come for treatment if he overdid anything at home. His prior problems would resolve quickly and are not contributing to this injury.

Mr. Biniek also showed degeneration on his x-rays. Again, these issues were asymptomatic prior to the injury.

It is my professional opinion that Mr. Biniek's injuries were severe that he will need ongoing treatment now and into the future. This treatment will need to be both medical and chiropractic. Mr. Biniek's injuries are of a permanent injury with damage to the ligaments, tendons, nerves, muscles and discs of his cervical spine. Due to the damage that he has sustained, this will further increase and hasten the onset of further degeneration of his cervical spine.

At the present time, Mr. Biniek's symptoms are being managed with

treatment and medication. He still is experiencing exacerbations when doing his job at work as well as working around the house.

It is my professional opinion that with treatment, his symptoms will be kept to a point that he still can function with the least amount of pain. However, if his symptoms intensify, he may have to go for a more aggressive approach to deal with his pain, i.e. surgery.


Sincerely,

William F. Newhart D.C. cert. M.D.T.





**ADVANCED PAIN
MANAGEMENT
SPECIALISTS**, P.C.

November 20, 2014


Attorney Richard M. Jurewicz
Galfand Berger LLP Law Offices
1835 Market Street
Ste. 2710
Philadelphia, PA 19103

RE: Edward Biniek
Date Of Birth: 06/16/1965
Date Of Accident: 03/11/2013

Dear Mr. Jurewicz,
Following your request for a narrative report regarding this office's evaluation and
treatment of Edward Biniek relative to his 03/11/2013 accident. I provided you with the
following report.

As you are aware, Edward Biniek is a 49-year-old gentleman who was sitting on a chair
at TJ Maxx when it collapsed on 03/11/2013 causing him to fall to the ground striking his
right upper torso. He was referred to our office through Dr. William Newhart for further
evaluation and treatment of his chronic right shoulder pain. He was initially evaluated at
Advanced Pain Management Specialists, P.C. office by Dr. Pravin Patel, M.D. on
09/04/2013. His chief complaint was chronic right shoulder pain and THE history of
present illness that we obtained at that time was that he was a 48-year-old, right-handed
male who was sitting in a chair at TJ Maxx when it collapsed and he fell onto his right
side landing on his right shoulder sustaining injury in the right shoulder, neck and lower
back. Edward reported on initial evaluation that his neck and lower back pain had
improved remarkably. However, he continued to have chronic severe pain in the right
shoulder with inability to raise the right arm normally. Edward reported that Dr. Newhart
had been doing adjustments for him and he as getting some relief with those adjustments
and massages. He also was taking Gralise 1 mg 2x/day, and Ambien 10 mg at night
given since his injury occurred to help with the pain and difficult sleeping. When he first
saw us 09/04/2013, he rated his pain as averaging 8-9 out of 10. He said after massage
and medications his pain would get relieved down to a level of 6-7 out of 10. Pain has
interfered with his sleep. He also notes pain in the posterior aspect of his shoulder and
under the shoulder blade on the right side shooting down the right shoulder into the right
upper arm. The patient stated that he had no prior history of shoulder problems. He
presented no prior history of anxiety, depression, emotional disturbance or substance
abuse.

11 Gallagher Drive
Plains, PA   18705
570-970-1030 • 570-970-0511 fax

1157 Lackawanna Trail
Clarks Summit, PA 18411
570-587-3588 • 570-587-3481 fax

Edward Biniek
December 11, 2014
Page 2

On physical exam that first visit, he was 5'8", 175 pounds. He was alert and cooperative for the exam. Neck examination at the time was reported normal by Dr. Patel. Right shoulder exam revealed no atrophy or fasciculations. No evidence of muscle spasms. However, he did have excruciating tenderness in the posterior aspect of his shoulder at the scapular notch on the right side. Active and passive ROM was painful and slightly restricted in external rotation. Hawkins impingement sign was positive. No restriction of abduction was noted. Motor functions were 5/5 in the right upper extremity. Reflexes were symmetric and +2/4 in the right upper extremity. No sensory loss was noted. Neurologic exam showed no focal deficit. Impression was chronic right shoulder pain with impingement syndrome in the right shoulder. Dr. Patel recommended a right suprascapular nerve block under fluoroscopic guidance, felt to be medically necessary and indicated. He was continued on his current medications. He was recommended to do stretching and strengthening exercises for the right shoulder. The following day, 09/05/2013, the right suprascapular nerve block was performed with fluoroscopic guidance.

