**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EDWARD and<br>MARLA BINIEK, h/w,<br><br>                             Plaintiff(s)<br><br>v.<br><br>MARMAXX OPERATING CORP. and<br>JOFRAN SALES, INC.<br>                             Defendant(s) | Civil Action No. 3:14-1154 |

## PRETRIAL MEMORANDUM OF DEFENDANT, MARMAXX OPERATING CORP.

Defendant, Marmaxx Operating Corp. (hereinafter referred to as "Marmaxx"), by and through its undersigned counsel, BONNER KIERNAN TREBACH & CROCIATA LLP, herein submits this Pretrial Memorandum in advance of the Pretrial Conference scheduled on August 26, 2015 at 1:30P.M.:

**A.**    **Brief Statement as to Federal Court Jurisdiction**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as plaintiffs are diverse from all defendants.

**B.**    **Summary of Facts and Contentions as to Liability**

Marmaxx denies liability.  Marmaxx contends that this incident occurred either: (1) because plaintiff failed to exercise due care when sitting on the Bradford Side Chair and/or (2) the Bradford Side Chair was not properly manufactured and/or assembled by Jofran Sales, Inc. (hereinafter "Jofran").  In the latter case, Marmaxx is entitled to defense, indemnification and additional insured status pursuant to the terms and conditions of the Purchase Order with Jofran.

**C.**    **Statement of Agreed Upon Undisputed Facts**

1.    On March 11, 2013 Plaintiffs Edward Biniek and his wife Marla Biniek along with their son Edward J. Biniek, III went to the T.J. Maxx store located in the Arena Hub Plaza in Wilkes-Barre.

2.     While in the T.J. Maxx store on March 11, 2013 Plaintiff Edward Biniek, his wife and son decided to look at floor displayed dining chairs.

3.     On March 11, 2013 Plaintiff Edward Biniek was 5'8" and weighed approximately 175 lbs.

4.     Defendant Marmaxx Operating Corporation d/b/a T.J. Maxx ("Marmaxx") is a retail department store chain which product line inventory includes clothing apparel and home furnishings including chairs, stools and tables.

5.     Defendant Jofran Sales, Inc. ("Jofran") is a domestic importer of home furnishings including casual dining sets, consoles, accent chairs and tables.

6.     The dining room/kitchen chair involved in the incident giving rise to the lawsuit filed by Plaintiffs is a 2-tone antique white chair identified as a Bradford Side Chair – KD.

7.     The initials KD stand for "Knock Down."

8.     The Bradford Side Chair generally comes only partially assembled and can either be assembled by the importer/distributor Defendant Jofran or the end user/the retail consumer.

9.     Defendant Marmaxx was a customer of Defendant Jofran and in the past had purchased "lots" (bulk amounts) of Bradford chairs from Defendant Jofran.

10.     The subject Bradford Side Chair involved in Plaintiff Edward Biniek's accident was assembled by Defendant Jofran and shipped in a corrugated box to one of Defendant Marmaxx's Distribution Centers.

11.     The subject Bradford Side Chair in its corrugated box along with other Marmaxx merchandise would be reshipped via commercial tractor/trailer from one of Defendant Marmaxx's Distribution Centers to a Regional Distribution Center in Pittston, Pennsylvania.

12.     Bradford Side Chairs then would be delivered via commercial tractor/trailer to Marmaxx store locations such as the Arena Hub store in Wilkes-Barre.

13.     Defendant Marmaxx employees would remove the Bradford Side Chairs from their corrugated boxes and write code numbers on the underside of the seat and observe any aesthetic defects.

14.     The Bradford Side Chairs would be stocked on the display floor by Defendant Marmaxx employees.

15.     The components of the Bradford Side Chair consist of a chair back, box seat and two front legs.

16.     Per the Assembly Instructions and Parts Identification Sheet, each front leg is connected by two screws sized 0M6X75MM in length along with a flat washer, lock washer and a nut.

17.     On February 15, 2013 a Bill of Lading confirming the shipment of 400 Bradford Side Chairs was shipped by Defendant Jofran to Defendant Marmaxx destined for its Distribution Center in Evansville, Indiana.

18.     On March 11, 2013, upon Plaintiff-Husband sitting on the Bradford Side Chair that was on display inside the T.J. Maxx store, the right front leg broke.

19.     Following the incident involving Plaintiff Edward Biniek, the chair involved in Plaintiff-Husband's accident along with a similar Bradford Side Chair was secured by Defendant Marmaxx employees.

20.     Plaintiff Edward Biniek has incurred $20,316.77 in medical expenses for medical treatment he claims was necessary to treat him for the injuries he suffered in the accident. Defendants do not contest the amount of medical charges just whether they are in fact related to

the injuries Plaintiff-Husband claims to have suffered in the accident, which gives rise to this

lawsuit.