He had a followup 09/26/2013. He still complained of pain in the right shoulder with spasms in the right trapezius and rhomboids. On that visit, Dr. Patel indicated that the patient stated he was still having severe pain in the right side of his neck. He stated that the suprascapular nerve block gave him 60% relief in pain in the shoulder and upper back. He noted increasing muscle spasms and stiffness on the right side of the neck involving the trapezius and rhomboid muscle groups. He was having difficulty sleeping due to that pain. On physical exam, the patient revealed excruciating tenderness over the posterior aspect of the shoulder with muscle spasms in the right trapezius and rhomboid. There is slight restriction in external rotation of the shoulder. Motor function otherwise remained 5/5 and reflexes were symmetric +2/4. Dr. Patel added that neck pain and muscle spasms in the right trapezius and rhomboid into his impressions and treatment plan, which included trigger point releases of those muscle groups. He was advised to use heat compresses and take non-steroidals over-the-counter for breakthrough pain.

He then followed up on 10/29/2013. The chief complaint was left shoulder pain with muscle spasms to the left side of the neck. The procedures were reported to have improved his pain by 70-80% at that time. They also helped to improve his function. He was now able to play golf again and could move his left shoulder with ease. He was not taking any medications, but he was getting chiropractic adjustments with Dr. Newhart on a regular basis. On physical exam at that time, there was minimal tenderness over left cervical facet joints, but no restriction of movements of the neck. The shoulder showed minimal tenderness over the left suprascapular notch. He was advised to continue doing stretching and strengthening exercises and continue with Dr. Newhart. At that point, he was to return to the office just on a p.r.n. basis if his symptoms flared-up.

He did return to our office on 02/14/2014. It is at that visit that I first saw and took over the care of Edward Biniek. His chief complaint presented to me at that time was bilateral neck and trapezius pain with some paresthesias into both arms. Interim History: He was

Edward Biniek
December 11, 2014
Page 3

continuing to see Dr. Newhart on a routine basis and he did have nerve conduction studies performed by Dr. Janerich, which the patient believed did not reveal any significant abnormalities but I did not actually have that report or study to review. I did review the MRI of the cervical spine performed 04/15/2013 and that did show C3-C4, C4-C5 and C5-C6 disc bulges with neural foraminal narrowing bilaterally as well as narrowing of the C3-C4 disc space with minimal mass effect upon the spinal cord at C3-C4 with slight flattening at C4-C5. I felt on my review of that study that that certainly could be the cause of his pain involving the neck and right shoulder and that it did correlate with the injury in the report of falling off the chair onto the right shoulder and torso area when the chair collapsed on him at TJ Maxx. He did note some aggravation of his symptoms with increased shoveling and snow blowing from the severe winter we were having late 2013/early 2014.

On my initial visit with Ed on 02/14/2014, his neurologic exam was within normal limits, but his spine exam showed tenderness over his bilateral lumbosacral facets with increased pain with extension with a positive facet load. At his cervical spine, he had notable increased paracervical tone in the upper paracervicals with facet tenderness C3-C4, C4-C5 and C5-C6 bilaterally. Cervical extension increased his discomfort and he had a positive Spurling's test for trapezius radiation bilaterally when he extended the neck. He had multiple trigger points palpable in the bilateral trapezius, levator scapula and paracervicals as well as pectorals.