There was no agreement among the parties as to undisputed facts 10, 13, 14, 20 and 23 as

numbered and set forth in plaintiffs' Pretrial Memorandum.

**D.      Brief Description of Damages**

Marmaxx denies that plaintiff, Edward Biniek, sustained any traumatic injuries as a result

of this incident, other than minor soft tissue injuries to his right shoulder and cervical spine,

which have since resolved.

**E.      Names and Addresses of Witnesses**

1.      Edward Biniek
        121 Maffet Street
        Plains, PA

2.      Marla Biniek
        121 Maffet Street
        Plains, PA

3.      Jarred Fanelli
        T.J. Maxx - Store #T0016
        461 Arena Hub Plaza
        Wilkes-Barre, PA

4.      Rebecca Bowers
        225 East Swedesford Road
        Wayne, PA

5.      Marylou Murtha
        651 Tioga Avenue
        Kingston, PA

6.      Tara Hughes
        394 E. Washington Street
        Manticoke, PA

7.      Daryle Agrella
        21 Ambrose Street
        Pittston, PA

8.      Emalee Klinefelter
        T.J. Maxx - Store #T0016
        461 Arena Hub Plaza
        Wilkes-Barre, PA

9.      Jeffrey Roy, President of Jofran
        1 Jofran Way
        Norfolk, MA

10.     Bob Roy, former President of Jofran
        1 Jofran Way
        Norfolk, MA

11.     Dr. Christopher P. Henderson, M.D.
        Scranton Orthopedic Specialists
        334 Main Street
        Dickson City, PA
        A copy of his curriculum vitae is attached hereto as Exhibit "A."

12.     Dr. Albert Janerich
        667 North River Street
        Plains, PA

13.     Dr. William F. Newhart, D.C.
        Newhart Chiropractic Center
        225 S. River Street
        Plains, PA

14.     Dr. Frank C. Olshemski
        836 N Washington Street
        Wilkes-Barre PA 18705-1823

15.     Dr. Harold J. Einsig
        3933 Perkiomen Avenue
        Reading, PA

16.     Any of Plaintiff's Treating Physicians as identified through the medical records.

Marmaxx reserves the right to call as a trial witness any and all witnesses identified by

plaintiffs and co-defendant, Jofran, in their Pre-trial Memoranda, and supplement the attached

witness list, if necessary, upon a showing of good cause for the supplementation.

**F.**     **Summary of Testimony of Each Expert**

Marmaxx intends to call Dr. Christopher P. Henderson as an expert witness in this case. It is anticipated that Dr. Henderson will testify in accordance with his expert reports attached hereto as Exhibit "B".  Dr. Henderson will testify that plaintiff, Edward Biniek, did not sustain any traumatic injury to his right shoulder or cervical spine.  Rather, at most, he sustained minor soft tissue contusions to his right shoulder and cervical spine, which have long since resolved.

**G.**     **Special Comments About Pleadings and Discovery**

None.

**H.**     **Summary of Legal Issues Involved and Legal Authorities Relied Upon**

Whether Jofran manufactured and supplied a defective Bradford Side Chair?  *See* Restatement (Second) of Torts § 402A

Whether Marmaxx is considered a "seller" under and therefore subject to Restatement (Second) of Torts § 402A?

Whether Marmaxx had a duty or the expertise to discover structural defects in the Bradford Side Chair?

Whether Plaintiff's Claims Are Barred by His Own Comparative Negligence?  *See* 42 Pa. C.S. § 7102

**I.**     **Stipulations Desired**

Authenticity of records produced during discovery by the parties.

**J.**     **Estimated Number of Trial Days**

Marmaxx anticipates that this case will take five (5) days of trial.

**K.**     **Any Other Matter Pertinent to the Case to be Tried.**

A Declaratory Judgment action may be filed against Jofran Sales, Inc. and its carrier, Liberty Mutual Insurance, for failing to defend and failing to agree to indemnify Marmaxx.

A Motion in Limine will be filed to preclude Jeffrey Keefer from offering his "expert" opinion that Marmaxx was negligent for failing to perform a "Quality Assurance Inventory Evaluation" to determine the structural integrity of the subject chair.

A Motion in Limine to preclude argument by Jofran Sales, Inc. that there was post-incident destructive testing of the subject chair that caused additional damage/splitting of the blocks.

A Motion in Limine to preclude Duane R. Ferguson, P.E. from testifying that plaintiff sat upon the chair while on the platform and the right front leg broke off when the chair and the plaintiff fell off of the platform.