My impressions after my initial evaluation of Edward were cervicalgia, cervical facet syndrome, myalgia, muscle spasms, lumbago, lumbar facet syndrome, history of right suprascapular neuropathy and treatment although I did not see suprascapular weakness. There was no specific dermatomal or myotomal loss pattern. Other diagnoses include cervical stenosis from disc displacement with cervical radiculitis. Because of his significant neck pain that radiated out towards both shoulders, but not further into the right upper extremity, with his bilateral cervical facet tenderness, I felt the best treatment would be modified bilateral cervical facet blocks. I gave additional volume technique to treat not only the facet joints but also the paracervical muscles and the nerve tissue. He wanted to try to avoid the more risky cervical epidural steroid injection. His facet blocks required authorization and since the patient was in a lot of pain, we proceeded with bilateral trigger point treatments in his paracervicals and trapezi musculature. I recommended continuation with Dr. Newhart with massage and traction trials. I thought it important to get a new set of nerve conduction tests in the upper extremities since it seemed to be progressing bilaterally and he had developing return of more neck symptoms. I recommended Flexeril at night to try to relax his muscle and also to improve his sleep/wake cycle as well as advising him to take 2-3 Aleve 2x/day.

On 02/21/2014, I began the series of treatments of bilateral cervical facet blocks at C3-C4, C4-C5 and C5-C6 with Ketorolac anti-inflammatory. I did believe that these facet blocks were indicated and medically necessary with a reasonable degree of medical certainty that the cervical facet syndrome was directly related to his 03/11/2013 fall out of

Edward Biniek
December 11, 2014
Page 4

a chair. His ongoing shoulder and paracervical pain and spasms leading to chronic increased posterior cervical facet compression from increased axial compression muscle forces in addition to any cervical neck injury such as disc protrusion that he may have experienced at the time of the fall.

On 03/20/2014 followup, Ed said his pain management was going great since he started the facet blocks. He was able to sleep a lot better. He was not using as much medication. His current pain level is intermittently up to 4 out of 10. He did note some tingling into his hands and the nerve conductions studies I requested revealed a right C7 radiculopathy (nerve root damage in his neck). On physical exam, I found him to have left and right trapezius trigger points that radiate into the arms. He showed cervical facet tenderness just at C5-C6 bilaterally now. Cervical extension mildly increased pain in his lower cervical spine. The remainder of the exam was normal. My impressions were markedly improved, but not resolved cervical facet syndrome at C3-C4 and C4-C5 with more C5-C6 bilateral facet pain. He had left greater than right trapezius trigger points and radiculitis by clinical exam and EMG. A tentative third modified cervical facet block was scheduled and the trigger point injections were done that day with Ketorolac.

On 04/03/2014 when I examined him for his cervical facets, he was found to have significant cervical facet tenderness at C4-C5, C5-C6 and C6-C7 bilaterally so those levels were treated on that date with cervical facet blocks utilizing 2 mL of Betamethasone.

On followup on 04/28/2014, his neck pain and trigger points were resolved from the cervical facet blocks and trigger point treatments. Ed still noted that he was waking up at night with some arm and hand paresthesias, more worse on his right side. Again, the EMG and nerve conduction studies did reveal C7 radicular component with this April 2013 MRI showing broad-based disc protrusions with encroachment of the neural foramen C3-C4, C5-C6 and C6-C7, and a minimal cord effect at C4-C5. He was continuing with Flexeril at night and Tramadol as needed once or twice a day. On exam, I did not see any significant abnormalities other than a positive Phalen's test on the right side. My impressions were right hand paresthesias with resolution of cervicalgia and resolution of his myofascial trigger points. Right hand symptoms at that time may be more due to carpal tunnel syndrome as the prior nerve testing did reveal carpal tunnel component. Obviously I did not feel that this carpal tunnel diagnosis was related to the 03/11/2013 fall. However, keep in mind that the C7 radiculitis/radiculopathy can produce the same symptoms as carpal tunnel syndrome. To help differentiate that, I tried a right carpal tunnel injection with a ½ mL of Celestone and because of his nighttime symptoms I started him on Gabapentin 100 mg gradually increasing dose. Edward has previously tried traction for his neck and that did not help him. I encouraged him to do cardiovascular exercise to increase his blood flow, to decrease or stop smoking and encouraged him to take Vitamins B, C, D and E. I did all this with the note that if these interventions are not successful in relieving his paresthesias, then we may need to consider a cervical epidural. I also recommended a compounded pain cream for Ed.