**L.    Prenumbered Schedule of Exhibits**

Please refer to the list of potential exhibits attached hereto as Exhibit "C".  Marmaxx may introduce as exhibits any or all of the documents or other demonstrative evidence identified therein at the time of trial.  Further, Marmaxx reserves the right to introduce into evidence any and all documents or other demonstrative evidence identified by any party to this matter as an exhibit in any Pre-trial Memoranda, and to supplement the attached exhibit list, if necessary, upon a showing of good cause for the supplementation.

**M.    Special Verdict Questions**

None at this time.

**N.    Certification of Notification of Requirements of Local Rule 16.2**

The undersigned counsel has conferred with his client and insurance carrier and notified the same of the settlement requirements of Local Rule 16.2.

**O.**     **Certificate of Compliance with Local Rule 30.10**

It is hereby stipulated that the undersigned counsel for Marmaxx has conferred with

counsel for plaintiffs and defendant, Jofran Sales, Inc. in an effort to eliminate irrelevancies, side

comments resolved objections and other matters not necessary for consideration by the trier of

fact.

Respectfully submitted,

BONNER KIERNAN TREBACH & CROCIATA, LLP

By:     _____

JAMES F. LYNN, ESQUIRE
Attorney ID No. 53838
KEVIN E. MONASTRA, ESQUIRE
Attorney ID No. 91648
Ten Penn Center, Suite 770
1801 Market Street
Philadelphia, PA 19103
Tel.: (215) 569-4433
Fax: (215) 569-4434
Attorneys for Defendant,
Marmaxx Operating Corp.

## CERTIFICATE OF SERVICE

I, James F. Lynn, Esquire, hereby certify that a copy of the Pretrial Memorandum of

Defendant, Marmaxx Operating Corp., has been filed electronically with the Court and is

available for viewing and downloading from the ECF System by the following:

Richard M. Jurewicz, Esq.
GALFAND BERGER, LLP
1835 Market Street, Suite 2710
Philadelphia, PA 19103
COUNSEL FOR PLAINTIFFS

Daniel D. Stofko, Esquire
CIPRIANI & WERNER, P.C.
409 Lackawanna Avenue
Suite 402
COUNSEL FOR JOFRAN SALES, INC.

BONNER KIERNAN TREBACH & CROCIATA, LLP

By: _____

JAMES F. LYNN, ESQUIRE
Attorney ID No. 53838
KEVIN E. MONASTRA, ESQUIRE
Attorney ID No. 91648
Ten Penn Center, Suite 770
1801 Market Street
Philadelphia, PA 19103
Tel.: (215) 569-4433
Fax: (215) 569-4434
Attorneys for Defendant,
Marmaxx Operating Corp.

EXHIBIT "A"

# CHRISTOPHER PATRICK HENDERSON, M.D.
## SCRANTON ORTHOPAEDIC SPECIALISTS
### 334 MAIN STREET
### DICKSON CITY, PA 18519
### (570) 307-1767

## CURRICULUM VITAE

CURRENT POSITION:

Orthopaedic Surgeon/Spine Surgeon
Scranton Orthopaedic Specialists
334 Main Street
Dickson City, Pa 18519

FELLOWSHIP:

Leatherman Spine Center
Spinal Surgery Fellowship
Louisville, Kentucky
August 2009 – August 2010

CERTIFICATION:

Certified – American Board of Orthopaedic Surgery
August 2012

RESIDENCY:

Union Memorial Hospital
Orthopaedic Surgery Residency
Baltimore, Maryland
July 2003 – June 2009

MEDICAL SCHOOL:

Jefferson Medical College
Doctor of Medicine
Philadelphia, PA
August 1999 – June 2003
Completed USMLE I-III

UNDERGRADUATE:

The George Washington University
Bachelor of Arts
Washington, District of Columbia
August 1994 – June 1998
Major: Political Science
*Cum Laude* Honors

PUBLICATIONS:

**Henderson C.P.**, Asdourian P.L. *Facet Joint Replacement for the Treatment of Degenerative Disorders of the Spine.* In Arthritis and Arthroplasty: The Spine. Co-ed. Shen FH and Shaffrey CI.2009.

CHRISTOPHER PATRICK HENDERSON, M.D.
CURRICULUM VITAE – CONTINUED

**Henderson C.P.**, Brislin B.T., Albert T.J. *Combined Anterior/Posterior Fusion for the Previously Operated Back.* Seminars in Spine Surgery. Vol. 13, No. 3 (September), 2001: pp 239-248.

**Henderson C.P.** Parks BG, Guyton GP. *Lateral Plantar Foot Pressures with Split versus Whole Anterior Tibialis Tendon Transfers.* Foot and Ankle International, 29(10) (October) 2008: 1038-41.