Edward Biniek
December 11, 2014
Page 5

On 05/23/2014 followup, his chief complaint was hand paresthesias particularly at nighttime. He still reported his neck was feeling good after the cervical facet blocks. However he did note right first carpometacarpal joint area pain at the right wrist/hand. He was using the pain cream at night and Gabapentin 100 mg 2x/day. On his review of systems, he felt like his right shoulder was drooping a little bit. He had a heaviness sensation into his trapezius region. On his physical exam, I saw myofascial taut band with a trigger point in the right trapezius and passive testing in the shoulder was normal in that when he did not have to activate his muscle his shoulder motions did not produce pain. Cervical spine exam was normal otherwise. Impressions were good resolution of the cervical facet syndrome, but with focal right trapezius trigger point noted with shoulder myalgia, mild right carpal tunnel syndrome and a right first CMC arthralgia. Of those diagnoses, just the cervical facet and right trapezius trigger point with shoulder myalgia would be most likely related to the 03/11/2013 injury. I recommended pain cream utilization for the neck, shoulders and wrist area with bilateral wrist support. I gave him a focal right trapezius injection and a right first CMC joint injection. The CMC joint injection was not felt to be related to the 03/11/2013 injury. Ed was happy with his improvements otherwise and he was going to be seen on an as needed basis after that point in time.

Unfortunately, Ed did have return of his right cervical facet symptoms mostly at C5-C6 and C6-C7 on followup visit 11/10/2014. He had tenderness over those cervical facets, worse with extension and right lateral flexion. Since he has been showing recurrent cervical facet/neck symptoms that did not have enough long term relief from anti-inflammatory treatments alone, I recommended setting up medial branch blocks for the C5, C6 and C7 medial branches to see if he is a candidate for more long term permanent relief from cervical medial branch radiofrequency treatment.

I do believe that a medial branch diagnostic test as well as any potential radiofrequency treatments for his cervical facet syndrome as well as the prior cervical facet anti-inflammatory blocks, trigger point injections, suprascapular nerve block and the EMG nerve conduction testing and on the cervical MRI he had 04/15/2013, were related to his 03/11/2013 injury.

Regarding prognosis, if the medial branch blocks show effective relief of his right cervical facet region pain, then we may have a chance of getting more permanent relief with radiofrequency ablation treatments to those medial branches that innervate his cervical facets, deep paracervical muscles and posterior neck in that region. However, the radiofrequency ablation techniques for the medial branches would not be expected to resolve his C7 radicular symptoms which are also felt to be causally related to the 03/11/2013 accident. If Ed did get more permanent cervical pain relief but still had C7 radicular symptoms on the right side, then I would proceed with a cervical epidural steroid injection. If these lines of treatments fail, then the final treatment I would recommend from an interventional standpoint relative to his 03/11/2013 injury at TJ Maxx would be a cervical spinal cord dorsal column stimulator. Of course, we would

Edward Biniek
December 11, 2014
Page 6

also refer him for a surgical consultation regarding his neck to shoulder pain.  Given the long duration of recurrent waxing and waning of symptoms regarding his neck and shoulder as well as right arm since 03/11/2013 through the present time, his prognosis would be best listed as just Fair.  There is a strong likelihood that some of his symptoms may continue indefinitely.  However, I still believe that there is a medically reasonable chance of more permanent resolution of his symptoms with the treatment algorithm outlined above.

All the opinions that I have expressed are within a reasonable degree of medical certainty, and within my expertise in the areas of physical medicine and rehabilitation, electrodiagnostic medicine and pain management.

Sincerely,

Harold J. Einsig, M.D.