**Henderson C.P.** Parks BG, Guyton GP. *Lateral Plantar Foot Pressures with Split versus Whole Anterior Tibialis Tendon Transfers.* Presented at the AOFAS Summer Meeting, July 2006, San Diego, California

MEETINGS:

AAOS Meeting – 2015
North American Spine Society Annual Meeting – 2007, 2010, 2013
Scoliosis Research Society National Meeting, 2012
Johns Hopkins Hands-on Spine Surgery Review Course – 2007

MEMBERSHIPS:

North American Spine Society
Fellow - American Academy of Orthopaedic Surgeons
Jefferson Alumni Association
Jefferson Orthopaedic Society (President 2002-2003)
Phi Chi National Medical Fraternity

APPOINTMENTS:

Clinical Associate Professor, Department of Surgery, Commonwealth Medical College 2012 to present

EXHIBIT "B"

SCRANTON ORTHOPAEDIC SPECIALISTS P.C.
CHRISTOPHER P. HENDERSON, M.D.
334 MAIN STREET, SUITE 1
DICKSON CITY, PA 18519
(570)307-1767

July 14, 2015

Attorney Daniel Stofko
Cipriani and Werner
Suite 402
Oppenheim Building
409 Lackawanna Ave.
Scranton, PA 18503

Supplemental report to the Independent Medical Examination
RE:  Edward Biniek - DOB: 06/16/1965

Dear Attorney Stofko:

Attached please find a supplemental report on Mr. Edward Biniek. My initial Independent Medical
Examination with Mr. Biniek was June 15, 2015. The additional report enclosed today is based on
additional medical records from Dr. Daniel Nguyen at Penn State Hershey Medical Center. I also
reviewed the MRI of the cervical spine from April 15, 2013 and a cervical spine MRI from January
22, 2005.

The records from Penn State Hershey Medical Center revealed that Mr. Biniek originally saw Dr.
Nguyen on April 24, 2014. Based on the patient filled out intake form his reason for that visit was
numbness in his arms, hands and fingers. Based on the anatomical chart, again filled out by Mr.
Biniek, he noted occasional pain in the neck with what looks to be numbness and tingling in the
hands and arms. I do not see anything that looks like pain in the right shoulder. At that visit, Dr.
Nguyen discussed getting an MRI of the brain, as well as a trial of physical therapy. He did note at
that time that the cervical MRI that he reviewed from April 15, 2013, did not show any significant
spinal cord or nerve impingement that was concordant with his findings. He then saw Mr Biniek
back on May 29, 2014, and noted that the patient had no improvement with physical therapy. Dr
Nguyen did review the brain and cervical MRIs from May 7, 2014, and he noted no intracranial
parenchymal lesion and he noted no new findings on the cervical MRI with severe levels of
foraminal stenosis which are unchanged from the prior examination. At that visit, the plan was for
a cervical epidural injection which he received on June 6, 2014. He then followed up on August 7,
2014 with resolution of the bilateral upper extremity numbness. He was sleeping at night without
the previous symptoms. He did note residual right shoulder pain described as a 5/10 and overall the
patient was happy with the results. At that visit, the plan stated that given the residual right
shoulder pain with his history of right C5-6 foraminal stenosis due to uncovertebral joint
hypertrophy. They offered a second epidural injection and the patient agreed. I would note that
uncovertebral joint hypertrophy is a degenerative arthritic change of the cervical spine. He
underwent the second epidural injection on August 26, 2014, and returned for follow up again on
October 16, 2014 with only complaints of residual pain along the right shoulder and in the right
thenar region of the hand. He noted his pain as a 4/10 at that point that was manageable with
conservative treatment. The plan at that point was continue with chiropractor and medication as
the symptoms were "very manageable conservatively." Mr. Biniek then saw Dr. Nguyen back on
January 18, 2015, with increased pain over the last several weeks and the plan was for another
cervical epidural injection.

Continued . . .
Re: Edward Biniek
Date; 07/14/15
Page 2


I also reviewed the images of the cervical MRI dated January 22, 2005. This shows what I would characterize as mild degenerative changes, especially at C3-4 with a left-sided disc osteophyte complex. There was no significant canal or foraminal narrowing. I also reviewed the MRI from April 16, 2013. Compared to the 2005 MRI, I did note some progression of the degenerative changes. No change in the C3-4 level disc osteophyte complex. There were minimal disc protrusions at C4-5, C5-6 and C6-7. There did look to be what I would consider mild foraminal narrowing on the right at C5-6 from disc osteophyte complex, again a degenerative change. No significant canal stenosis.