HJE/nj



# ADVANCED PAIN MANAGEMENT SPECIALISTS, P.C.

DECEMBER 16, 2014

MEDIAL BRANCH BLOCKS
64490 - $300.00
64491 - $150.00
64492 - $150.00
SET OF 2

RFL
64633 - $540.00
64634 - $250.00

STIM TRIAL
63650 - $1200.00

THE COST OF THE DEVICE ITSELF WOULD HAVE TO COME FROM THE SURGEON. WE ONLY DO THE TRIAL TO SEE IF THE IMPLANT WOULD BE EFFECTIVE.

If you have any questions or require further information, please call: (570) 970-1037 ext. 202 at your earliest convenience.

Sincerely,

RUTHANN BROWN
Billing Specialist

11 Gallagher Drive
Plains, PA 18705
570-970-1030 • 570-970-0511 fax

1157 Lackawanna Trail
Clarks Summit, PA 18411
570-587-3588 • 570-587-3481 fax



Exhibit E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

EDWARD and MARLA BINIEK, h/w          :
121 Maffet Street                              :
Plains, PA.  18705                            :          No. 3:14-CV-1154
               Plaintiffs          :
      vs.                                  :

T.J. MAXX/THE T.J. MAXX COMPANIES, INC. :
770 Cochituate Road                         :          <u>JURY TRIAL DEMANDED</u>
Framingham, Massachusetts  01701   :
        And                                   :
JOFRAN, INC.                                  :
One Jofran Way                               :
Norfolk, Massachusetts  02056        :
             Defendants          :

## <u>PLAINTIFFS' LIST OF EXHIBITS</u>

| PTF | DFT | DESCRIPTION | IDENTIFIED | EVIDENCE | RULING | WITNESS ON STAND |
|-----|-----|-------------|------------|----------|--------|------------------|
| P1 | | Photograph of area of incident –Biniek 1 | | | | |
| P2 | | Photograph of platform on which the chair was situated – Biniek 2 | | | | |
| P3 (a-f) | | Six photographs taken of the chair – Biniek 3 | | | | |
| P4 | | Seven photographs of TJ Maxx Store & Displays – Fanelli 1 | | | | |
| P5 | | Diagram depicting accident area – Fanelli 2 | | | | |

| P6 | | Eleven photographs of the chair – Fanelli 3 | | | | |
|---|---|---|---|---|---|---|
| P7 | | Photograph of chair tag – Fanelli 4 | | | | |
| P8 | | TJ Maxx document, Pages 1, 2, 3 of 9 – Fanelli 5 | | | | |
| P9 | | Marmaxx eLibrary – Bowers 2 | | | | |
| P10 | | Job Analysis – Bowers 3 | | | | |
| P11 | | Small Bites Training – Bowers 4 | | | | |
| P12 | | Damage Reduction – Bowers 5 | | | | |
| P13 | | Photograph of the under seat of the chair – Hughes 1 | | | | |
| P14 | | Photograph of the under seat of the chair – Hughes 1 | | | | |
| P15 | | Jofran, Inc., Manta.com – Roy 1 | | | | |
| P16 | | Jofran, Inc., List of Manufacturers – Roy 2 | | | | |
| P17 | | Jofran, Inc., Stain Walnut | | | | |