After reviewing these medical records and MRIs, my impression of the injury sustained by Mr. Biniek in March of 2013 is are unchanged. I believe he sustained a right shoulder contusion, as well as a cervical contusion/strain. The continued symptoms he was having is related to the preexisting degenerative changes in his cervical spine, as well as symptoms possibly related to carpal tunnel syndrome. Although there were some mild changes noted in the MRI from 2013 compared to 2005. I see no evidence of an acute injury; rather I think these findings are expected progression of degenerative changes of the cervical spine. These are findings that I classify as "normal wear and tear" when I am discussing similar situations with my patients. These opinions are all based on a reasonable degree of medical certainty. Please do not hesitate to contact me with any questions or concerns.


Sincerely,

Electronically signed by Henderson, Christopher P. MD on 07/21/2015 at 2:55 pm

CHRISTOPHER P. HENDERSON, M.D.
CPH/lr

**SCRANTON ORTHOPAEDIC SPECIALISTS P.C.**
**CHRISTOPHER P. HENDERSON, M.D.**
**334 MAIN STREET, SUITE 1**
**DICKSON CITY, PA 18519**
**(570)307-1767**

July 14, 2015

Attorney Daniel Stofko
Cipriani and Werner
Suite 402
Oppenheim Building
409 Lackawanna Ave.
Scranton, PA 18503

Supplemental report to the Independent Medical Examination
RE: Edward Biniek - DOB: 06/16/1965

Dear Attorney Stofko:

Attached please find a supplemental report on Mr. Edward Biniek. My initial Independent Medical Examination with Mr. Biniek was June 5, 2015. The additional report enclosed today is based on additional medical records from Dr. Daniel Nguyen at Penn State Hershey Medical Center. I also reviewed the MRI of the cervical spine from April 15, 2013 and a cervical spine MRI from January 22, 2005.

The records from Penn State Hershey Medical Center revealed that Mr. Biniek originally saw Dr. Nguyen on April 24, 2014. Based on the patient filled out intake form his reason for that visit was numbness in his arms, hands and fingers. Based on the anatomical chart, again filled out by Mr. Biniek, he noted occasional pain in the neck with what looks to be numbness and tingling in the hands and arms. I do not see anything that looks like pain in the right shoulder. At that visit, Dr. Nguyen discussed getting an MRI of the brain, as well as a trial of physical therapy. He did note at that time that the cervical MRI that he reviewed from April 15, 2013, did not show any significant spinal cord or nerve impingement that was concordant with his findings. He then saw Mr. Biniek back on May 29, 2014, and noted that the patient had no improvement with physical therapy. Dr Nguyen did review the brain and cervical MRIs from May 7, 2014, and he noted no intracranial parenchymal lesion and he noted no new findings on the cervical MRI with several levels of foraminal stenosis which are unchanged from the prior examination. At that visit, the plan was for a cervical epidural injection which he received on June 6, 2014. He then followed up on August 7, 2014 with resolution of the bilateral upper extremity numbness. He was sleeping at night without the previous symptoms. He did note residual right shoulder pain described as a 5/10 and overall the patient was happy with the results. At that visit, the plan stated that given the residual right shoulder pain with his history of right C5-6 foraminal stenosis due to uncovertebral joint hypertrophy. They offered a second epidural injection and the patient agreed. I would note that uncovertebral joint hypertrophy is a degenerative arthritic change of the cervical spine. He underwent the second epidural injection on August 26, 2014, and returned for follow up again on October 16, 2014 with only complaints of residual pain along the right shoulder and in the right thenar region of the hand. He noted his pain as a 4/10 at that point that was manageable with conservative treatment. The plan at that point was continue with chiropractor and medication as the symptoms were "very manageable conservatively." Mr. Biniek then saw Dr. Nguyen back on January 18, 2015, with increased pain over the last several weeks and the plan was for another cervical epidural injection.
Continued . . .
Re: Edward Biniek
Date; 07/14/15
Page 2

I also reviewed the images of the cervical MRI dated January 22, 2005. This shows what I would characterize as mild degenerative changes, especially at C3-4 with a left-sided disc osteophyte complex. There was no significant canal or foraminal narrowing. I also reviewed the MRI from April 16, 2013. Compared to the 2005 MRI, I did note some progression of the degenerative changes. No change in the C3-4 level disc osteophyte complex. There were minimal disc protrusions at C4-5, C5-6 and C6-7. There did look to be what I would consider mild foraminal narrowing on the right at C5-6 from disc osteophyte complex, again a degenerative change. No significant canal stenosis.