| | | Contemporary Upholstered Shield Stool – Roy 3 | | | | |
|---|---|---|---|---|---|---|
| P18 | | Jofran Product Specification Sheet – Roy 4 | | | | |
| P19 | | Proforma Invoice dated 6/9/2011 – Roy 5 | | | | |
| P20 | | Quality Audit Report dated 9/1/2011 – Roy 6 | | | | |
| P21 | | Quality Audit Report dated 8/31/2011 – Roy 7 | | | | |
| P22 | | Jofran, Inc., Assembly Instructions & Parts ID – Roy 8 | | | | |
| P23 | | Jofran, Inc., invoice dated 2/13/2013 – Roy 9 | | | | |
| P24 | | TJ Maxx order dated 1/16/2013 – Roy 10 | | | | |
| P25 | | Bill of Lading dated 2/15/2013 – Roy 11 | | | | |
| P26 | | Bill of Lading dated 2/13/2013 – Roy 12 | | | | |
| P27 | | Bill of Lading dated 2/13/2013 | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | – Roy 13 | | | | |
| P28 | | Photograph of underside of chair – Roy 14 | | | | |
| P29 | | Photograph of stamp: Made in Vietnam on underside of chair – Roy 15 | | | | |
| P30 | | Photograph of screw in joint of underside of chair – Roy 16 | | | | |
| P31 (a to g) | | Cover note by Barbara Manko and seven black & white photographs of subject chair – Murtha 1 | | | | |
| P32 | | TJX Accident Report – Murtha 2 | | | | |
| P33 | | Chair involved in the accident | | | | |
| P34 | | Exemplar Chair | | | | |
| P35 | | Photographs of chair involved in the accident | | | | |
| P36 | | Curriculum Vitae of Jeffrey Keefer | | | | |
| P37 | | Report of Jeffrey Keefer | | | | |
| P38 | | Photographs taken by Jeffrey Keefer | | | | |

| P39 | | Affidavit of Edward J. Biniek, III | | | | |
|-----|---|---|---|---|---|---|
| P40 | | Documents referenced in report of Jeffrey Keffer | | | | |
| P41 | | Curriculum vitae of Dr. Albert D. Janerich | | | | |
| P42 | | Report of Dr. Albert D. Janerich | | | | |
| P43 | | Medical records of Dr. Albert D. Janerich | | | | |
| P44 | | Medical billing of Dr. Albert D. Janerich | | | | |
| P45 | | Deposition transcript of Dr. Albert D. Janerich | | | | |
| P46 | | DVD of videotaped deposition of Dr. Albert D. Janerich | | | | |
| P47 | | Curriculum vitae of Dr. William F. Newhart | | | | |
| P48 | | Report of Dr. William F. Newhart | | | | |
| P49 | | Medical records of Dr. William F. Newhart | | | | |

5

| P50 | | Medical billing of Dr. William F. Newhart | | | | |
|---|---|---|---|---|---|---|
| P51 | | Deposition transcript of Dr. William F. Newhart | | | | |
| P52 | | DVD of videotaped deposition of Dr. William F. Newhart | | | | |
| P53 | | Model of the Spine | | | | |
| P54 | | Medical records of Geisinger Urgent Care dated March 12, 2013 | | | | |
| P55 | | Medical billing of Geisinger Urgent Care dated March 12, 2013 | | | | |
| P56 | | MRI Scan of March 20, 2013 from Valley Open MRI | | | | |
| P57 | | Medical billing for MRI Scan of March 20, 2013 from Valley Open MRI | | | | |
| P58 | | MRI Scan report dated March 20, 2013 | | | | |
| P59 | | MRI of April 15, 2013 from Valley Open | | | | |

| | | MRI | | | | |
|---|---|---|---|---|---|---|
| P60 | | Medical billing for MRI of April 15, 2013 from Valley Open MRI | | | | |
| P61 | | MRI Scan report dated April 15, 2013 | | | | |
| P62 | | Medical records of Dr. William Charlton | | | | |
| P63 | | Medical billing of Dr. William Charlton | | | | |
| P64 | | Medical records of Advanced Pain Management Specialists | | | | |
| P65 | | Medical billing of Advanced Pain Management Specialists | | | | |
| P66 | | Medical records of Dr. Dan T. Nguyen | | | | |
| P67 | | Medical billing of Dr. Dan T. Nguyen | | | | |
| P68 | | Medical records of Geisinger Medical Center, Department of Neurosurgery | | | | |
| P69 | | Medical billing from Geisinger Medical Center, | | | | |