After reviewing these medical records and MRIs, my impression of the injury sustained by Mr. Biniek in March of 2013 is are unchanged. I believe he sustained a right shoulder contusion, as well as a cervical contusion/strain. The continued symptoms he was having is related to the preexisting degenerative changes in his cervical spine, as well as symptoms possibly related to carpal tunnel syndrome. Although there were some mild changes noted in the MRI from 2013 compared to 2005. I see no evidence of an acute injury; rather I think these findings are expected progression of degenerative changes of the cervical spine. These are findings that I classify as "normal wear and tear" when I am discussing similar situations with my patients. These opinions are all based on a reasonable degree of medical certainty. Please do not hesitate to contact me with any questions or concerns.

Sincerely,

Electronically signed by Henderson, Christopher P. MD on 07/22/2015 at 4:06 pm

CHRISTOPHER P. HENDERSON, M.D.
CPH/lr

**SCRANTON ORTHOPAEDIC SPECIALISTS P.C.**
**CHRISTOPHER P. HENDERSON, M.D.**
**334 MAIN STREET**
**DICKSON CITY, PA 18519**
**(570)307-1767**

**June 5, 2015**

**IN RE: Edward Biniek**            **- Independent Medical Examination**
**DOB:   06/16/1965**

This is an independent medical examination of Mr. Edward Biniek, DOB: 06/16/1965. The examination is taking place at my office at Scranton Orthopaedic Specialists P.C. in Dickson City, Pennsylvania. Mr. Biniek was present today with a nurse. It was explained to him upon entering the room the nature of this Independent Medical Examination, in that in no way constituted the initiation of a doctor/patient relationship. He expressed understanding of this.

Mr. Biniek is a 49-year-old gentleman who reports an injury sustained from an accident on March 11, 2013. He reports that evening that he was shopping for furniture at T.J. Max. At the end of the visit to the store he sat on a chair in the store to test it before purchasing it. Evidently, the right front leg of the chair broke and the patient fell to his right side. He reports that he landed on his right upper arm, shoulder and struck the right side of his head. He states that he did not lose consciousness. He denied any lacerations or abrasions and states that there was no bruising. He more than anything reports that he was embarrassed because this happened right in front of his son. He went home with complaints of a headache that evening. He also reported that he began having numbness and tingling in his right arm from the shoulder into the arm and hand, and occasionally similar symptoms in the left upper extremity. He states that these started essentially immediately after the fall. Given his continued symptoms, he was evaluated at an urgent care center the next day and he reports that he might have a slight concussion. From there he went to see Dr. Newhart who is his chiropractor that he has seen in the past and was getting some temporary relief with traction and other modalities. Given the persistent symptoms though, he was referred to Dr. Patel at Advanced Pain Management from the chiropractor. With Dr. Patel and his partner, he has had several various injections. Mr. Biniek that initially he did get temporary relief with trigger point injections. He was subsequently referred by his mother to a physiatrist at Penn State Hershey and has had epidural injections there. He states that these really give him the best relief for a few months or so at a time. The other injections he received including facet blocks did not really give him any significant relief.

Currently he complains of continued neck pain and pain into the right shoulder. He notes paresthesias with numbness and tingling into the right hand, and he really points to all the fingers. He occasionally has similar symptoms in the left arm. He reports a lot of trouble sleeping at night. He does continue working as a maintenance supervisor for the school district. He does take Flexeril mainly at night to help him sleep. He takes Tramadol maybe a few times a month for more severe pain. He has tried other pain medication in the past, but he stopped these because they were ineffective. He denies any objective numbness or weakness today in his upper or lower extremities. He denies any radicular pain in his legs.

Continued . . .
Re: Edward Biniek
Date: 06/05/15
Page 2

No bowel or bladder dysfunction.

A history was obtained today from a history intake form that the patient filled out prior to the visit.

Past Medical History: As filled out by the patient shows a deviated septum when he was approximately 25 years old.

Past Surgical History: None other than injections for the "pinched nerve" and injections for back pain.

Medications: Flexeril, Ambien, Gralise although he reports that he is no longer taking this, Tramadol.

Allergies: Penicillin.

Family History: His parents are both alive and in good health. His sister is alive and in good health. He does report a blood disorder in his sister's history, and his mother does have arthritis.

Social History: He is employed as a maintenance supervisor for Wilkes Barre School District. He is married. He has two children. He reports that he exercises weekly which consists of walking. He denies any substance abuse. He currently smokes one pack per day for 15 years. He drinks alcohol one to two times a month.

Review of systems: The only pertinent positives are numbness and tingling in the right shoulder, elbow, hand and the left arm, and joint aches/pain in the right shoulder and elbow.