| | | Department of Neurosurgery | | | | |
|---|---|---|---|---|---|---|
| P70 | | X-ray scan taken at Wilkes Barre Hospital on 5/5/2014 | | | | |
| P71 | | Medical billing for X-ray scan taken at Wilkes Barre Hospital on 5/5/2014 | | | | |
| P72 | | X-ray report of scan taken at Wilkes Barre Hospital on 5/5/2014 | | | | |
| P73 | | MRI Scans taken at Geisinger Medical Center of the C Spine on 5/7/2014 | | | | |
| P74 | | MRI Scans taken at Geisinger Medical Center of the Brain on 5/7/2014 | | | | |
| P75 | | Medical billing for MRI taken at Geisinger Medical Center of the C Spine on 5/7/2014 | | | | |
| P76 | | Medical billing for MRI taken at Geisinger Medical Center of the Brain on 5/7/2014 | | | | |
| P77 | | MRI report taken at Geisinger Medical Center | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | of the C Spine on 5/7/2014 | | | | |
| P78 | | MRI report taken at Geisinger Medical Center of the Brain on 5/7/2014 | | | | |
| P79 | | Family medical records | | | | |
| P80 | | Medical billing from PM Medical Products | | | | |
| P81 | | Dr. Pravin Patel nerve block report dated 9/5/2013 | | | | |
| P82 | | Dr. Harold Einsig trigger point injections report dated 2/24/2014 | | | | |
| P83 | | Dr. Harold Einsig cervical facet block report dated 2/21/2014 | | | | |
| P84 | | Dr. Harold Einsig cervical facet block report dated 3/10/2014 | | | | |
| P85 | | Dr. Harold trigger point injections report dated 3/20/2014 | | | | |
| P86 | | Dr. Harold Einsig cervical facet block report dated | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 4/3/2014 | | | | |
| P87 | | Dr. Harold Einsig right carpal tunnel injection report dated 4/28/2014 | | | | |
| P88 | | Dr. Dan Nguyen spine epidural injection report dated 6/6/2014 | | | | |
| P89 | | Dr. Dan Nguyen spine epidural injection report dated 8/26/2014 | | | | |
| P90 | | Scan of the lumbar spine taken on 10/2/2002 at Geisinger Wyoming Valley | | | | |
| P91 | | Report of scan of the lumbar spine taken on 10/2/2002 at Geisinger Wyoming Valley | | | | |
| P92 | | MRI scan of the cervical spine taken on 1/22/2005 at Valley Open MRI | | | | |
| P93 | | Report of MRI scan of the cervical spine taken on 1/22/2005 at Valley Open MRI | | | | |
| P94 | | Wage loss analysis with pay | | | | |

| | | check and wage records attached | | | | |
|---|---|---|---|---|---|---|
| P95 | | Plaintiffs' Income Tax Returns and W2 forms | | | | |
| P96 | | Video of Chair Inspection | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**GALFAND BERGER, LLP**


BY: _____
　　　　　　　**RICHARD M. JUREWICZ**
　　　　　　　Attorney for Plaintiffs

　　　　　　　**Attorney I.D. No.: 39436**
　　　　　　　**1835 Market Street, Suite 2710**
　　　　　　　**Philadelphia, PA  19103**
　　　　　　　**215-665-6829**
Dated: _____　　**rjurewicz@galfandberger.com**

11



## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EDWARD and MARLA BINIEK, h/w   :
121 Maffet Street        :
Plains, PA. 18705        :  No. 3:14-CV-1154
      Plaintiffs    :
    vs.        :
              :
T.J. MAXX/THE T.J. MAXX COMPANIES, INC. :
770 Cochituate Road      :  <u>JURY TRIAL DEMANDED</u>
Framingham, Massachusetts  01701  :
     And       :
JOFRAN, INC.         :
One Jofran Way        :
Norfolk, Massachusetts  02056   :
      Defendants   :

## PLAINTIFFS' PROPOSED SPECIAL VERDICT QUESTIONS

<u>Question 1</u>:

Was the chair defective?

Yes _____     No _____

If you answered "Yes" or "No" to Question 1, please go to Question 2 below.

<u>Question 2</u>:

Was the chair a factual cause in causing the harm?

Yes _____     No _____

If you answered "Yes" or "No" to Question 2, please go to Question 3 below.