As recorded today at this visit, height 68 inches, weight 176 pounds, blood pressure 129/75, temperature 97.6 degrees Farenheit. The patient is a well-nourished, well-appearing, pleasant, middle-aged gentleman in no apparent distress. Upon entering the room, he is seated in a chair and is able to stand without any difficulty. He is alert and oriented times three and cooperative with the exam. His breathing is nonlabored. He walks with a nonanltagic gait. On exam of he cervical spine there is no swelling, ecchymosis or erythema. No visible or palpable muscle spasms. He has full range of motion of the cervical spine in flexion, extension, lateral rotation and lateral bending with minimal discomfort. He does have mild tenderness in the right trapezius, but no obvious spasms here. On exam of his shoulders he has essentially full active range of motion in forward flexion and abduction. There are negative impingement signs in the right shoulder and non rotator cuff weakness. No evidence of instability. He has no pain with range of motion at the elbows or wrists bilaterally.

On neurological exam sensation is intact to light touch in all dermatomes in the upper and lower extremities. He has 5/5 strength in all muscle groups in the upper and lower extremities.

Continued . . .
Re: Edward Biniek
Date: 06/05/15
Page 3

He has symmetric 2+ reflexes at the triceps, biceps and brachial radialis. Negative Hoffman's signs bilaterally. He does have a mildly positive Tinel's at the right carpal tunnel. No Tinel's at the cubital tunnel and negative Tinel's in the left arm.

Medical records reviewed: I had the opportunity to personally review the following medical records.

1. Notes from Dr. Albert Janerich.
2. Medical records from Advanced Pain Management.
3. Medical records from Wyoming Valley Health Care System.
4. Medical records from Dr. William Newhart/Newhart Chiropractic Center.
5. Medical records from Dr. Frank Olshemski.
6. Medical records from Penn State Hershey Medical Center.
7. Medical records from Geisinger Wyoming Valley Medical Center.
8. The deposition transcript from Edward Biniek, dated February 4, 2015.
9. The incident report.

I also had the opportunity to review radiology reports from numerous diagnostic studies including MRIs of the cervical spine. These include AP and lateral x-rays of the cervical spine from Valley Open MRI and Diagnostic Center, dated March 20, 2013, AP and lateral x-rays of the thoracic spine from the same center dated March 20, 2013. Reports of cervical MRIs from the same center dated January 22, 2005, and April 16, 2013. There is also a cervical MRI report from Geisinger Wyoming Valley dated May 7, 2014.

Imaging studies I had the opportunity to personally review the following imaging studies: MRI of the cervical spine dated April 16, 2013 and MRI of the cervical spine dated May 7, 2014. On review of both of these MRIs, there is no evidence of acute fracture or acute injury. There are what I would characterize as mild degenerative changes at multiple levels. There is no evidence of disc herniation and no significant canal stenosis. There is mild foraminal narrowing on the right at C5-6. I would classify all of these as age appropriate degenerative changes.

DIAGNOSIS:
1. Right shoulder contusion.
2. Cervical contusion/strain.

DISCUSSION: Based on the discussion I had with Mr. Biniek on June 5th in my office, as well as the records I had the opportunity to review, my impression was the above stated diagnosis from this injury. It does not sound like it was a significant trauma, certainly not something that I would expect to cause long term issues. I think the contusion and strain diagnosis, which is essentially a soft tissue injury, has resolved. He does have continued complaints, but I think these are mainly from preexisting longstanding issues that he has had.

Continued . . .
Re: Edward Biniek
Date: 06/05/15
Page 4


He has had of his cervical spine that date back to 2002 from what I can tell with no significant change. There has also been several instances in the medical records where he has had complaints of neck pain, right shoulder pain, and symptoms consistent with carpal tunnel syndrome. While he is still complaining of these similar types of symptoms, I do not think that they are causally related to this injury in March of 2013. During our visit he expressed to me that he was having a lot of trouble sleeping from his symptoms, however, again on the review of the medical records, specifically with Dr. Olshemski, his family doctor, he has been dealing with insomnia really for years prior to this injury and he has tried multiple medications for this. I think he may have continued waxing and waning of his symptoms, again from the preexisting degenerative changes. On reviewing the medical records from Dr. Janerich, his neck pain complaints have been ongoing. A note from January 30, 2007, noted that his neck pain was about 60 percent of normal. A note from Dr. Janerich on October 28, 2013, noted that his neck was 70 percent of normal which is an improvement from the 2007 and after the injury. February 11, 2014, he did note increased neck pain, but felt that it may have been aggravated by the recent heavy snow and lots of heavy work and snow blowing he was doing. April 28, 2014, his pain was 60 percent of normal and January 16, 2015, it was 40 percent of normal. The EMG study from April 23, 2013, by Dr. Janerich was interpreted as a right C7 radiculopathy, but I see no evidence of C7 nerve root compression on imaging and there are no symptoms that he points to in a specific dermatomal C7 pattern. The EMG also showed possible right carpal tunnel syndrome which is certainly possible especially with the Tinel's sign on exam. I do not feel that this was caused by the injury though. A note from Dr. Olshemski, May 9, 2012, noted bilateral carpal tunnel syndrome symptoms. There was also noted at this time that he had right shoulder discomfort and it was felt likely from a trapezius muscle irritation.