<u>Question 3</u>:

Were any of the defendants negligent?  Please answer for each defendant.

Defendant T.J. MAXX  Yes _____    No _____

Defendant JOFRAN, INC. Yes _____    No _____

If you answered Question 3 "Yes" as to any Defendant, please go to Question 4.

1

If you answered Question 3 "No" as to all Defendants, the Plaintiffs cannot recover in negligence. If you also answered Questions 1 and 2 "No," the Plaintiffs cannot recover and you should not answer any further questions and should return to the courtroom.

Question 4:

Was the negligence of those Defendants you have found to be negligent a factual cause of any harm to Edward Biniek?

Defendant T.J. MAXX          Yes _____          No _____

Defendant JOFRAN, INC.          Yes _____          No _____

If you answered Question 4 "Yes" as to any Defendant, please go to Question 5.

If you answered Question 4 "No" as to all Defendants, you have found to be negligent, the Plaintiffs cannot recover in negligence.

Question 5:

Was Edward Biniek negligent?

Yes _____          No _____

If you answered Question 5 "Yes," please go to Question 6.

If you answered Question 5 "No," please go to Question 7.

Question 6:

Was Edward Biniek's negligence a factual cause of any harm to him?

Yes _____          No _____

Please go to Question 7.

Question 7:

If you have found more than one party casually negligent, you must apportion the negligence among those parties.

2

Taking the combined negligence that was a factual cause of any harm to Edward Biniek as 100 percent, what percentage of that casual negligence was attributable to each of the Defendants you have found to be causally negligent and what percentage was attributable to Edward Biniek?

Percentage of causal negligence attributable to Defendant T.J. MAXX (Answer only if you have answered "Yes" to Questions 3 and 4 for Defendant T.J. MAXX.)

_____ %

Percentage of causal negligence attributable to Defendant JOFRAN, INC. (Answer only if you have answered "Yes" to Questions 3 and 4 for Defendant JOFRAN, INC..)

_____ %

Percentage of causal negligence attributable to Edward Biniek (Answer only if you have answered "Yes" to Questions 5 and 6 for Edward Biniek.)

_____ %

Total 100%

If you have found Edward Biniek's causal negligence to be greater than 50 percent, then the plaintiffs cannot recover in negligence. In that event, only proceed to Question 8 if you answered "Yes" to Questions 1 and 2.

Question 8:

State the amount of damages, if any, sustained by the Plaintiff Edward Biniek as a result of the incident. Do not reduce the amount of damages by the percentage of causal negligence, if any, that you have attributed to Edward Biniek.    $ _____

State the amount of damages, if any, sustained by the Plaintiff –Wife, Marla Biniek as a result of the incident.    $ _____

3

_____

FOREPERSON

4



**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDWARD and MARLA BINIEK, h/w | : | |
| 121 Maffet Street | : | |
| Plains, PA. 18705 | : | No. 3:14-CV-1154 |
| Plaintiffs | : | |
| vs. | : | |
| | : | |
| T.J. MAXX/THE T.J. MAXX COMPANIES, INC. | : | |
| 770 Cochituate Road | : | JURY TRIAL DEMANDED |
| Framingham, Massachusetts 01701 | : | |
| And | : | |
| JOFRAN, INC. | : | |
| One Jofran Way | : | |
| Norfolk, Massachusetts 02056 | : | |
| Defendants | : | |

**CERTIFICATION PURSUANT TO LOCAL RULE 30.10**

It is hereby stipulated that Attorney for Plaintiffs has conferred with Counsel for Defendants in an effort to eliminate irrelevancies, side comments, resolved objections, and other matters not necessary for consideration by the trier of fact.

**GALFAND BERGER, LLP**

BY: _____
    **RICHARD M. JUREWICZ**
    Attorney for Plaintiffs

**Attorney I.D. No.: 39436
1835 Market Street, Suite 2710
Philadelphia, PA 19103
215-665-6829
rjurewicz@galfandberger.com**

Dated: 8/15/15