Therefore based on all of the history I obtained and the medical records I reviewed, the above diagnosis is made and I do think that he has recovered completely from this. Any further treatment for his symptoms would not be as a result of the injury sustained on March 11, 2013. All of these opinions are made within a reasonable degree of medical certainty.


Sincerely,

CHRISTOPHER P. HENDERSON, M.D.
CPH/lr

EXHIBIT "C"

**CASE CAPTION:** Edward and Marla Biniek, h/w v. Marmaxx Operating Corp. and Jofran Sales, Inc.

**CASE NUMBER:** 3:14-1154

**MIDDLE DISTRICT OF PENNSYLVANIA**     **JUDGE:** The Honorable Malachy E. Mannion

| PTF | DEFT, MARMAXX OPERATING CORP. | DESCRIPTION OF OBJECT OR ITEM | IDENTIFIED | EVIDENCE | RULING | WINTESS ON STAND |
|-----|------|------|------|------|------|------|
| | 1 | Purchase Order including Terms and Conditions | | | | |
| | 2 | All Photographs taken of Loss Location | | | | |
| | 3 | All Photographs taken of Subject Chair | | | | |
| | 4 | All Photographs taken of Exemplar Chairs | | | | |
| | 5 | Jofran's Answers and Responses to Plaintiffs' Discovery Requests | | | | |
| | 6 | Plaintiffs' Rule 26 Disclosures | | | | |
| | 7 | Plaintiffs' Income Tax Returns | | | | |
| | 8 | Medical Records from Advanced Pain Management | | | | |
| | 9 | Medical Records from Milton S. Hershey Medical Center | | | | |
| | 10 | Medical Records from Harold Ensig, M.D. | | | | |
| | 11 | Medical Records from William Newhart, D.C. | | | | |

| | | | |
|---|---|---|---|
| 12 | Medical Records from Albert Janerich, M.D. | | |
| 13 | Medical Records from Wilkes-Barre General Hospital | | |
| 14 | Medical Records from Wilkes-Barre Radiology | | |
| 15 | Medical Records from Geisinger Wyoming Valley | | |
| 16 | Medical Records from Dr. Frank Olshemski Family Practice | | |
| 17 | Medical Records from Valley Open MRI | | |
| 18 | Medical Records from Orthopedic Consultants of Wyoming Valley | | |
| 19 | Curriculum Vitae of Dr. Christopher P. Henderson | | |
| 20 | Expert Reports of Dr. Christopher P. Henderson | | |
| 21 | Videotape trial deposition of Dr. Christopher P. Henderson | | |
| 22 | Deposition Testimony of Marla Biniek | | |
| 23 | Deposition Testimony of Edward Biniek and attached exhibits | | |
| 24 | Deposition Testimony of Joffrey A. Roy and attached exhibits | | |
| 25 | Exemplar Chairs | | |
| 26 | Records from Wilkes-Barre School District | | |
| 27 | Medical Records from Geisinger Urgent Care | | |
| 28 | 5/5/2014 X-ray of Cervical Spine Film and Corresponding Report | | |
| 29 | 10/07/02 MRI of Lumbar Spine Film | | |

| | | |
|---|---|---|
| | | and Corresponding Report |
| 30 | | 10/07/02 MRI of Cervical Spine Film and Corresponding Report |
| 31 | | 5/08/04 MRI of Lumbar Spine Film and Corresponding Report |
| 32 | | 7/13/04 EMG Report Film and Corresponding Report |
| 33 | | 1/22/05 MRI of Cervical Spine Film and Corresponding Report |
| 34 | | 3/22/06 MRI of Lumbar Spine Film and Corresponding Report |
| 35 | | 10/19/06 Report of Dr. Albert Janerich, M.D. Records |
| 36 | | 3/20/13 X-ray of Cervical Spine Film and Corresponding Report |
| 37 | | 3/20/13 X-ray of Thoracic Spine Film and Corresponding Report |
| 38 | | 4/15/2013 MRI of Cervical Spine Film and Corresponding Report |
| 39 | | 5/07/14 MRI of Cervical Spine Film and Corresponding Report |
| 40 | | 4/23/2013 EMG Study |
| 41 | | Medical Records from Penn State College of Medicine Neuroradiology Spine Clinic |