**S-E-A PROJECT NO. 612570**          **ISSUE DATE: June 29, 2015**

# CIPRIANI & WERNER, P.C.
### Your File No. 1144-39772S
### Attention: Daniel D. Stofko, Esq.
### 409 Lackawanna Way
### Scranton, Pennsylvania 18503

## FALL EVALUATION

*Edward and Marla Biniek v. T.J. Maxx, et al.*
### Incident Location: 461 Arena Hub Plaza
### Wilkes Barre, Pennsylvania 18702



795 Cromwell Park Drive, Suite N
Glen Burnie, MD 21061
410.766.2390 • 800.635.9507
Fax 410.766.0749
www.SEAlimited.com



PLAINTIFF'S
EXHIBIT
**A**

ATLANTA • BALTIMORE/WASHINGTON • CHARLOTTE • CHICAGO • CLEVELAND • COLUMBUS • FORT LAUDERDALE • HOUSTON • ST. LOUIS • TAMPA

# S·E·A™

## TABLE OF CONTENTS

**SECTION**                                                                                    **PAGE**

I.      Project Summary ...................................................................................................1
        Project Assignment ...........................................................................................1
        Scope of Project.................................................................................................1
        Conclusions........................................................................................................1

II.     Procedures.............................................................................................................2

III.    Discussion.............................................................................................................4
        Background.........................................................................................................4
        Chair Inspection.................................................................................................6
        Keefer Report Analysis....................................................................................15

IV.     Signatures ..........................................................................................................18

i



PLAINTIFF'S
EXHIBIT
A
tabbies

**S·E·A**™

## I.   PROJECT SUMMARY

### PROJECT ASSIGNMENT

S-E-A, Ltd. (S-E-A) was requested by Daniel D. Stofko, Esq. with Cipriani & Werner, P.C., to investigate and consult regarding a reported fall incident. Mr. Edward Biniek reportedly sat on a dining room chair at the T.J. Maxx store in Wilkes Barre, Pennsylvania, when the chair broke and he fell to the floor. The subject investigation was assigned to S-E-A Senior Project Engineer, Duane R. Ferguson, P.E., as S-E-A Project No. 612570.

### SCOPE OF PROJECT

Specifically, S-E-A was requested to review discovery material, inspect the subject chair, and consult regarding the actions of Jofran, Inc. (Jofran).

### CONCLUSIONS

- **Inspection of the subject chair found no movement between the seat (seat box) and chair back.**

- **Plaintiff's expert report did not take into account that the chairs had been inspected by others prior to his inspection of the chairs.**

- **Examination of the subject chair found that the connections were tight and secure.**

- **The type fasteners used for the subject chair were appropriate and provide for a stable connection.**

- **It is unknown what the conditions of the chairs were in when they were delivered to T.J. Maxx. T.J. Maxx stated that they would not put items with obvious damage onto the floor.**

- **The physical damage to the chair is only consistent with a situation in which the chair was on the platform when Mr. Biniek sat on it and the chair fell off the platform edge causing the leg to break off the chair. The failure of the chair is not consistent with loose connections.**

- **It is unknown when the blocking for the chair back became damaged. The splitting of the blocks is consistent with the scenario where in the chair impacted the floor when the front leg broke. There is also evidence of post incident destructive testing and additional damage/splitting of the blocks. Regardless of how the corner blocks became damaged, the chair back was securely fastened to the seat.**

- **T.J. Maxx put markings/tags on the underside of the chair at the store. T.J. Maxx did not note loose legs or cracking of the blocks. The moisture levels stated and shown in the Jofran Quality Assurance reports do not show excessive moisture levels.**



PLAINTIFF'S EXHIBIT
tabbies
A

**S·E·A**™

## II.   PROCEDURES

1. **S-E-A examined the subject chair on March 11, 2015 at the office of Bonner, Kiernan, Trebach & Crociata in Philadelphia, Pennsylvania.** During that time:

   - Visual and photographic examination of the subject chair and three exemplars were performed
   - Field notes and diagrams were prepared

2. **S-E-A also reviewed the following:**

   - Complaint – Civil Action
   - Plaintiff's Request for Production of Documents in Aid of Preparation of Complaint Pursuant to Rule 4003.8
   - Plaintiff's expert report dated April 6, 2015 prepared by Jeffery Keefer
   - Forty-one color-copied photographs taken on September 26, 2013 by Carol Czepas
   - Packing Step Power Point (undated) for the Bradford Side Chairs
   - Product Specification sheet for the Bradford Side Chairs
   - Manufacturers Certificate No. HK/CARB/2009/03/1002
   - General Certification of Conformity and Compliance dated December 7, 2009
   - Jofran Quality Audit Report dated September 1, 2011 for a Center Pedestal Dining Base
   - Jofran Quality Audit Report dated August 31, 2011 for a Bradford Side Chair KD
   - Jofran Quality Audit Report dated September 1, 2011 for a Bradford Side Chair KD
   - Jofran Packing Mark dated December 14, 2009
   - Jofran Assembly Instructions & Parts Identification for the Bradford Side Chair KD dated October 29, 2009
   - Jofran Weekly Production Report from January 2011 through July 2011
   - Jofran Weekly Production Report from May 2011 through August 2011
   - Proforma Invoice from Thanh Phu Phat Co. Ltd to Jofran dated June 9, 2011
   - Invoice from Thanh Phu Phat Co. Ltd to Jofran dated August 27, 2011
   - T.J. Maxx Rule 26 Disclosures, including photographs taken at the subject T.J. Maxx
   - Deposition Transcript of Mr. Edward Biniek



PLAINTIFF'S EXHIBIT A

*S·E·A*™

- Deposition Transcript of Ms. Marla Biniek
- Deposition Transcript of Mr. Jarod Fanelli
- Deposition Transcript of Mr. Daryle Agrella
- Deposition Transcript of Ms. Emalee Klinfelter
- Deposition Transcript of Mr. Joffrey Roy
- Deposition Transcript of Ms. Mary Murtha
- Deposition Transcript of Ms. Rebecca Bowers
- Deposition Transcript of Ms. Tara Hughes
- Wood Handbook, March 1999 edition as published by the U.S. Department of Agriculture, Forest Service, Forest Products Laboratory



## *S·E·A*™

---

## III. DISCUSSION

---

## BACKGROUND

Jofran imported chairs, and in some instances, assembled them for distribution and sale to stores including the subject T.J. Maxx. Based on a review of the Jofran literature, the subject chair is described as a "Bradford Side Chair-KD" model number "644-826KD" (Bradford). The KD stands for knock-down, which means the chairs are partially assembled at the manufacturer prior to shipping to Jofran. The chairs are delivered to Jofran partially assembled and then Jofran, either assembles the chairs and distributes them to the retailers, or they deliver the chairs unassembled. Jofran assembled the subject chair prior to distribution to T.J. Maxx. The Bradford chairs are shipped to Jofran in basically four pieces; the complete seat, chair back and two front legs. **Figure 1** is the assembly instructions and parts identification sheet for the Bradford chairs. The seat back is attached to the seat with the screws and the two front legs, which have preinstalled screws, are bolted to the seat.

According to the Jofran literature the chairs are comprised of "Solid Rubber Wood". Rubberwood, whose scientific name is Hevea brasiliensis, is also known as parawood. Rubberwood is a widely used material for wood furniture, cabinetry and wood flooring. Rubberwood has very little shrinkage, as it relates to moisture content, making it one of the more stable construction materials available for furniture manufacturing. Rubberwood is compared to oak furniture, except that when it comes to moisture content Rubberwood is superior as it shrinks much less than oak.

Mr. Biniek reportedly was shopping at the T.J. Maxx store in Wilkes Barre, Pennsylvania with his wife and son. Mr. Biniek indicated that they were at the store for no particular reason other than to browse and shop. Mr. Biniek further stated that he was walking past a set of dining room chairs and he sat on one to test it out to see if he would like the chair. Mr. Biniek stated that he sat on the chair, it collapsed, and he fell to the floor. Mr. Biniek does not remember if the chair was on an elevated platform when he sat on the chair or if it was on the store floor. Mr. Biniek testified that the chair did not move when he sat on it. Ms. Tara Hughes testified that when she walked by the chairs, where Mr. Biniek reported he was trying out the subject chair, that the chairs were on an elevated platform. Ms. Hughes further testified that after she passed Mr. Biniek and the platform where the chairs were sitting, she took about three or four steps when she heard a sound like someone had fallen. She walked back and saw Mr. Biniek on the floor. The right front leg, as sitting in the chair, was the chair leg that reportedly broke as Mr. Biniek sat on the chair.



**S·E·A**™



**FIGURE 1:**   Assembly Instruction and Parts
Identification for the subject chair



PLAINTIFF'S
EXHIBIT
A

**S·E·A**™

## CHAIR INSPECTION

Examination of the subject chair found that both front legs were broken (**Figure 2**). It is unknown how the left front leg of the chair became damaged in the two years the chair was stored after the incident. The two front legs of the subject chair were denoted as 'A' and 'B', where leg 'A' is the leg that reportedly broke on the date of the incident (**Figures 3 through 6**). Examination of the seat back attachment to the chair seat found the connection to be tight with no movement (**Figures 7 through 9**). The front legs were both broken off near the seat connection, with the screw still bolted into the chair assembly. Examination of the front leg connection found this connection tight as well (**Figures 10 through 13**). S-E-A did note that the blocking for the rear legs showed signs of cracking. S-E-A also inspected the three exemplar chairs that were provided (**Figure 14**). The white chair was also on the floor on the date of the incident. Examination of the chairs found no damage to the blocking on any of the chairs (**Figures 15 through 17**).



**FIGURE 2:**    View of the chair showing both front legs broken off.



PLAINTIFF'S EXHIBIT

A

tabbies

# S·E·A™



**FIGURE 3:**    View showing the letter designation 'A' on the bottom of the chair.



**FIGURE 4:**    View showing the letter designation 'B' on the bottom of the chair.



PLAINTIFF'S EXHIBIT

A

**S·E·A**™



**FIGURE 5:**     View showing the letter designation 'A' on the front chair leg.



**FIGURE 6:**     View showing the letter designation 'B' on the front chair leg.



PLAINTIFF'S
EXHIBIT
A

*S·E·A*™



**FIGURE 7:**   View showing seat back tight against the seat.



**FIGURE 8:**   View showing seat back tight against the seat.



PLAINTIFF'S
EXHIBIT
A

*S·E·A*™



**FIGURE 9:**   View showing seat back tight against the seat.



**FIGURE 10:**   View showing the front leg tight against the seat.



**PLAINTIFF'S EXHIBIT**

**A**

*S·E·A*™



**FIGURE 11:**   View showing the front leg tight against the seat.



**FIGURE 12:**   View showing the front leg tight against the seat.

- 11 -



PLAINTIFF'S
EXHIBIT

A

*S·E·A*™



**FIGURE 13:**   View showing the front leg tight against the seat.



**FIGURE 14:**   Three exemplar chairs.  The white chair was also on the floor on the
date of the subject incident.


PLAINTIFF'S
EXHIBIT

A

**S·E·A**™



**FIGURE 15:**   Chair blocking showing no cracking.



**FIGURE 16:**   Chair blocking showing no cracking.


PLAINTIFF'S
EXHIBIT
A
tabbies

*S·E·A*™



**FIGURE 17:**   Chair blocking showing no cracking.



PLAINTIFF'S
EXHIBIT

A

## S·E·A™

## KEEFER REPORT ANALYSIS

The Keefer report stated that the inspection of the chair found a "severe amount of lateral movement between the seat box and back assembly." **S-E-A's inspection of the subject chair found no movement between the seat (seat box) and chair back.** As such, S-E-A is unsure how Mr. Keefer can state such a fact when this was not observed. As can be seen in Figures 7 through 9, the seat and chair back are tight against each other which would prevent any movement of the chair.

The Keefer report further stated the inspection of the three exemplar chairs; "these chairs were found to have front leg and also seat box joints with excessive amounts of play and lateral movement. The bolts that connected the seat box to the back assembly were not properly and securely tightened and allowed a remarkable amount of lateral movement... It is my opinion that these chairs were not properly assembled in accordance with the Jofran Assembly instructions and industry custom and practice and prone to failure if put in service." **Mr. Keefer did not take into account that the chairs had been inspected by others prior to his inspection of the chairs. S-E-A inspected the chairs prior to Mr. Keefer and S-E-A removed some of the bolts to inspect the front legs of the exemplar chairs.** In addition, these chairs do not represent the condition of the failed chair as all the connections on the subject chair were tight and secure.

The Keefer report concluded the following:

1. *The blocks through which the front leg hanger bolts were inserted and passed through were excessive in size allowing for lateral movement of the front legs that would compromise the structural integrity of the incident chair.*

S-E-A's examination of the subject chair found that the connections were tight and secure as shown in Figures 10 through 13. As such there would be no lateral movement of the chair legs. Mr. Biniek testified that the chair did not move when he sat on it. **Based on S-E-A's examination of the chair, the front legs of the chair were securely fastened.**

2. *Failure to implement the use of readily available locking nuts and failing to properly secure and tighten the lock washer and nut to the hanger bolts will result in the chair legs losing their structural rigidity with the seat box comprising the structural integrity and safety of the incident chair.*

This conclusion in the Keefer report is misleading, as lock washers and nuts were used for the construction of the chair. Mr. Keefer is just stating his preference of locking nuts to be used instead. **The type fasteners used for the subject chair were appropriate and provide for a stable connection.** S-E-A's examination of the subject chair found that all of the connections were securely tightened. There is no indication that nuts were not securely fastened.

3. *During the examination of the three exemplar chairs this writer could see a clear disregard for competent and consistent assembly practices. Loose hardware and the resulting lateral motion prevalent in both the front leg joints and the joints between the seat box and the chair back shows a lack of adherence to the Jofran Assembly instructions by Jofran assembly personal.*


PLAINTIFF'S EXHIBIT
**A**

## S·E·A™

S-E-A previously discussed this condition. S-E-A removed the nuts to examine the connection of the exemplar chairs. The exemplar chairs have been in storage for two years and examined by others. **It is unknown what the conditions of the chairs were when they were delivered to T.J. Maxx. T.J. Maxx stated that they would not put items with obvious damage onto the floor.**

4. *Mr. Biniek did not misuse or abuse the chair and sat on it in a method that would be expected. Further, the incident chair was not overloaded by Mr. Biniek sitting on it.*

Mr. Biniek testified that he is unsure of whether he sat on the chair on the elevated platform. Mr. Biniek also testified that there was no movement of the chair when he sat on it. S-E-A's examination of the subject chair, found all the fasteners securely tightened. **The physical damage to the chair is only consistent with a situation in which the chair was on the platform when Mr. Biniek sat on it and the chair fell off the platform edge causing the leg to break off the chair. The failure of the chair is not consistent with loose connections.**

5. *The incident chair demonstrated poor workmanship in the pattern, location and position of the pre-drilled holes for the screws and machine bolts that connect the entire seat box and front leg assembly to the chair back. When the poorly designed and constructed corner blocks cracked and split apart, 4 of the 6 bolts connecting the seat box to the chair back were no longer applying the pressure required to maintain a rigid connection. The entire connection point became excessively loose and allowed the chair to rock back and forth putting excessive lateral force on the front legs and comprising the structural integrity of the chair.*

S-E-A's examination of the chair found the front legs and chair back to be firmly secured. Figures 7 through 13 show that the front legs and chair back were tight and securely fastened against the seat. These chair connections were not loose as stated in the Keefer report. **It is unknown when the blocking for the chair back became damaged. The splitting of the blocks is consistent with the scenario in which the chair impacted the floor and the front leg broke. There also is evidence of post incident destructive testing and additional damage/splitting of the blocks. Regardless of how the corner blocks became damaged, the chair back was securely fastened to the seat.**

6. *The failure of the rear corner blocks based on the design alone is predictable and this design should have been rejected by Jofran at the time of the Quality Audits. You simply cannot drill wood screw holes this close to the edges of the blocks and in the direction of the wood grain and not expect the blocks to crack and fail. Aside from the wood screw holes being drilled in a manner destined for failure the bolt holes were then drilled only a fraction of an inch away from the outside wood screws further weakening the blocks and nearly guaranteeing the cracking and failing of the wood blocks. These blocks are critical to maintaining a rigid connection between the seat and the chair back.*

As previously stated, it is unknown when the rear corner blocks became damaged. In addition, this chair back was securely and firmly attached to the seat.



PLAINTIFF'S EXHIBIT
A

*S·E·A*™

7. *While Jofran inspected the chairs as reflected by its Quality Audit Reports, no such Quality Assurance was followed with respect to inspecting the Bradford KD chairs that were assembled for its customer T.J. Maxx. Had an effective Quality Assurance Program been implemented at the time of the incident chair was assembled and prior to it being boxed for shipment, Jofran would have discovered the cracked and failing rear corner blocks and any loose front leg hardware that clearly led to the failure of this chair to reliably support the body weight of an average sized occupant during normal usage.*

Again, as previously stated, it is unknown when the rear corner blocks became damaged. The rear seat back and front legs were securely and firmly attached to the seat. The front leg hardware for the subject chair was not loose.

8. *Similarly had the same Quality Assurance Inventory evaluation been done by T.J. Maxx upon receiving the chair after it was removed from its corrugated container and again when it was placed on the display floor, an inspection would have determined that the rear corner blocks were cracked and broken and the hardware for the failed leg was not properly and securely tightened. This chair should have never made it to the display floor.*

**T.J. Maxx put markings/tags on the underside of the chair at the store. T.J. Maxx did not note loose legs or cracking of the blocks. T.J. Maxx stated that they would not put items with obvious damage onto the floor.**

9. *That the use of lock nuts was a far superior and safer choice of hardware to maintain the integrity of pressure between the chair legs and seat bottom and would not have impaired the function or utility of the incident chair had lock nuts been utilized. Lock nuts would not have backed out or loosened like the standard hardware nuts Jofran used to assemble the subject chair. Incorporating lock nuts would have prevented the incident chair leg from separating.*

There is no evidence that the connections were loose. All of the nuts were securely fastened with lock washers. Jofran has supplied thousands of this type of chair, with no reported incidents. **The fasteners used for the subject chair were appropriate and provide for a secure connection.**

10. *Excessive moisture levels in the wood used to manufacture the Bradford chairs led to shrinkage of the chair parts and contributed to the cracking and failure of these parts.*

There is no evidence of shrinkage of the chair parts or when the cracking of the rear corner blocks occurred. As previously stated, Rubberwood has a very low shrinkage rate with regard to moisture content. The moisture content in wood will change with whatever the environment it is in. The moisture readings shown during Jofran's quality control do not show excessive moisture readings. Mr. Roy, with Jofran, stated that if the chairs did show moisture readings above 15%, the chairs would not be distributed for use. **The moisture levels stated and shown in the Jofran Quality Assurance reports do not show excessive moisture levels.**



## S·E·A™

## IV.   SIGNATURES

S-E-A hereby certifies the opinions and conclusions expressed herein have been
formulated within a reasonable degree of professional certainty.  They are based upon the
application of reliable principles and scientific methodologies to all the facts known by
S-E-A when this report was issued, as well as knowledge, skill, experience, training
and/or education.  Should additional information be discovered, S-E-A reserves the right
to appropriately amend or augment these findings.

Report Prepared By:                                    Report Reviewed By:

Duane R. Ferguson, P.E.                    Anthony D. Cornetto, III, P.E.
Senior Project Engineer                    Senior Project Engineer
Commonwealth of Pennsylvania               Commonwealth of Pennsylvania
Registration No.  PE062664                 Registration No.  PE074701



Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF PENNSYLVANIA
2                - - - - - - - - - - -
3    EDWARD and MARLA BINIEK,  :
     h/w,                      :
4              Plaintiffs      :
                               :
5         - vs -               :
                               :
6    MARMAXX OPERATING CORP.   :
     for T.J. MAXX/THE T.J.    :
7    MAXX COMPANIES, INC. and  :
     JOFRAN SALES, INC.        :
8              Defendants      :   NO. 3:14-1154
9
10             Oral deposition of MARLA BINIEK,
11   taken pursuant to notice, was held at CIPRIANI &
12   WERNER, PC, 409 Lackawanna Avenue, Suite 402,
13   Scranton, Pennsylvania 18503, on Wednesday,
14   February 4, 2015, commencing at 1:41  p.m., before
15   CHRISTINE R. COOPERMAN, a Professional Reporter
16   and Notary Public in and for the Commonwealth of
17   Pennsylvania.
18
19   A P P E A R A N C E S:
20     GALFAND BERGER, LLP
       BY:  RICHARD M. JUREWICZ, ESQUIRE
21       1835 Market Street, Suite 2710
         Philadelphia, PA 19103
22       (800) 222-8792
         -- Counsel for the Plaintiffs
23
               - - -
24
25   Job No. CS1996980
```

PLAINTIFF'S
EXHIBIT
B

```
 1   A P P E A R A N C E S:

 2

 3     BONNER KIERNAN
       BY:  JAMES F. LYNN, ESQUIRE
 4        1801 Market Street, Suite 770
          Philadelphia, PA 19103
 5        (215) 569-4433
          -- Counsel for Defendant, Marmaxx
 6           Operating Corp.

 7

 8     CIPRIANI & WERNER, PC
       BY:  DANIEL D. STOFKO, ESQUIRE
 9        409 Lackawanna Avenue, Suite 402
          Scranton, PA 18503
10        (570) 347-0600
          -- Counsel for Defendant, Jofran Sales, Inc.

11

12

13

14

15

16

17

18   A L S O   P R E S E N T:

19     EDWARD BINIEK, JR.

20

21

22

23

24

25
```

PLAINTIFF'S
EXHIBIT
tabbies
B

Page 3

1                          I N D E X

2     Testimony of:  MARLA BINIEK

3        By:  Mr. Stofko ............... 4

         By:  Mr. Lynn ............... 14

4

5

6
                          E X H I B I T S

7

8     NUMBER                  DESCRIPTION              MARKED

9     NO EXHIBITS WERE MARKED

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFF'S
EXHIBIT
B
tabbies

Page 4

1            (It is hereby stipulated and

2    agreed by and among counsel for the respective

3    parties that signing, sealing, certification and

4    filing are waived and that all objections, except

5    as to the form of the question, be reserved until

6    the time of trial.)

7            MARLA BINIEK, having been first

8    duly sworn, was examined and testified as follows:

9                    - - -

10                  EXAMINATION

11                  - - -

12   BY MR. STOFKO:

13       Q.     Good afternoon, Mrs. Biniek.  My

14   name is Dan Stofko.  I represent Jofran, Inc., in

15   this matter.  You were present for the

16   instructions that I gave to your husband.

17       A.     Yes.

18       Q.     Did you hear those instructions

19   and understand them?

20       A.     Yes.

21       Q.     The only one I'll repeat is, if

22   you don't understand the question, please let us

23   know.  If I ask you a question and you provide a

24   response, we'll all assume that you heard and

25   understood the question and that you're giving a



PLAINTIFF'S
EXHIBIT
B

Page 5

1   truthful response.  Okay?

2       A.      Yes.

3       Q.      Would you please state your full

4   name for the record?

5       A.      Marla Lynn Biniek.

6       Q.      And what is your date of birth?

7       A.      4/6/71.

8       Q.      And you were present at the time

9   of the incident at T.J. Maxx?

10      A.      Yes.

11      Q.      Tell us what you witnessed on the

12  day of the incident.

13      A.      Well, as far as these pictures go,

14  it wasn't like this.  These chairs weren't stacked

15  up like this.

16              MR. JUREWICZ:  Well, he's not

17  asking that.

18              THE WITNESS:  Oh, okay.

19              That chair was here, he sat in it

20  and the leg gave right out.

21  BY MR. STOFKO:

22      Q.      Well, let's go to the pictures

23  then.  This is Biniek 1 and 2, the pictures from

24  your husband's deposition.

25      A.      Okay.

PLAINTIFF'S
EXHIBIT
B
tabbies

Page 6

1          Q.      And I understand these pictures

2    were taken after the incident and they're not an

3    exact replica of what the store looked like.

4          But I want to ask you about these

5    platforms.  When your husband sat on the chair,

6    was it on the platform?

7          A.      No, it was not.

8          Q.      Where was it?

9          A.      It was on the floor.  There were

10   other chairs on the floor, too.  The chair was on

11   the floor.  He sat on it and it just -- it gave

12   right out.

13         Q.      How many chairs were on the floor?

14         A.      Maybe a half dozen.

15         Q.      Were they all the same?

16         A.      I just remember the one that he

17   sat on.  I just remember this one that was, you

18   know, right in this area here.  But there were

19   other ones around that were also on the floor.

20         Q.      When you say "right in this area

21   here," you're pointing to an area near the

22   platform in the foreground of Biniek 2?

23         A.      Yeah.  Right in this area I just

24   remember it being in.  By the time it had

25   cracked -- I mean, I wasn't looking around at any

PLAINTIFF'S
EXHIBIT
tabbies
B

Page 7

1    other chairs, no.

2          Q.      Were there chairs right next to

3    the chair that he sat in?

4          A.      Not right next to it, but around.

5          Q.      As you approached that area, were

6    there chairs already on the ground?

7          A.      Yes.

8          Q.      Were there chairs on the platforms

9    as well?

10         A.      Yes.

11         Q.      How many chairs were on the

12   platform?

13         A.      I can't say.

14         Q.      Did you see anyone sitting in any

15   other chairs?

16         A.      No.

17         Q.      Did you see anyone remove any

18   chairs from the platforms?

19         A.      No.

20         Q.      Did you see anyone handle the

21   chairs before your husband sat in them?

22         A.      No.

23         Q.      How far away from your husband

24   were you when he sat in the chair?

25         A.      Maybe five feet.

PLAINTIFF'S
EXHIBIT
B

Page 8

1          Q.       And were you in front of him, to
2     the side?
3          A.       In front of him.
4          Q.       Did you have any discussion
5     regarding the chairs as you approached the area?
6          A.       Just that we needed new dining
7     room chairs -- kitchen chairs.
8          Q.       Did you speak with any store
9     associates at any time that day?
10          A.       No.
11          Q.       Did you see any warning signs in
12     the area such as, you know, Chairs are for display
13     only?
14          A.       No.
15          Q.       Did anyone ever tell you that the
16     chairs were for display only?
17          A.       No.
18          Q.       Did you see any movement in the
19     chair from the time he sat down until the time the
20     incident occurred?
21          A.       No.
22          Q.       Did you notice the chair wobble?
23          A.       No.
24          Q.       Did you hear any creaking or any
25     sound?

PLAINTIFF'S
EXHIBIT
tabbies
B

Page 9

1           A.      As he was sitting on the floor,

2    yeah.  That's about it.  It happened so fast.

3           Q.      Did you touch or move any of the

4    chairs before your husband sat down?

5           A.      No.

6           Q.      Did you see anybody touch or move

7    any of the chairs before your husband sat down?

8           A.      No.

9           Q.      After the incident occurred, did

10   you see any store personnel move any items that

11   were in the area?

12           A.      No.

13           Q.      How long did you remain in the

14   area of the furniture after the incident?

15           A.      In the area of the furniture?

16   Three minutes until she walked him up front.

17           Q.      Where was the broken chair at that

18   time, when you left the area?

19           A.      I want to say right in the same

20   area.

21           Q.      Just so the record reflects --

22           A.      Yeah.  Well, this would be this

23   area here.  Like right around here.

24           Q.      I just want to state for the

25   record that she's pointing to the foreground in

**PLAINTIFF'S EXHIBIT**

tabbies

**B**

Page 10

1    front of the platform that's on the left in Biniek

2    1 and 2.

3         A.    Uh-huh.

4         Q.    From the time of the incident

5    until the time you left the area where the

6    furniture was, did you see any store employee, or

7    anybody for that matter, move any of the chairs

8    that were on the ground?

9         A.    No.

10        Q.    Did you see anyone move any chairs

11   from the platforms?

12        A.    No.

13        Q.    Did you personally have any

14   conversation with any store employee after the

15   incident?

16        A.    No.

17        Q.    Did anyone ask you what you saw?

18        A.    No.

19        Q.    Did you take a look at the chair

20   that had broken?

21        A.    After the fact, no.   No.

22        Q.    So if we were to show you

23   pictures, close-up pictures, of the chair that

24   were taken after the fact, you wouldn't be able to

25   tell us whether or not they accurately reflect

**PLAINTIFF'S EXHIBIT B**

Page 11

1    what the chair looked like immediately after the

2    incident?

3            A.      No.

4            Beforehand, it looked like that.  That's

5    all I remember.  Before it was broke.  I remember

6    the chair.

7            Q.      I'm sorry.  You pointed to Biniek

8    3 --

9            A.      No.  This one that's put together.

10   I remember looking at it before it was broke.

11   After it broke, I did not look at it.

12           Q.      So just so the record's clear,

13   you're pointing to the chair that's in the

14   background of the first picture in Biniek 3 that

15   is still put together.  It's, like, an off-white

16   color with a wood-colored seat.

17           A.      Uh-huh.

18                   MR. LYNN:  I'll represent that's

19   the at-issue chair.

20                   MR. STOFKO:  That's just the back

21   end of it, Jim?

22                   MR. LYNN:  Yeah.

23                   THE WITNESS:  Oh, I see.  Okay.

24   BY MR. STOFKO:

25           Q.      Did anyone ever contact you by

**PLAINTIFF'S EXHIBIT**
**B**

Page 12

1     telephone, such as an investigator, asking you
2     questions about this matter?
3           A.      (No verbal response.)
4           Q.      No?
5           A.      No.
6           Q.      Did you ever see any incident
7     report from T.J. Maxx?
8           A.      No.
9           Q.      Did you ever tell your husband
10    that you didn't recall if the chair was on the
11    platform or on the floor when he sat on it?
12          A.      No.
13          Q.      Did you ever tell him that you
14    were unsure of where the chair was?
15          A.      No.
16          Q.      Since the date of the incident,
17    how has your husband's physical condition impacted
18    your life?
19          A.      He's slowed down.  Like he said,
20    he doesn't shovel the snow.  He doesn't help me
21    around the houses like he used to, running the
22    vacuum and such.  He used to be able to get up on
23    ladders and clean track lighting and stuff for me.
24    He won't do that.
25          We're not as active as we used to be.  We

PLAINTIFF'S
EXHIBIT
B

Page 13

1  used to go bike riding with the kids.  And on the

2  school soccer field, kicking the ball around,

3  playing baseball.  Swimming in the pool.  He might

4  have cooled off a couple times in the summer, but

5  no basketball or volleyball in the pool.

6       Q.      Have you had any relationship

7  problems because of the incident?

8       A.      Physical?

9       Q.      Either/or, yes.

10      A.      Yeah.

11      Q.      How so?

12      A.      We used to be pretty active.  Now,

13  it's almost like I have to convince him.  He says,

14  My neck is killing me, and I just say, I'll try

15  and make your neck feel better.  And I'm not used

16  to that.

17      Q.      How about emotional strife or

18  arguing, things like that?

19      A.      No.  It's just really hard to see

20  him miserable and hurting.  He just walks around

21  like this (indicating) all the time, you know.

22              MR. LYNN:  Indicating putting his

23  left hand on his right shoulder.  I just want the

24  record to reflect.

25              THE WITNESS:  Yeah.

PLAINTIFF'S
EXHIBIT
tabbies
13

Page 14

```
 1                    MR. STOFKO:  I don't have any
 2     further questions.
 3                         - - -
 4                        EXAMINATION
 5                         - - -
 6     BY MR. LYNN:
 7          Q.      Good afternoon, Mrs. Biniek.
 8     Hopefully, I got that right.
 9          Your husband testified that he had sat
10     upon the chair for about ten seconds before it
11     collapsed.  Does that comport with your
12     recollection or is your recollection something
13     different?
14          A.      Yeah.  He sat down and the leg
15     just gave out.
16          Q.      So your recollection is
17     immediately upon sitting on it, it collapsed,
18     correct?
19          A.      Yeah.
20          Q.      And was his testimony correct that
21     it was just you and your son who were there
22     shopping?
23          A.      Yes.
24          Q.      Is that correct?
25          A.      Me and little Eddie were there.
```

PLAINTIFF'S
EXHIBIT
13

Page 15

1          Q.      Your daughter was not present?

2          A.      No.

3          Q.      As a first reaction to it, was

4    anybody laughing, thinking it was funny?

5          A.      Oh, shit.  It was one of them.

6          Q.      Was anybody laughing?

7          A.      Maybe a chuckle out of my

8    12-year-old son at the time.

9          Q.      Other than your son, nobody else?

10         A.      No.

11         Q.      And the type of chair -- a wooden

12   slat-back chair that you see on Biniek Exhibit

13   3 -- do you recall there being any other similar

14   chairs or similar-looking chairs --

15         A.      Yes.

16         Q.      -- that were out on display at the

17   time in addition to that one?

18         A.      Similar, yes.

19         Q.      And similar how?

20         A.      I don't remember, but they were

21   similar.

22         Q.      Wooden chairs?

23         A.      Yes.

24         Q.      Do you recall how many wooden

25   chairs you saw that day in addition to the subject

**PLAINTIFF'S EXHIBIT**

**13**

Page 16

1    chair?

2         A.      I cannot say for certain.

3         Q.      Is there a ballpark range or you

4    just really don't know?

5         A.      Three.

6         Q.      You think there were a total of

7    three or a total of four similar-looking wooden

8    chairs?

9         A.      Three.

10        Q.      Total?

11        A.      Yes.

12        Q.      Were they the same color, if you

13   know?

14        A.      No.

15        Q.      No, you don't know or no, they

16   weren't?

17        A.      No, they weren't.

18        Q.      What were the different colors?

19        A.      Probably all brown as opposed to

20   the white back and the brown -- and the wood seat.

21        Q.      So the one that you see in Biniek

22   3 has a, what, brown seat?

23        A.      Uh-huh, yes.

24        Q.      And what color --

25        A.      Off-white.

PLAINTIFF'S
EXHIBIT
13

Page 17

1          Q.      Any others that were off-white
2    with a brown seat?
3          A.      Not that I recall.  That was the
4    only one.
5          Q.      And the other ones you saw, were
6    they all brown including a brown seat?
7          A.      Yes.
8          Q.      Do you recall any other colors
9    other than the off-white and all brown?
10         A.      No.
11         Q.      At any point in time, did you
12   touch the subject chair before your husband had
13   sat upon it?
14         A.      No.
15         Q.      At any point in time, did you
16   touch any of the other chairs?
17         A.      No.
18         Q.      Did your husband in any way, for
19   lack of a better word, inspect the chair before
20   sitting upon it?
21         A.      No.
22         Q.      Did he simply walk up to it and
23   sit on it?
24         A.      Yes.
25         Q.      Did he at any point in time pick

PLAINTIFF'S
EXHIBIT
13
tabbies

Page 18

1    it up and look underneath it?

2         A.      No.

3         Q.      Did you overhear any store

4    employee or person you understood to be a store

5    employee say anything that day before you left the

6    store?

7         A.      To me?

8         Q.      To you or your husband.  Anything

9    you may have overheard.

10        A.      Oh, just asked him if he was okay

11   and that she needed to file a report, needed some

12   information.

13        Q.      And would that be the store

14   associate that came upon soon after or is that the

15   store manager?

16        A.      The one up front.

17        Q.      Did you hear any conversation

18   between your husband and the female who came upon

19   him very soon after the accident?  Did you

20   overhear any conversation between them?

21        A.      Just information:  name, address.

22        Q.      So you were there when this other

23   salesperson --

24        A.      I wasn't right there in the

25   conversation, but I, you know, gathered that's

PLAINTIFF'S
EXHIBIT
tabbies
B

Page 19

1    what it was.   Just basic information:   the time,

2    the date.

3         Q.      Did you hear anything being spoken

4    by that particular store employee?

5         A.      No.

6         Q.      Did you hear anything spoken by

7    the person up front who was identified by your

8    husband to be a store manager?

9         A.      No.

10        Q.      What were you doing when your

11   husband was speaking with the store manager?

12        A.      Buying a candle.

13        Q.      And where was the candle?

14        A.      You have to walk around the T.J.

15   Maxx and go to a register.   He was more so by the

16   doors, so I really didn't hear him.

17        Q.      So he was taking care of providing

18   the necessary information to fill out a proper

19   report, and you were making your purchase of a

20   candle, correct?

21        A.      Yes.

22        Q.      Did you have -- did you overhear

23   any store employee speak about this particular

24   incident either on the day of the incident or any

25   time thereafter?

**PLAINTIFF'S EXHIBIT**
**B**
tabbies

Page 20

```
 1          A.      No.
 2          Q.      Have you personally been in this
 3   particular T.J. Maxx store at any point in time
 4   prior to this accident?
 5          A.      Yes.
 6          Q.      And on how many occasions that
 7   you're willing to admit to your husband?
 8          A.      I would say maybe two dozen.
 9          Q.      And at any point in time, have you
10   purchased any type of home furnishing such as a
11   chair, a couch, a table --
12          A.      No.
13          Q.      -- at that store?
14          A.      No.
15          Q.      Had you ever had an opportunity to
16   visualize any type of home furnishing that was
17   displayed on a platform as you recall it on any of
18   these prior two dozen occasions?
19          A.      No.
20          Q.      Do you personally know the
21   identity of any of the individuals who were
22   employed at this particular T.J. Maxx store at the
23   time of the incident?  Not particularly there on
24   the day, but who worked there.
25          A.      No.
```

PLAINTIFF'S
EXHIBIT
B

1          Q.       This Ms. Mertha that your husband

2    identified, do you know who she was?

3          A.       No.

4          Q.       When were you and your husband

5    married?

6          A.       March of '99.

7          Q.       And for a period of time prior

8    thereto, did you live with your husband?

9          A.       Yes.

10         Q.       And how long did you live with him

11   before being married?

12         A.       Eight and a half years.

13         Q.       And before living together for

14   this eight and a half years, was there a period of

15   time where the two of you were dating but not

16   living together?

17         A.       Uh-huh.

18         Q.       And how long was that?

19         A.       Six months.

20         Q.       So without forcing me to do the

21   math, how long have you known your husband?

22              MR. JUREWICZ:   Twenty-four years.

23              THE WITNESS:   Yeah.   It will be

24   twenty-five years.   Twenty-five years next month

25   it will be.

PLAINTIFF'S
EXHIBIT
tabbies
B

Page 22

1    BY MR. LYNN:

2           Q.      Well, is it twenty-five years next

3    month from the time you were married --

4           A.      No.   I'm thinking from when we

5    were married.

6           Q.      No.   I want to know how long have

7    you -- is it twenty-five years plus nine years,

8    thirty-four years, that you have known him?

9           A.      No.   No.

10          Q.      All right.   Because you said you

11   married in March of '99 and you lived together

12   before that for eight and a half years and you

13   dated before living together for six years.   So

14   that gives me nine --

15          A.      The fall of '90, I've been with

16   him.

17          Q.      You've been -- you've known him --

18                  MR. JUREWICZ:   It's twenty-five

19   years, Jim.   How much do we have to beat this into

20   the ground?   Twenty-five is twenty-five.

21   BY MR. LYNN:

22          Q.      Did your husband ever have any

23   neck problems that you were aware of prior to the

24   incident in the T.J. Maxx store?

25          A.      No.

PLAINTIFF'S
EXHIBIT

B

Page 23

1          Q.      Did he ever complain to you of any

2     problems with his neck prior to the incident in

3     the T.J. Maxx store?

4          A.      No.

5          Q.      Did he ever, to your knowledge,

6     have an x-ray or MRI scan of his neck prior to the

7     accident in the T.J. Maxx store?

8          A.      No.

9          Q.      Did he ever have any treatment for

10    his neck as far as you know prior to the accident

11    in the T.J. Maxx store?

12         A.      No.

13         Q.      Did your husband ever have any

14    problems with his right shoulder at any point in

15    time before the incident in the T.J. Maxx store?

16         A.      No.

17         Q.      Did your husband have any medical

18    treatment for his right shoulder for -- prior to

19    the accident in the T.J. Maxx store?

20         A.      No.

21         Q.      Did your husband have -- ever

22    offer or verbalize any complaints about his right

23    shoulder at any time before the accident in the

24    T.J. Maxx store?

25         A.      No.

PLAINTIFF'S
EXHIBIT
B
tabbies

Page 24

1          Q.      Did your husband ever have any
2    x-rays or MRI scans of his right shoulder before
3    the incident in the T.J. Maxx store?
4          A.      No.
5                  MR. LYNN:  I have no further
6    questions.
7                  Thank you, very much.
8                  MR. JUREWICZ:  Anything else?
9                  MR. STOFKO:  Nothing further.
10   Thanks.
11                 MR. JUREWICZ:  Okay.  We are done.
12                 (Witness excused.)
13                 (Whereupon, the deposition was
14   concluded at 2:06 p.m.)
15
16
17
18
19
20
21
22
23
24
25

PLAINTIFF'S
EXHIBIT
B

Page 25

```
 1              C E R T I F I C A T E

 2

 3          I do hereby certify that I am a Notary

 4   Public in good standing, that the aforesaid

 5   testimony was taken before me, pursuant to notice,

 6   at the time and place indicated; that said

 7   deponent was by me duly sworn to tell the truth,

 8   the whole truth, and nothing but the truth; that

 9   the testimony of said deponent was correctly

10   recorded in machine shorthand by me and thereafter

11   transcribed under my supervision with

12   computer-aided transcription; that the deposition

13   is a true and correct record of the testimony

14   given by the witness; and that I am neither of

15   counsel nor kin to any party in said action, nor

16   interested in the outcome thereof.

17

18          Christine R. Chapman

19          _____

                    Notary Public

20

21

22

23

24

25
```



PLAINTIFF'S EXHIBIT
B

**[& - display]**                                                      Page 1

| & |
| --- |
| **&**  1:11 2:8 |

| 1 |
| --- |
| **1**  5:23 10:2 |
| **12**  15:8 |
| **14**  3:3 |
| **1801**  2:4 |
| **1835**  1:21 |
| **18503**  1:13 2:9 |
| **19103**  1:21 2:4 |
| **1:41**  1:14 |

| 2 |
| --- |
| **2**  5:23 6:22 10:2 |
| **2015**  1:14 |
| **215**  2:5 |
| **222-8792**  1:22 |
| **2710**  1:21 |
| **2:06**  24:14 |

| 3 |
| --- |
| **3**  11:8,14 15:13 |
| 16:22 |
| **347-0600**  2:10 |
| **3:14-1154**  1:8 |

| 4 |
| --- |
| **4**  1:14 3:3 |
| **4/6/71**  5:7 |
| **402**  1:12 2:9 |
| **409**  1:12 2:9 |

| 5 |
| --- |
| **569-4433**  2:5 |
| **570**  2:10 |

| 7 |
| --- |
| **770**  2:4 |

| 8 |
| --- |
| **800**  1:22 |

| 9 |
| --- |
| **90**  22:15 |
| **99**  21:6 22:11 |

| a |
| --- |
| **able**  10:24 12:22 |
| **accident**  18:19 20:4 |
| 23:7,10,19,23 |
| **accurately**  10:25 |
| **action**  25:15 |
| **active**  12:25 13:12 |
| **addition**  15:17,25 |
| **address**  18:21 |
| **admit**  20:7 |
| **aforesaid**  25:4 |
| **afternoon**  4:13 14:7 |
| **agreed**  4:2 |
| **aided**  25:12 |
| **anybody**  9:6 10:7 |
| 15:4,6 |
| **approached**  7:5 8:5 |
| **area**  6:18,20,21,23 |
| 7:5 8:5,12 9:11,14 |
| 9:15,18,20,23 10:5 |
| **arguing**  13:18 |
| **asked**  18:10 |
| **asking**  5:17 12:1 |
| **associate**  18:14 |
| **associates**  8:9 |
| **assume**  4:24 |
| **avenue**  1:12 2:9 |
| **aware**  22:23 |

| b |
| --- |
| **b**  3:6 |
| **back**  11:20 15:12 |
| 16:20 |
| **background**  11:14 |
| **ball**  13:2 |
| **ballpark**  16:3 |
| **baseball**  13:3 |
| **basic**  19:1 |
| **basketball**  13:5 |
| **beat**  22:19 |
| **berger**  1:20 |
| **better**  13:15 17:19 |
| **bike**  13:1 |
| **biniek**  1:3,10 2:19 |
| 3:2 4:7,13 5:5,23 |

| 6:22 10:1 11:7,14 |
| --- |
| 14:7 15:12 16:21 |
| **birth**  5:6 |
| **bonner**  2:3 |
| **broke**  11:5,10,11 |
| **broken**  9:17 10:20 |
| **brown**  16:19,20,22 |
| 17:2,6,6,9 |
| **buying**  19:12 |

| c |
| --- |
| **c**  1:19 2:1 25:1,1 |
| **candle**  19:12,13,20 |
| **care**  19:17 |
| **certain**  16:2 |
| **certification**  4:3 |
| **certify**  25:3 |
| **chair⁹**  5:19 6:5,10 |
| 7:3,24 8:19,22 9:17 |
| 10:19,23 11:1,6,13 |
| 11:19 12:10,14 |
| 14:10 15:11,12 16:1 |
| 17:12,19 20:11 |
| **chairs**  5:14 6:10,13 |
| 7:1,2,6,8,11,15,18 |
| 7:21 8:5,7,7,12,16 |
| 9:4,7 10:7,10 15:14 |
| 15:14,22,25 16:8 |
| 17:16 |
| **christine**  1:15 |
| **chuckle**  15:7 |
| **cipriani**  1:11 2:8 |
| **clean**  12:23 |
| **clear**  11:12 |
| **close**  10:23 |
| **collapsed**  14:11,17 |
| **color**  11:16 16:12,24 |
| **colored**  11:16 |
| **colors**  16:18 17:8 |
| **commencing**  1:14 |
| **commonwealth**  1:16 |
| **companies**  1:7 |
| **complain**  23:1 |
| **complaints**  23:22 |

| comport  14:11 |
| --- |
| **computer**  25:12 |
| **concluded**  24:14 |
| **condition**  12:17 |
| **contact**  11:25 |
| **conversation**  10:14 |
| 18:17,20,25 |
| **convince**  13:13 |
| **cooled**  13:4 |
| **cooperman**  1:15 |
| **corp**  1:6 2:6 |
| **correct**  14:18,20,24 |
| 19:20 25:13 |
| **correctly**  25:9 |
| **couch**  20:11 |
| **counsel**  1:22 2:5,10 |
| 4:2 25:15 |
| **couple**  13:4 |
| **court**  1:1 |
| **cracked**  6:25 |
| **creaking**  8:24 |
| **cs1996980**  1:25 |

| d |
| --- |
| **d**  2:8 3:1 |
| **dan**  4:14 |
| **daniel**  2:8 |
| **date**  5:6 12:16 19:2 |
| **dated**  22:13 |
| **dating**  21:15 |
| **daughter**  15:1 |
| **day**  5:12 8:9 15:25 |
| 18:5 19:24 20:24 |
| **defendant**  2:5,10 |
| **defendants**  1:8 |
| **deponent**  25:7,9 |
| **deposition**  1:10 5:24 |
| 24:13 25:12 |
| **description**  3:8 |
| **different**  14:13 |
| 16:18 |
| **dining**  8:6 |
| **discussion**  8:4 |
| **display**  8:12,16 |
| 15:16 |

Veritext Legal Solutions

**PLAINTIFF'S EXHIBIT**
**B**
tabbies®

**displayed**  20:17
**district**  1:1,1
**doing**  19:10
**doors**  19:16
**dozen**  6:14 20:8,18
**duly**  4:8 25:7

**e**

**e**  1:19,19 2:1,1,18,18
  3:1,6 25:1,1
**eddie**  14:25
**edward**  1:3 2:19
**eight**  21:12,14 22:12
**either**  13:9 19:24
**emotional**  13:17
**employed**  20:22
**employee**  10:6,14
  18:4,5 19:4,23
**esquire**  1:20 2:3,8
**exact**  6:3
**examination**  4:10
  14:4
**examined**  4:8
**excused**  24:12
**exhibit**  15:12
**exhibits**  3:9

**f**

**f**  2:3 25:1
**fact**  10:21,24
**fall**  22:15
**far**  5:13 7:23 23:10
**fast**  9:2
**february**  1:14
**feel**  13:15
**feet**  7:25
**female**  18:18
**field**  13:2
**file**  18:11
**filing**  4:4
**fill**  19:18
**first**  4:7 11:14 15:3
**five**  7:25 21:24,24
  22:2,7,18,20,20
**floor**  6:9,10,11,13
  6:19 9:1 12:11

**follows**  4:8
**forcing**  21:20
**foreground**  6:22
  9:25
**form**  4:5
**four**  16:7 21:22 22:8
**front**  8:1,3 9:16 10:1
  18:16 19:7
**full**  5:3
**funny**  15:4
**furnishing**  20:10,16
**furniture**  9:14,15
  10:6
**further**  14:2 24:5,9

**g**

**galfand**  1:20
**gathered**  18:25
**given**  25:14
**gives**  22:14
**giving**  4:25
**go**  5:13,22 13:1
  19:15
**good**  4:13 14:7 25:4
**ground**  7:6 10:8
  22:20

**h**

**h**  1:3 3:6
**half**  6:14 21:12,14
  22:12
**hand**  13:23
**handle**  7:20
**happened**  9:2
**hard**  13:19
**hear**  4:18 8:24 18:17
  19:3,6,16
**heard**  4:24
**held**  1:11
**help**  12:20
**home**  20:10,16
**hopefully**  14:8
**houses**  12:21
**huh**  10:3 11:17
  16:23 21:17

**hurting**  13:20
**husband**  4:16 6:5
  7:21,23 9:4,7 12:9
  14:9 17:12,18 18:8
  18:18 19:8,11 20:7
  21:1,4,8,21 22:22
  23:13,17,21 24:1
**husband's**  5:24
  12:17

**i**

**identified**  19:7 21:2
**identity**  20:21
**immediately**  11:1
  14:17
**impacted**  12:17
**incident**  5:9,12 6:2
  8:20 9:9,14 10:4,15
  11:2 12:6,16 13:7
  19:24,24 20:23
  22:24 23:2,15 24:3
**including**  17:6
**indicated**  25:6
**indicating**  13:21,22
**individuals**  20:21
**information**  18:12
  18:21 19:1,18
**inspect**  17:19
**instructions**  4:16,18
**interested**  25:16
**investigator**  12:1
**issue**  11:19
**items**  9:10

**j**

**james**  2:3
**jim**  11:21 22:19
**job**  1:25
**jofran**  1:7 2:10 4:14
**jr**  2:19
**jurewicz**  1:20 5:16
  21:22 22:18 24:8,11

**k**

**kicking**  13:2

**kids**  13:1
**kiernan**  2:3
**killing**  13:14
**kin**  25:15
**kitchen**  8:7
**know**  4:23 6:18 8:12
  13:21 16:4,13,15
  18:25 20:20 21:2
  22:6 23:10
**knowledge**  23:5
**known**  21:21 22:8
  22:17

**l**

**l**  2:18
**lack**  17:19
**lackawanna**  1:12
  2:9
**ladders**  12:23
**laughing**  15:4,6
**left**  9:18 10:1,5
  13:23 18:5
**leg**  5:20 14:14
**life**  12:18
**lighting**  12:23
**little**  14:25
**live**  21:8,10
**lived**  22:11
**living**  21:13,16
  22:13
**llp**  1:20
**long**  9:13 21:10,18
  21:21 22:6
**look**  10:19 11:11
  18:1
**looked**  6:3 11:1,4
**looking**  6:25 11:10
  15:14 16:7
**lynn**  2:3 3:3 5:5
  11:18,22 13:22 14:6
  22:1,21 24:5

**m**

**m**  1:20
**machine**  25:10

PLAINTIFF'S
EXHIBIT
B

| | | | |
|---|---|---|---|
| **making** 19:19 | **number** 3:8 | **pictures** 5:13,22,23 | **r** |
| **manager** 18:15 19:8 | **o** | 6:1 10:23,23 | **r** 1:15,19 2:1,18 25:1 |
| 19:11 | **o** 2:18 | **place** 25:6 | **range** 16:3 |
| **march** 21:6 22:11 | **objections** 4:4 | **plaintiffs** 1:4,22 | **ray** 23:6 |
| **marked** 3:8,9 | **occasions** 20:6,18 | **platform** 6:6,22 | **rays** 24:2 |
| **market** 1:21 2:4 | **occurred** 8:20 9:9 | 7:12 10:1 12:11 | **reaction** 15:3 |
| **marla** 1:3,10 3:2 4:7 | **offer** 23:22 | 20:17 | **really** 13:19 16:4 |
| 5:5 | **oh** 5:18 11:23 15:5 | **platforms** 6:5 7:8,18 | 19:16 |
| **marmaxx** 1:6 2:5 | 18:10 | 10:11 | **recall** 12:10 15:13 |
| **married** 21:5,11 | **okay** 5:1,18,25 | **playing** 13:3 | 15:24 17:3,8 20:17 |
| 22:3,5,11 | 11:23 18:10 24:11 | **please** 4:22 5:3 | **recollection** 14:12 |
| **math** 21:21 | **old** 15:8 | **plus** 22:7 | 14:12,16 |
| **matter** 4:15 10:7 | **ones** 6:19 17:5 | **point** 17:11,15,25 | **record** 5:4 9:21,25 |
| 12:2 | **operating** 1:6 2:6 | 20:3,9 23:14 | 13:24 25:13 |
| **maxx** 1:6,7 5:9 12:7 | **opportunity** 20:15 | **pointed** 11:7 | **record's** 11:12 |
| 19:15 20:3,22 22:24 | **opposed** 16:19 | **pointing** 6:21 9:25 | **recorded** 25:10 |
| 23:3,7,11,15,19,24 | **oral** 1:10 | 11:13 | **reflect** 10:25 13:24 |
| 24:3 | **outcome** 25:16 | **pool** 13:3,5 | **reflects** 9:21 |
| **mean** 6:25 | **overhear** 18:3,20 | **present** 4:15 5:8 | **regarding** 8:5 |
| **medical** 23:17 | 19:22 | 15:1 | **register** 19:15 |
| **mertha** 21:1 | **overheard** 18:9 | **pretty** 13:12 | **relationship** 13:6 |
| **middle** 1:1 | **p** | **prior** 20:4,18 21:7 | **remain** 9:13 |
| **minutes** 9:16 | **p** 1:19,19 2:1,1,18 | 22:23 23:2,6,10,18 | **remember** 6:16,17 |
| **miserable** 13:20 | **p.m.** 1:14 24:14 | **probably** 16:19 | 6:24 11:5,5,10 |
| **month** 21:24 22:3 | **pa** 1:21 2:4,9 | **problems** 13:7 | 15:20 |
| **months** 21:19 | **particular** 19:4,23 | 22:23 23:2,14 | **remove** 7:17 |
| **move** 9:3,6,10 10:7 | 20:3,22 | **professional** 1:15 | **repeat** 4:21 |
| 10:10 | **particularly** 20:23 | **proper** 19:18 | **replica** 6:3 |
| **movement** 8:18 | **parties** 4:3 | **provide** 4:23 | **report** 12:7 18:11 |
| **mri** 23:6 24:2 | **party** 25:15 | **providing** 19:17 | 19:19 |
| **n** | **pc** 1:12 2:8 | **public** 1:16 25:4,19 | **reporter** 1:15 |
| **n** 1:19 2:1,18 3:1 | **pennsylvania** 1:1,13 | **purchase** 19:19 | **represent** 4:14 |
| **name** 4:14 5:4 18:21 | 1:17 | **purchased** 20:10 | 11:18 |
| **near** 6:21 | **period** 21:7,14 | **pursuant** 1:11 25:5 | **reserved** 4:5 |
| **necessary** 19:18 | **person** 18:4 19:7 | **put** 11:9,15 | **respective** 4:2 |
| **neck** 13:14,15 22:23 | **personally** 10:13 | **putting** 13:22 | **response** 4:24 5:1 |
| 23:2,6,10 | 20:2,20 | **q** | 12:3 |
| **needed** 8:6 18:11,11 | **personnel** 9:10 | **question** 4:5,22,23 | **richard** 1:20 |
| **neither** 25:14 | **philadelphia** 1:21 | 4:25 | **riding** 13:1 |
| **new** 8:6 | 2:4 | **questions** 12:2 14:2 | **right** 5:20 6:12,18 |
| **nine** 22:7,14 | **physical** 12:17 13:8 | 24:6 | 6:20,23 7:2,4 9:19 |
| **notary** 1:16 25:3,19 | **pick** 17:25 | | 9:23 13:23 14:8 |
| **notice** 1:11 8:22 | **picture** 11:14 | | 18:24 22:10 23:14 |
| 25:5 | | | 23:18,22 24:2 |

PLAINTIFF'S
EXHIBIT
13

| | | | |
|---|---|---|---|
| **room**  8:7 | **slowed**  12:19 | **telephone**  12:1 | **understood**  4:25 |
| **running**  12:21 | **snow**  12:20 | **tell**  5:11 8:15 10:25 | 18:4 |
| | **soccer**  13:2 | 12:9,13 25:7 | **united**  1:1 |
| **s** | **son**  14:21 15:8,9 | **ten**  14:10 | **unsure**  12:14 |
| **s**  1:19 2:1,18,18 3:6 | **soon**  18:14,19 | **testified**  4:8 14:9 | **v** |
| **sales**  1:7 2:10 | **sorry**  11:7 | **testimony**  3:2 14:20 | **vacuum**  12:22 |
| **salesperson**  18:23 | **sound**  8:25 | 25:5,9,13 | **verbal**  12:3 |
| **sat**  5:19 6:5,11,17 | **speak**  8:8 19:23 | **thank**  24:7 | **verbalize**  23:22 |
| 7:3,21,24 8:19 9:4,7 | **speaking**  19:11 | **thanks**  24:10 | **visualize**  20:16 |
| 12:11 14:9,14 17:13 | **spoken**  19:3,6 | **thereof**  25:16 | **volleyball**  13:5 |
| **saw**  10:17 15:25 | **stacked**  5:14 | **thereto**  21:8 | **vs**  1:5 |
| 17:5 | **standing**  25:4 | **things**  13:18 | **w** |
| **says**  13:13 | **state**  5:3 9:24 | **think**  16:6 | **w**  1:3 |
| **scan**  23:6 | **states**  1:1 | **thinking**  15:4 22:4 | **waived**  4:4 |
| **scans**  24:2 | **stipulated**  4:1 | **thirty**  22:8 | **walk**  17:22 19:14 |
| **school**  13:2 | **stofko**  2:8 3:3 4:12 | **three**  9:16 16:5,7,9 | **walked**  9:16 |
| **scranton**  1:13 2:9 | 4:14 5:21 11:20,24 | **time**  4:6 5:8 6:24 8:9 | **walks**  13:20 |
| **sealing**  4:3 | 14:1 24:9 | 8:19,19 9:18 10:4,5 | **want**  6:4 9:19,24 |
| **seat**  11:16 16:20,22 | **store**  6:3 8:8 9:10 | 13:21 15:8,17 17:11 | 13:23 22:6 |
| 17:2,6 | 10:6,14 18:3,4,6,13 | 17:15,25 19:1,25 | **warning**  8:11 |
| **seconds**  14:10 | 18:15 19:4,8,11,23 | 20:3,9,23 21:7,15 | **way**  17:18 |
| **see**  7:14,17,20 8:11 | 20:3,13,22 22:24 | 22:3 23:15,23 25:6 | **wednesday**  1:13 |
| 8:18 9:6,10 10:6,10 | 23:3,7,11,15,19,24 | **times**  13:4 | **werner**  1:12 2:8 |
| 11:23 12:6 13:19 | 24:3 | **total**  16:6,7,10 | **white**  11:15 16:20 |
| 15:12 16:21 | **street**  1:21 2:4 | **touch**  9:3,6 17:12,16 | 16:25 17:1,9 |
| **shit**  15:5 | **strife**  13:17 | **track**  12:23 | **willing**  20:7 |
| **shopping**  14:22 | **stuff**  12:23 | **transcribed**  25:11 | **witness**  5:18 11:23 |
| **shorthand**  25:10 | **subject**  15:25 17:12 | **transcription**  25:12 | 13:25 21:23 24:12 |
| 23:14,18,23 24:2 | **suite**  1:12,21 2:4,9 | **treatment**  23:9,18 | 25:14 |
| **shovel**  12:20 | **summer**  13:4 | **trial**  4:6 | **witnessed**  5:11 |
| **show**  10:22 | **supervision**  25:11 | **true**  25:13 | **wobble**  8:22 |
| **side**  8:2 | **swimming**  13:3 | **truth**  25:7,8,8 | **wood**  11:16 16:20 |
| **signature**  25:18 | **sworn**  4:8 25:7 | **truthful**  5:1 | **wooden**  15:11,22,24 |
| **signing**  4:3 | **t** | **try**  13:14 | 16:7 |
| **signs**  8:11 | **t**  2:18 3:6 25:1,1 | **twenty**  21:22,24,24 | **word**  17:19 |
| **similar**  15:13,14,18 | **t.j.**  1:6,6 5:9 12:7 | 22:2,7,18,20,20 | **worked**  20:24 |
| 15:19,21 16:7 | 19:14 20:3,22 22:24 | **two**  20:8,18 21:15 | **x** |
| **simply**  17:22 | 23:3,7,11,15,19,24 | **type**  15:11 20:10,16 | **x**  3:1,6 23:6 24:2 |
| **sit**  17:23 | 24:3 | **u** | **y** |
| **sitting**  7:14 9:1 | **table**  20:11 | **uh**  10:3 11:17 16:23 | **yeah**  6:23 9:2,22 |
| 14:17 17:20 | **take**  10:19 | 21:17 | 11:22 13:10,25 |
| **six**  21:19 22:13 | **taken**  1:11 6:2 10:24 | **underneath**  18:1 | 14:14,19 21:23 |
| **slat**  15:12 | 25:5 | **understand**  4:19,22 | |
| | | 6:1 | |

PLAINTIFF'S EXHIBIT B

**[year – years]**                                                            Page 5

| |
|---|
| **year**  15:8<br>**years**  21:12,14,22<br>  21:24,24 22:2,7,7,8<br>  22:12,13,19 |

PLAINTIFF'S<br>EXHIBIT<br>13<br>tabbies

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.


PLAINTIFF'S EXHIBIT
B

# AFFIDAVIT OF EDWARD J. BINIEK, III

1. My name is Edward J. Biniek, III. I go by Eddie.

2. I was with my mom and dad at the T.J. Maxx store in Wilkes-Barre when my dad had his accident.

3. My mom and dad were in the store browsing around and after a while we wound up toward the back of the store in the corner where some furniture was located.

4. As I remember there were a couple wooden kitchen chairs on the floor next to a large platform that had other furniture on it that I cannot specifically remember the kind or type but believe that there was at least a table on the platform.

5. I heard my mom tell my dad that they needed some new kitchen chairs. My dad walked over and then sat down on the wooden kitchen chair that was on the floor in front of the platform.

6. Once my dad sat down on it I heard a loud crack like someone breaking wood to start a fire, at least that is what it sounded like to me, when the right front leg collapsed and the chair and my father fell to the right and my dad landed on the floor hitting his right side and head.

7. I heard my mom ask my dad if he was okay and not to get up

8. My dad then got up and told my mom that he thought he would be okay. Then the lady sales associate that had walked by us while we were walking toward the chairs came back and asked my dad if he was okay and then said something about she could have the store call for an ambulance if he needed one.

9. I could not believe what happened to my dad. All he did was just sit down on a chair that was on the floor and it just collapsed and threw him to the ground. He did nothing other than just simply sit down on the chair.

10. I have read the foregoing statement and it is true and correct to the best of my knowledge, recollection and belief and accurately sets forth what I saw that evening while I was with my mom and dad.


PLAINTIFF'S EXHIBIT
C

BY:  Edward J. Biniek III
     _____
     EDWARD J. BINIEK, IIII

SWORN TO AND SUBSCRIBED :

BEFORE ME THIS 27th DAY :

OF  March  , 2015:

Bonnie R Stuhl
_____
NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
BONNIE R. STUHL, Notary Public
City of Philadelphia, Phila. County
My Commission Expires July 4, 2018


PLAINTIFF'S
EXHIBIT
C

Case 3:14-cv-01154-MEM   Document 38-2   Filed 09/11/15   Page 54 of 90

TARA HUGHES                                            October 08, 2014
BINIEK vs. MARMAXX OPERATING CORP                            1–4

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
3    -------------------------x
     EDWARD and MARLA BINIEK,   :  CIVIL ACTION
4        Plaintiff(s),          :
5        v.                     :
6    MARMAXX OPERATING CORP.     :
         and                    :
7    JOFRAN SALES, INC.          :
         Defendant(s).          :  NO. 3:14-CV-1154
8    -------------------------x
9              - - -
              October 8, 2014
10             - - -
11        Oral deposition of TARA HUGHES, held
12   at the LAW OFFICES OF NEIL T. O'DONNELL, 267
13   Wyoming Avenue, Kingston, Pennsylvania 18704,
14   beginning at 2:51 p.m., on the above date,
15   before Denise D. Bach, a Federally Approved
16   Registered Professional Reporter and Notary
17   Public.
18
19
20
21        ESQUIRE DEPOSITION SOLUTIONS
22          1835 Market Street
              Suite 2600
23        Philadelphia, Pennsylvania 19103
              (215) 988-9191
24
```

**Page 2**

```
1    APPEARANCES:
2
3        GALFAND BERGER, LLP
         BY: RICHARD M. JUREWICZ, ESQUIRE
4        Suite 2710
         1835 Market Street
5        Philadelphia, PA 19103
         215.665.1600
6        rjurewicz@galfandberger.com
         --Representing the Plaintiff(s)
7
8        BONNER KIERNAN TREBACH & CROCIATA LLP
         BY: JAMES F. LYNN, ESQUIRE
9        Ten Penn Center, Suite 770
         1801 Market Street
10       Philadelphia, PA 19103
         215.569.4433
11       jlynn@bonnerkiernan.com
         --Representing the Defendant(s),
12           Marmaxx Operating Corp.
13
         CIPRIANI & WERNER
14       BY: DANIEL D. STOFKO, ESQUIRE
         409 Lackawanna Avenue
15       Suite 402
         Scranton, Pennsylvania 18503
16       dstofko@c-wlaw.com
         --Representing the Defendant(s),
17           Jofran Sales, Inc.
18
19
20
21
22
23
24
```

**Page 3**

```
1              I N D E X
2    WITNESS                              PAGE
     TARA HUGHES
3    By Mr. Jurewicz                      5, 47
     By Mr. Stofko                        32
4
5           E X H I B I T S
6    MARKED      DESCRIPTION              PAGE
7    Hughes-1  Color Photocopy of Photograph  40
               of Under Seat of Chair
8
9    Hughes-2  Color Photocopy of Photograph  41
               of Under Seat of Chair
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
1         DEPOSITION SUPPORT INDEX
2
3    DIRECTION TO WITNESS NOT TO ANSWER
4    Page  Line        Page  Line      Page  Line
5    (None)
6
7
8    REQUEST FOR PRODUCTION OF DOCUMENTS
9    Page  Line        Page  Line      Page  Line
10   (None)
11
12
13           STIPULATIONS
14   Page  Line        Page  Line      Page  Line
15    5     2
16
17
18           QUESTIONS MARKED
19   Page  Line        Page  Line      Page  Line
20   (None)
21
22
23
24
```





PLAINTIFF'S EXHIBIT D

800.211.DEPO (3376)
EsquireSolutions.com

Page 5

1         - - -
2         (It is hereby stipulated and agreed
3 by and among counsel that signing, sealing,
4 filing and certification are waived; and that
5 all objections, except as to the form of
6 questions, be reserved until the time of trial.)
7         - - -
8         TARA HUGHES, having been first duly
9 sworn, was examined and testified as follows:
10        - - -
11            EXAMINATION
12        - - -
13 BY MR. JUREWICZ:
14    Q.    My name is Rick Jurewicz and I
15 represent Mr. and Mrs. Biniek in a lawsuit they
16 filed as a result of a chair collapse incident
17 that took place in the T.J.Maxx Arena Hub store
18 in Wilkes-Barre back in March of 2013.
19        Do you know anything about the
20 accident?
21    A.    I do.  I -- actually, I saw the
22 gentleman previous to the accident.  I saw in
23 the general vicinity where he was, he was there
24 with two children.  I didn't recall boy or girl,

Page 6

1 but they were two children.  And right when I
2 walked past him, there was a clothing, like a
3 clothing rack.  We were -- where they were
4 displayed, it was near the lingerie, so there
5 was a clothing rack.  So as soon as I passed
6 him, I didn't see him sit, I heard -- I heard
7 him go down, like immediately.  So I, I just
8 walked right back and he was on the ground.  So
9 that's, that's how I found him.
10        But he was -- him and the two
11 children were the only two -- like three people
12 in the vicinity.  So it was probably half a
13 second when I walked back and walked back and he was
14 on the ground.
15    Q.    When you saw them for the first
16 time, it obviously was before the accident?
17    A.    Yes.
18    Q.    Were they walking toward a
19 particular area of the store?
20    A.    They were in the -- they were in
21 the back where that display was, it was in the
22 right-hand corner of the store near the offices
23 and the break room and the bathrooms.  So it
24 was, it was behind the lingerie, so it was in

Page 7

1 that vicinity.
2    Q.    If I showed you some pictures,
3 would that help you out?
4    A.    Sure.
5    Q.    Take a look at what's been marked
6 as 1A, Fanelli, and there's a series of
7 photographs.
8    A.    Okay.
9    Q.    And you obviously recognize what's
10 in 1A, right?
11    A.    The front.
12    Q.    That's where you go get your pay?
13    A.    Not anymore.
14    Q.    And when did you stop working at
15 T.J.Maxx?
16    A.    August of --
17    Q.    And why did you stop working --
18        MR. LYNN:  August of what?
19        THE WITNESS:  Of 2013.
20 BY MR. JUREWICZ:
21    Q.    Why?
22    A.    Misunderstanding between
23 Mr. Fanelli and I.
24    Q.    Was your decision to leave a

Page 8

1 voluntary --
2    A.    Yes.
3    Q.    -- or involuntary one?
4    A.    Voluntary.
5    Q.    What did you think of Mr. Fanelli
6 as a manager?
7    A.    If I'm under oath, very
8 inappropriate.
9    Q.    Enough said.
10    A.    Um-hmm.
11    Q.    If you take a look at --
12    A.    This is right where the display
13 was.
14        MR. LYNN:  You're referring to --
15 BY MR. JUREWICZ:
16    Q.    1E.
17        MR. LYNN:  -- Fanelli Exhibit 1E.
18        THE WITNESS:  Oh, 1E.  I thought
19 you said 1A, I'm sorry.
20 BY MR. JUREWICZ:
21    Q.    That's all right.  It wouldn't
22 surprise me if I did.
23    A.    Okay.
24    Q.    Putting aside what merchandise is




PLAINTIFF'S
EXHIBIT
D

Case 3:14-cv-01154-MEM   Document 38-2   Filed 09/11/15   Page 56 of 90

TARA HUGHES                                          October 08, 2014
BINIEK vs. MARMAXX OPERATING CORP                            9—12

Page 9

1  now on display, the area of the store is the
2  area where you understand that Mr. Biniek had
3  his accident?
4      A.    Yes.
5      Q.    And at the time, or I should say
6  on the evening of his accident, did the store
7  have what is referred to as those four elevated
8  display areas?
9      A.    Yes.
10     Q.    And if we can use Exhibit Fanelli
11 1E, where was it that you saw Mr. Biniek and his
12 two children for the first time?
13     A.    For the first time, it was not
14 even in this area.  It was like I was greeting
15 him throughout the store.  Like I saw lots of
16 people, so I saw him walking through the store.
17 That was the first time.
18     Q.    Maybe I should take a step back
19 and ask you, in March of 2013, what was your
20 position with T.J.Maxx?
21     A.    I was -- I was associate.  I was
22 going for front-end coordinator.  So they were
23 ready to like -- they were training me for
24 front-end coordinator.

Page 10

1      Q.    And in March of 2013, although you
2  were training for a new position --
3      A.    Um-hmm.
4      Q.    -- was there an area of the store
5  that you were assigned as a store associate?
6      A.    I was in men's and kids.
7      Q.    And men's and kids, does that
8  include the home furnishing?
9      A.    No, no.
10     Q.    Do you know if there was someone
11 that was assigned to the home furnishings or
12 home décor department?
13     A.    There always is.
14     Q.    Do you know who the store
15 associate was that evening or that shift?
16     A.    No, no.
17           MR. LYNN:  Are --
18           MR. JUREWICZ:  I'm on the day of
19 the accident.
20           MR. LYNN:  Okay.  Well, earlier
21 you were just asking her about March of 2013.
22 So I don't know if she's answering just for the
23 month or for the day.
24           THE WITNESS:  No, I was trying to

Page 11

1  recall the day.
2  BY MR. JUREWICZ:
3      Q.    You understand that that's where
4  my questions were directed?
5      A.    Um-hmm, yes.
6      Q.    Fair enough.
7            Was there what would be referred
8  to as a merchandise coordinator that worked in
9  March of 2013 for each -- that held the position
10 as merchandise coordinator for each of the
11 different departments?
12     A.    Yes, but I don't recall.
13     Q.    Karen Nagle, does that sound
14 familiar?
15     A.    Yes, yes.
16     Q.    Was she there at the time of the
17 accident?
18     A.    I don't recall.
19     Q.    Who was the head person, or who
20 was running the store at the time?
21           MR. LYNN:  Of the accident?
22           MR. JUREWICZ:  Of course.
23           THE WITNESS:  The manager that you
24 said that I was -- I did the report with.  I

Page 12

1  can't recall her name.  Murtha or Nash.  Murtha?
2  Mary Lu Murtha, yes.
3  BY MR. JUREWICZ:
4      Q.    And was she an assistant store
5  manager?
6      A.    Yes, yes.  They're all like --
7  Jerry Fanelli is the head and I guess there was
8  like three like supervisors type.
9      Q.    So when you first saw Mr. Biniek
10 for the first time with his kids, where in the
11 store were they?
12     A.    They were in, in this particular
13 area, because I was actually walking out of the
14 break room, which is out of the picture, but
15 it's like right in the corner.  This is the
16 right-hand corner of the store and the break
17 room and the restrooms are like right here.
18     Q.    If we, if we take a look at 1G,
19 you'll see a sign that says "Restrooms"?
20     A.    Yep.  I was walking out of that
21 area.
22     Q.    In the area where the sign
23 "Restrooms" is located?
24     A.    Yes.





PLAINTIFF'S
EXHIBIT
D

Case 3:14-cv-01154-MEM   Document 38-2   Filed 09/11/15   Page 57 of 90

TARA HUGHES                                        October 08, 2014
BINIEK vs. MARMAXX OPERATING CORP                           13–16

Page 13

1    Q.    And in what direction were you
2  walking?
3    A.    Towards the four displays.
4    Q.    And at what point in time did you
5  see Mr. Biniek and his two children?
6    A.    Right in front of the display.
7    Q.    Which display?
8    A.    It was one of the front two.  I
9  can't recall.
10   Q.    Were they still walking towards
11 the front display or had they stopped at that
12 point?
13   A.    They stopped to look, to shop, to
14 look.
15   Q.    Was that the first time you saw
16 them in the store that evening?
17   A.    No.  I think that's what I was
18 trying to say.  Like I saw them just shopping
19 earlier, like just in passing.  I recognized him
20 when I saw him again in that area.
21   Q.    All right.  Having seen him in the
22 store earlier that evening?
23   A.    Um-hmm, yes.
24   Q.    And then you went your way?

Page 14

1    A.    Yep.  It was -- yep.  He did
2  shopping, I had my break, so that would have
3  been a half an hour, and then I saw him again.
4    Q.    And then when you saw him at the
5  display, had he stopped at that point to look
6  like he was observing something?
7    A.    Yeah, yes.
8    Q.    Do you know what he was looking
9  at?
10   A.    The chairs.
11   Q.    Do you know how many chairs that
12 were there?
13   A.    I believe four.  There were three
14 or four.
15   Q.    And what kind of chairs were they?
16   A.    That's what I was trying to
17 remember.  They were like, they were -- they
18 were table chairs, like that you would use at a
19 table, not like a living room or anything.  I
20 couldn't remember if they were wicker or wood,
21 but I'm seeing the picture, they're obviously --
22 that must be the picture.  I was trying to
23 recall all morning.  But they were like, just
24 like pull-in chairs for a table.  That's --

Page 15

1  that's my recollection.
2    Q.    That's important what your
3  recollection is, not necessarily what's shown
4  here.
5    A.    No, I know, I know.  They were
6  definitely chairs that were bolt -- put
7  together, like bolted.
8    Q.    How do you know that?
9    A.    Because when he did -- after he
10 did his paperwork, I said to Mary Lu Murtha, why
11 don't we check the rest of the chairs.  And we
12 went out and we turned the rest of the chairs
13 over and they were all defective.  So we took
14 them all back, me and her.
15   Q.    And what was defective about the
16 chairs?
17   A.    Where the bolts were going, they
18 weren't -- they weren't meeting like where the
19 wood would crisscross, and I guess -- the wood
20 would crisscross like this and then there was
21 a -- I'm not very much of a carpenter, but --
22   Q.    Well, hold on a second.  Go ahead,
23 I'll make you a carpenter when your deposition
24 is over.

Page 16

1    A.    The bolts weren't meeting where
2  the legs would go in.  So the bolt went through,
3  like the chairs are square and then they have
4  like, this is where the leg would be right here,
5  and then there's like, kind of like a, like a
6  little piece of wood.
7    Q.    Like a block of wood?
8    A.    Yes.  And they were going in
9  through the block of wood and it looked like
10 they were directed towards each side of the leg
11 and they weren't meeting the legs.
12        So we, both of us, took the rest
13 of the chairs off the floor.
14   Q.    And let's start first with the
15 chair that was involved in Mr. Biniek's
16 accident.
17   A.    Um-hmm.
18   Q.    And we'll get back to what you
19 heard and how soon you got over there, but since
20 you were on to the defective chairs, I want to
21 explore that issue with you.
22   A.    Okay.
23   Q.    Okay.  After you -- after you
24 heard the sound, did you know what it was when


ESQUIRE
SOLUTIONS


PLAINTIFF'S
EXHIBIT
D

800.211.DEPO (3376)
EsquireSolutions.com

Page 17

1  you heard the sound?
2      A.    I definitely knew it was somebody
3  fell. Like because we have like those shiny
4  concrete floors, it was just like a thump. And
5  like right after these displays, there's a
6  lingerie cart right here, and there was
7  nothing -- nobody except three people, a man and
8  two little children. So definitely knew it was
9  somebody went down. And I was only like a split
10  second ahead of the -- so I knew, I knew
11  somebody went down.
12          MR. STOFKO: When you say "right
13  here," I don't want to cut you off, but the
14  record can't reflect that. When you said "right
15  here," as far as the lingerie rack, could you
16  explain with respect to this?
17          THE WITNESS: Oh, I was pointing
18  kind of to the picture. Where the four like --
19          MR. LYNN: Platforms?
20          THE WITNESS: -- platforms are,
21  right after, probably a good four or five feet,
22  that's where the lingerie racks would start.
23          MR. STOFKO: Would it be down and
24  to the right if you're looking at the picture --

Page 18

1          MR. LYNN: Don't mark that,
2  though.
3          MR. JUREWICZ: I'm not, I'm not.
4  It's already been marked. This is --
5          MR. LYNN: I mean, don't have her
6  mark somebody else's exhibit.
7          MR. JUREWICZ: She's not.
8  BY MR. JUREWICZ:
9      Q.    This has been marked Fanelli
10  Number 2.
11      A.    Okay.
12      Q.    You're going to see, there's a red
13  square box and, within that box, there's four
14  small black boxes.
15      A.    Um-hmm.
16      Q.    Are you with me?
17      A.    Um-hmm.
18      Q.    Now, using this exhibit as a point
19  of reference, can you tell me where you were
20  when you heard the thud?
21      A.    Probably about right here.
22      Q.    So you're more towards, we'll say,
23  going towards the front of the store?
24      A.    Yes, I was walking out of this

Page 19

1  door, so going this way. I went around actually
2  because you have to go around the platforms and
3  then I was walking down this way, but it was
4  like the vicinity of like right there.
5      Q.    And you said you were about four
6  feet away from the platform?
7      A.    Yes, yes.
8      Q.    And your back was to the platform?
9      A.    Yes.
10      Q.    And when you passed the platform,
11  Mr. Biniek was there with his two children?
12      A.    Yes.
13      Q.    And at that point in time, were
14  any chairs on the floor?
15      A.    No. Not at that time, no.
16      Q.    Can you give me an idea, after you
17  passed Mr. Biniek, how many steps, if you would
18  want to do it by steps, or if you would want to
19  do it by seconds, where you passed him and then
20  heard a thud or a sound to indicate to you that
21  something happened?
22      A.    It was only like three or four
23  steps.
24      Q.    And how loud -- if you could,

Page 20

1  describe the sound that you heard.
2      A.    Well, he wasn't, as I recall, he
3  wasn't a big man, because I kept saying, how
4  could he break that chair? You know, I knew
5  something was wrong. So it wasn't like a huge
6  thud, but it was like out of the ordinary sound
7  in a department store.
8      Q.    Sure.
9          And when you turned around, what
10  did you see?
11      A.    I saw him on the floor. And I
12  believe one of the children was reaching for him
13  already. But I, I tried to get over to him.
14  And he said he was okay. But he hit pretty
15  loud, you know, like I know I fell on those
16  floors before, I know what that feels like.
17          So like he stood up. And I told
18  him not to go anywhere, because I wanted to get
19  my manager. So he stood up and I asked him if
20  he -- he first didn't want to do an accident
21  report. And I said, no, you have to do an
22  accident report. You know, I knew you had the
23  accident. So I made him stay in the vicinity
24  until I got Mary Lu and she came to him and then





PLAINTIFF'S
EXHIBIT
D

Page 21

1  she asked him if he needed an ambulance. And he
2  was fine walking. So they walked up to the
3  front and then did the paperwork.
4       Q.    And when you first saw him, was he
5  still on the floor?
6       A.    Yes.
7       Q.    And what was his position? Was he
8  prone, was he sitting up, was he kneeling? I'm
9  not trying to put words in your mouth.
10      A.    No, I'm trying to remember. I
11  think he was on one knee, like actually like he
12  was like he went down and like -- and he caught
13  himself a little bit, but like he didn't like
14  fall, like fall like completely. Like he fell,
15  but like he caught himself with one knee type of
16  thing.
17      Q.    How do you know that if you didn't
18  see it?
19      A.    I think -- I recall him -- well,
20  when I saw him on one knee, so within the three
21  seconds. I don't know, I don't recall his age,
22  but I think he was older than me. I don't know
23  if he could have got from the sitting position
24  to a knee at that time.

Page 22

1       Q.    What was the position of the
2  chair?
3       A.    On the ground. Well, the leg was
4  off. So it was like three legs, three legs and
5  then the one down, so --
6       Q.    All right. And I get it that one
7  of the legs was not connected to the chair
8  anymore, right?
9       A.    Um-hmm, um-hmm.
10      Q.    So what was the position of the
11  chair? Was it on the -- was it still upright,
12  was it on its side, was it --
13      A.    It was tilted, it like fell to
14  where the leg fell off, so it was tilted to the
15  ground.
16      Q.    And when you called for your
17  assistant store manager, did you do it by
18  intercom, radio, cellphone?
19      A.    I ran up. I didn't -- we didn't
20  have -- we didn't use the radios at the time, so
21  I told him, please stay right where you are, and
22  I ran to get her.
23      Q.    Did you touch the chair at all?
24      A.    No.

Page 23

1       Q.    And how long did it take you to
2  get your assistant store manager?
3       A.    Not even two minutes. She was --
4  she ran back.
5       Q.    And was the chair in still the
6  same location and position?
7       A.    Yes, um-hmm.
8       Q.    And was Mr. Biniek still there?
9       A.    Yes.
10      Q.    And at what point in time, if any,
11  did you take a look at the chair that was
12  involved in his accident?
13      A.    Well, I recall all three of us
14  actually turning it over. Like he was there
15  when we looked at it.
16      Q.    I see.
17      A.    And so he saw the defect in that
18  chair with us. So like we all looked, because
19  we were all in shock, because he's not a very
20  big man. So we all looked, so we saw and then
21  we left it go and then we did our paperwork and
22  stuff and then that's when we saw the other
23  ones. We went and looked.
24      Q.    And what were your observations of

Page 24

1  the actual chair itself that was missing the
2  leg?
3       A.    It was the same. The bolts were
4  aimed, but not hitting wood.
5       Q.    And could you tell from looking at
6  the bolts whether the bolts were fully recessed
7  or were any part of the bolts --
8       A.    They weren't coming out, no. They
9  were -- they were fully into the piece of wood
10  that it's supposed to go in, but never connected
11  to the other part.
12      Q.    And what -- you were referring to
13  the bolts?
14      A.    Um-hmm.
15      Q.    When you turned the chair over,
16  did it have an area where there were four bolts?
17      A.    Every leg had a bolt. So,
18  actually, like the leg that cracked, like it
19  just -- like it didn't have any -- like it
20  didn't have anything in it to hold it, it was
21  just like, like from the top, it was bolted, I
22  guess. That's how they were made. But it
23  didn't have anything to hold it. So it could
24  have happened on any leg the same thing. If the





PLAINTIFF'S
EXHIBIT
D

Page 25

1 gentleman sat down and leaned to that way, it
2 could have went any way if -- because they were
3 all -- none of them were bolted the right way.
4     Q.     And were you surprised by what you
5 saw?
6     A.     Yes.
7     Q.     Did you tell your assistant store
8 manager what your own impression was when you
9 looked at the chair?
10    A.     I told her I was embarrassed.
11    Q.     Why were you personally
12 embarrassed if it wasn't your chair?
13    A.     Because I was representing the
14 store.
15    Q.     Are chairs -- have you ever been
16 involved where merchandise is taken off of a
17 trailer and then taken to the floor for display?
18    A.     Not in that particular store, no.
19 Like clothing. Not like chairs or anything.
20    Q.     Had you ever been involved in
21 taking merchandise from a trailer and then
22 inspecting the merchandise before it goes on the
23 floor?
24    A.     I was in clothing in that store,

Page 26

1 and so I started in August of 2012. And from
2 August -- probably a good six months, we didn't
3 even inspect the clothes. And then they got on
4 us in the back to inspect the clothes. So I
5 don't know the practice of the furniture.
6     Q.     Fair enough.
7     A.     But the clothing, like we had -- I
8 guess somebody got in trouble and then all of a
9 sudden we had to inspect the clothing. So I
10 don't know if they follow the same policy with
11 everything that came in.
12    Q.     When were the other chairs
13 inspected after Mr. Biniek's accident?
14    A.     Immediately. I said, I said to
15 Mary Lu, I said, let's look at these chairs.
16 And she was in shock also. So both of us
17 carried them back to the room.
18    Q.     And what, if anything, did Mary Lu
19 say to you after you inspected the other chairs?
20    A.     She -- like I can even recall her
21 personality, she's like, oh, my gosh, Tar, she
22 was just -- it was candid, but almost in a
23 little bit of embarrassment, shock herself. I
24 can't speak for her emotion, but --

Page 27

1     Q.     I'm going to show you what's been
2 marked as Murtha Exhibit 1, and there's a series
3 of photographs there.
4     A.     Okay.
5     Q.     And take a look at each of the
6 photographs.
7     A.     Yeah, that's -- yeah, my --
8         MR. LYNN: Just wait for a
9 question.
10        THE WITNESS: Okay.
11 BY MR. JUREWICZ:
12    Q.     Let's start first --
13        MR. LYNN: He wants you to look at
14 them all first.
15        MR. JUREWICZ: Well, no, we'll go
16 in order this way.
17        MR. LYNN: Oh, okay.
18 BY MR. JUREWICZ:
19    Q.     Let's start with the first
20 photograph. Do you recognize what's shown in
21 Murtha-1A?
22    A.     Yes.
23    Q.     What's that?
24    A.     That's the chair the gentleman

Page 28

1 fell off of.
2     Q.     And if you take a look at
3 Murtha-1B, what's shown in this photograph?
4     A.     That's the chair.
5     Q.     Does this appear to resemble the
6 condition of the chair when you saw it that
7 evening?
8     A.     Yes, yes. These are the good
9 legs, actually. Yes.
10    Q.     All right. And you can see -- can
11 you see, if you look in the photograph, any type
12 of damage to any of the wood that's in the
13 chair?
14    A.     Yes, that was -- that's what I'm
15 recalling with the straight -- I knew there was
16 a crack with the bolts. I knew something didn't
17 match up. That's what I was trying to recall,
18 but that's exactly what I recall now. It was
19 the bolts damaged the wood. I guess my
20 recollection was --
21    Q.     Yeah, you're doing good.
22    A.     -- of the --
23    Q.     And if you take a look at 1C.
24    A.     Yep, I remember that.





PLAINTIFF'S
EXHIBIT
D

Case 3:14-cv-01154-MEM   Document 38-2   Filed 09/11/15   Page 61 of 90

TARA HUGHES                                          October 08, 2014
BINIEK vs. MARMAXX OPERATING CORP                          29–32

Page 29

1   Q.    And 1D.
2         Now, you said something about the
3   bolt didn't go all the way through. I'm going
4   to show you a different photograph of what's
5   been identified as Exhibit Fanelli 3C.
6         And do you see the front of the
7   chair?
8   A.    Yep.
9   Q.    All right. Was there -- I mean,
10  does that represent -- I realize that this
11  picture now shows two legs rather than four
12  legs --
13  A.    Um-hmm.
14  Q.    -- but is that what you meant,
15  that there was a portion where the bolt didn't
16  go through the entire wood? I wasn't sure by
17  your answer what you said.
18        MR. LYNN: Objection to form.
19        You can answer.
20        THE WITNESS: Actually, no. My
21  recollection was -- like I recalled the bolts
22  were not in the right way, but I recall them now
23  that way. They were in too far, that the wood
24  was cracking.

Page 30

1         MR. LYNN: Let the record reflect
2   that the witness was pointing to the corner of
3   the chair in the upper left-hand corner on
4   Exhibit Fanelli-3C.
5   BY MR. JUREWICZ:
6   Q.    If we go to Fanelli-3G, all right,
7   you mentioned that now you believe that the
8   hardware was too far in?
9   A.    Too far. Yeah, I knew it was the
10  hardware and I knew it was the part of the wood
11  that I saw. But, yeah, it was that, definitely.
12  I recall that.
13  Q.    All right. And does this
14  illustrate what you meant by when you say the
15  hardware was too far in?
16  A.    Yes.
17        MR. LYNN: Objection. She clar --
18  that's not what she meant. She clarified that
19  earlier, Counsel, and corrected it.
20  BY MR. JUREWICZ:
21  Q.    Is that what you meant?
22  A.    Yes, that -- yes.
23  Q.    And to you, is this what you
24  believe rendered the chair defective?

Page 31

1   A.    Yes.
2   Q.    And the other chairs you looked
3   at, did they have a similar defect?
4   A.    All -- yep. They all had the same
5   exact -- exact cracks where the bolts were.
6   Q.    Did it appear to you that there
7   was poor workmanship in assembling the chairs?
8         MR. LYNN: Objection.
9         THE WITNESS: Can I answer?
10        MR. LYNN: Yes, you can answer.
11  BY MR. JUREWICZ:
12  Q.    Yes.
13  A.    Yes.
14  Q.    Have you ever put together
15  anything?
16  A.    Yes.
17  Q.    Ever put any chairs together that
18  you got for Christmas or anything else like
19  that?
20  A.    Yes. And I would do that.
21  Absolutely. And it would soften the wood and
22  crack faster.
23        MR. JUREWICZ: Thank you. That's
24  all I have.

Page 32

1         MR. LYNN: Dan may have some.
2         - - -
3         EXAMINATION
4         - - -
5   BY MR. STOFKO:
6   Q.    My name is Dan Stofko. I
7   represent Jofran in this matter.
8         You just testified that there
9   were -- you saw cracks in all the other chairs?
10  A.    Yes.
11  Q.    Were all the other chairs this
12  same particular model?
13  A.    They were a set. Like we would --
14  like if you would have purchased like four
15  chairs for a table, like the same, they were all
16  the same.
17  Q.    And did you discuss those cracks
18  with Mary Lu Murtha?
19  A.    Yes. That's why she and I took
20  them off the floor.
21  Q.    And did you take any photographs
22  of those chairs?
23  A.    I didn't personally, but that -- I
24  don't know if that was my job as an associate or





Case 3:14-cv-01154-MEM   Document 38-2   Filed 09/11/15   Page 62 of 90

TARA HUGHES                                          October 08, 2014
BINIEK vs. MARMAXX OPERATING CORP                            33—36

Page 33
1   if that was her job as a manager.
2       Q.    All right.  Do you know if those
3   chairs were preserved?
4       A.    I don't know what -- I didn't know
5   what they do at the time to any of that stuff.
6       Q.    When you took them off the floor,
7   where did you take them?
8       A.    Into the back room.
9       Q.    When you say back room --
10      A.    No, no, we didn't.  There was like
11  a storage closet actually like where we kept our
12  soda locked up and we took them back there.
13  Like we didn't even take them to the back room
14  where all our merchandise was.  We took them to
15  like a ten-by-ten room type of like locked.
16      Q.    Did you ever see the chairs after
17  that?
18      A.    No.
19      Q.    Did you ever hear from anyone what
20  happened to those chairs?
21      A.    No.
22      Q.    How long did you work at T.J.Maxx
23  after that incident?
24      A.    Until August of 2013.

Page 34
1       Q.    Were you ever in that storage room
2   again?
3       A.    Yes.  For --
4       Q.    And did you --
5       A.    That's where we would go, they
6   locked the soda up, to bring the soda out to the
7   soda machine.  And they weren't there, like --
8   they weren't -- like they weren't there the
9   whole time, so I don't know when they left or --
10  that's where we just took them that night.
11      Q.    Do you remember ever seeing them
12  at any time after the incident?
13      A.    No.
14      Q.    Can you tell me specifically where
15  the cracks were located on the other chairs?
16  Not on the chair that broke, but on the other
17  chairs.
18      A.    They were in the same, the same
19  place where the bolts met the legs; in all four
20  legs, in all the chairs.
21      Q.    Front and back?
22      A.    Um-hmm.  Yes.
23      Q.    This was 1E.  I think I have that
24  marked right.

Page 35
1           MR. LYNN:  Why don't we just show
2   her the same one.
3           MR. JUREWICZ:  Yeah, yep.
4   BY MR. STOFKO:
5       Q.    On 1E, and I'll represent --
6           MR. LYNN:  Just so -- we say 1E,
7   it's Murtha-1E.
8           THE WITNESS:  Okay.
9   BY MR. STOFKO:
10      Q.    On Murtha-1E, I'll represent this
11  shows the front corner, this is one of the legs
12  that was broken off, either originally or, as
13  you can see from these pictures, subsequently a
14  second leg was broken off this chair?
15          MR. LYNN:  Objection to form.  The
16  photographs that you're showing, Murtha
17  Exhibit 1, were taken at a time when only the
18  subject leg was broken off.  So this is the
19  subject leg.  I just don't want the witness to
20  be misled.
21          MR. STOFKO:  No, that's good.
22  Thanks for clarifying.
23          THE WITNESS:  Okay.  What was the
24  question?

Page 36
1   BY MR. STOFKO:
2       Q.    This shows the inner corner of
3   that area where the leg broke off.  I believe
4   your testimony was that all four corners had
5   cracked wood?
6       A.    I meant like all legs, all these
7   pieces.
8           MR. LYNN:  And she's referring to
9   the piece that the bolt goes into before it
10  reaches the actual leg itself.
11  BY MR. STOFKO:
12      Q.    Okay.  So does that refresh your
13  recollection?  Because this piece isn't cracked,
14  correct?
15      A.    It is.  I can see where the wood
16  is damaged.
17      Q.    Where?
18          MR. LYNN:  Just so the record --
19  she's still pointing to Murtha Exhibit 1E.
20  BY MR. STOFKO:
21      Q.    Where is that piece of wood
22  cracked?
23      A.    I can see hairline.  And then this
24  would be where a bolt was put through and

ESQUIRE
SOLUTIONS

PLAINTIFF'S
EXHIBIT
D

800.211.DEPO (3376)
EsquireSolutions.com



Page 37

1  obviously put through too tight, because the
2  wood around it is cracking.
3       Q.    When you say --
4            MR. LYNN: She's referring to
5  where one of the upper right-hand wood screw is
6  placed, saying it's in too tight.
7  BY MR. STOFKO:
8       Q.    A screw and not a bolt, correct?
9       A.    Yes, yes, a screw.
10      Q.    But it's your opinion that that
11 screw cracked this wood and there's a hairline
12 crack there?
13      A.    Yes, this is what I see in the
14 black and white. Two, actually, yes.
15      Q.    You said two. Where do you see
16 the two cracks?
17      A.    The upper right hand where, where
18 the screw would go, that was -- it appears to me
19 that it went through too tightly, so it cracked
20 the wood a little bit. And underneath it, I can
21 see it's the same markings as where the -- where
22 the wood is pulling up, it's -- it's darker in
23 the black and white. I don't know if you have a
24 color one over there. I have black and white.

Page 38

1            MR. LYNN: He's looking for one
2  for you.
3            THE WITNESS: Okay.
4            MR. LYNN: Do you know which one
5  this is?
6            MR. STOFKO: I don't.
7            MR. LYNN: Unless you want to mark
8  it as a separate exhibit, but we shouldn't have
9  to.
10           Is that one of the Fanelli
11 exhibits?
12           MR. STOFKO: Yeah. This is when
13 the two legs are off.
14           MR. LYNN: All right. Is that the
15 one you have here?
16           MR. STOFKO: Yes.
17           MR. LYNN: But this is the leg.
18           THE WITNESS: Yeah.
19           MR. LYNN: So you want her to
20 focus on --
21           MR. STOFKO: No, that's fine, she
22 can focus on the other one. She said they were
23 all cracked.
24 BY MR. STOFKO:

Page 39

1       Q.    Look at this corner in that one,
2  please.
3            MR. LYNN: Let me see if there's a
4  closer one. Yeah, I guess that's all we got for
5  you right now.
6            THE WITNESS: Okay.
7            MR. LYNN: I'm sorry.
8            THE WITNESS: That's all right.
9  BY MR. STOFKO:
10      Q.    That inside corner?
11      A.    This one? Yep.
12           MR. LYNN: So the record reflects,
13 just that we're looking at Fanelli-3D right now.
14 Is that what you have? Okay. All right.
15           THE WITNESS: Now, in the colored,
16 I only see the one damaged area, because I guess
17 it was a darker part of the wood.
18           MR. LYNN: She's pointing to the
19 upper right-hand corner next to the wood screw.
20           THE WITNESS: Right.
21 BY MR. STOFKO:
22      Q.    Have you ever seen any photographs
23 of any of the other chairs?
24      A.    No.

Page 40

1       Q.    Now, earlier --
2            MR. STOFKO: I'm sorry, Jim, are
3  you ready?
4            MR. LYNN: Yeah, I'm listening.
5  I'm just trying to see if I can help you out
6  here, believe it or not.
7  BY MR. STOFKO:
8       Q.    Earlier you testified that you saw
9  where the bolts didn't connect in the leg. Did
10 we now clarify?
11      A.    Yes, I'm definitely clarified. I
12 was -- I knew there was that angle. I knew it
13 was a bolt or metal that was causing the
14 problem, but this clearly clarifies my memory
15 from a couple years ago.
16           MR. LYNN: Dan, just so you know,
17 these are the photos your adjuster took. It's
18 my only copy, though.
19           Does he have a color copier out
20 there, you want to ask him, in case you want to
21 mark this? Especially maybe this one?
22           MR. STOFKO: Yes. And the one
23 before, I think.
24           (Exhibit No. Hughes-1, Color





PLAINTIFF'S
EXHIBIT
D

Page 41

1  Photocopy of Photograph of Under Seat of Chair;
2  Exhibit No. Hughes-2, Color Photocopy of
3  Photograph of Under Seat of Chair, were marked
4  for identification.)
5  BY MR. STOFKO:
6      Q.    If we reference Number 1 --
7      A.    Okay.
8      Q.    -- and this shows one of the
9  corners of the subject chair, can you identify
10  any cracks in the wood there?
11      A.    No cracks.  Just -- it just
12  appears that the screws went too tight in.
13      Q.    What do you base that opinion on?
14      A.    How all four holes were, the wood
15  was like torn or shredded, whatever.  I don't
16  know the word.  But, I mean, if you put a screw
17  in the wood and you keep screwing and the wood
18  kind of like butterflies out.
19      Q.    Do you mean like the shavings in
20  the hole?
21      A.    Yes, yes.
22      Q.    All right.  But it's your -- I'm
23  sorry, just so we're clear, when you say
24  "butterfly out," you're talking about the

Page 42

1  shavings?
2      A.    The shavings, yes.
3      Q.    All right.  And then same question
4  on Number 2, when you look at the joint there on
5  the left in that photograph, do you see any
6  cracks there?
7      A.    Yes.  Coming off the right, upper
8  right-hand hole, there's a crack.
9      Q.    Okay.  And you believe that to be
10  a crack in the wood itself?
11      A.    That's what it appears to be.
12      Q.    All right.  So when you say that
13  you saw cracks on all of the joints on all of
14  the chairs, are we talking about actual cracks
15  in the wood, or like you referenced in
16  Exhibit 1, some shavings near the hole?
17      A.    No, I'm talking about the three
18  other chairs that we took off the floor, they
19  were cracked.  That's what I was talking about.
20  When we pulled the other chairs, like cracked,
21  like streaming out like a river cracked, that
22  were in the exhibits from the other chairs.
23  That's what I was talking about, from the other
24  chairs.

Page 43

1      Q.    Okay.  I just want to go back to
2  the incident itself.
3           And you had testified that you
4  came out from the back?
5      A.    Yes.
6      Q.    And walked around the furniture
7  area, correct?
8      A.    Um-hmm.
9      Q.    And in that time, you saw Mr.
10  Biniek?
11      A.    Um-hmm.
12      Q.    And his children?
13      A.    Yes.
14      Q.    And then was it correct that you
15  turned left to go down an aisle toward the front
16  of the store?
17      A.    Well, I didn't turn necessarily.
18  Like you come out the back door and there's like
19  the four platforms, so you kind of like have to
20  snake around.  I didn't make any turns, I'm just
21  snaking.  Like here's the four platforms --
22  here's the four platforms, and right here is
23  when I kind of snaked around, and that was the
24  first lingerie rack right here.  And I was like

Page 44

1  feet, like just a couple steps away from where
2  he was.
3      Q.    And then I believe it was your
4  testimony that at that time there were no chairs
5  on the floor, they were on the platforms?
6      A.    No.  I didn't see it on the floor
7  when I walked past, no.
8      Q.    And then three or four steps later
9  is when you heard the sound?
10      A.    Yes.
11      Q.    Do you believe Mr. Biniek sat in
12  the chair while it was on the platform or on the
13  ground?
14      A.    Definitely on the ground.  Because
15  if he was on the platform, he would have hit his
16  head.  He would have -- because the chairs are
17  always kind of towards the front or the side of
18  the platform, so like you would fall right off
19  the platform also and they're like a lift up.
20  So he would have hit his head.  He was -- he
21  wouldn't have fell on his -- on his knees.
22      Q.    Other than the fact that he -- the
23  way he fell, do you have any other basis for
24  believing the chair was put on the floor?





PLAINTIFF'S
EXHIBIT
D

Case 3:14-cv-01154-MEM   Document 38-2   Filed 09/11/15   Page 65 of 90

TARA HUGHES                                          October 08, 2014
BINIEK vs. MARMAXX OPERATING CORP                          45—48

Page 45

1    A.    Other than he told me so.  He
2  said, all I did was take it off and I wanted to
3  try it out.  And there's --
4    Q.    Okay.  So do you believe in that
5  three or four steps from when you saw him and
6  there was no chair on the floor until the
7  accident happened, that he had time to take it
8  off the platform, sit it on the ground and then
9  sit down in it and the chair broke?
10   A.    Yes, because it was -- it doesn't
11 take that long.  They're not that heavy, you
12 just pick it up, put it down, sit.  That's it.
13   Q.    Did you hear him put the chair
14 down on the ground?
15   A.    Yes.
16   Q.    Can you describe generally your
17 circumstances for leaving T.J.Maxx's employment?
18   A.    And why is that relevant?
19        MR. STOFKO:  Jim, do you want to
20 direct her to answer the question?
21        MR. LYNN:  I can't direct her to
22 answer the question.  I'm not directing her not
23 to answer the question.
24        MR. STOFKO:  I'm not going to get

Page 46

1  into a back-and-forth with your witness.  It's a
2  discovery deposition.
3        THE WITNESS:  I don't know, is
4  that relevant?
5        MR. LYNN:  It's something he's
6  allowed to ask.  I can't force you to answer a
7  question you don't want to answer.  If he wants
8  to go to a judge and ask a judge that you answer
9  the question, that's up to him.
10        THE WITNESS:  Oh, okay.  Well,
11 Mr. Fanelli was too overly friendly.  He got his
12 wife from the other store to get my daughter a
13 job.  He got my husband some nonprofit money for
14 his, and then he asked me what I'm going to do
15 for him.  There you go.
16 BY MR. STOFKO:
17   Q.    And then shortly after that, I
18 assume you voluntarily resigned?
19   A.    Yep.  And I never told my husband
20 because my daughter still worked with his wife.
21 My daughter was -- after that, on Facebook,
22 social network, Mary Lu Murtha, they all took me
23 off of Facebook and then my daughter was fired
24 from the other store, the associate store, where

Page 47

1  Mr. Fanelli got my daughter the job.
2        So he asked me for a favor and I
3  kept it quiet.  So now I'm meeting my lawyer
4  that maybe I'll be contacting.
5    Q.    Did you ever take any concerns to
6  management at T.J.Maxx?
7    A.    Absolutely not; because he was
8  married and he had a life and I was not about to
9  do anything.  Nope.
10   Q.    How about with respect to your
11 daughter being fired, did you ever --
12   A.    My daughter wasn't fired for
13 months later.  And they called her up and told
14 her, she was under 18, told her that she took a
15 picture on social network while she was on the
16 clock, and everybody does, and they fired her.
17        MR. STOFKO:  I have no further
18 questions.
19             - - -
20        FURTHER EXAMINATION
21             - - -
22 BY MR. JUREWICZ:
23   Q.    Have the answers that you gave
24 here today been truthful and honest?

Page 48

1    A.    Absolutely.
2    Q.    And despite whatever disagreement
3  you had with your store manager, has that
4  affected your ability to be fair, true and
5  impartial?
6    A.    It has not affected my ability.
7    Q.    And you have no axe to grind with
8  T.J.Maxx?
9    A.    Nope.  I walked away.  I mean, it
10 was a part-time job.  I don't need it.
11   Q.    No axe to grind with Jofran?
12   A.    I don't even know who Jofran is.
13   Q.    And you're not here to try and
14 help out Mr. Biniek unnecessarily?
15   A.    Don't even know him.
16   Q.    And can I have your home address,
17 please?
18   A.    Sure.  394 East Washington Street,
19 Nanticoke, 18634.
20   Q.    And I got a funny feeling I'll be
21 getting ahold of you at some point in time if
22 this case doesn't settle, so could I have your
23 cell phone number, please?
24   A.    804-1003.





PLAINTIFF'S
EXHIBIT
D

TARA HUGHES                                                    October 08, 2014
BINIEK vs. MARMAXX OPERATING CORP                                      49–50

Page 49

1      Q.      And I promise I won't contact you
2   unless this case does go to trial.
3      A.      Okay.
4              MR. JUREWICZ:  All right.  Thank
5   you very much.
6              THE WITNESS:  Okay.
7              MR. LYNN:  Thank you very much.
8              THE WITNESS:  Thank you.
9              MR. JUREWICZ:  Nice meeting you.
10             THE WITNESS:  You too.
11             (Deposition is concluded at
12  3:37 p.m.}
13
14
15
16
17
18
19
20
21
22
23
24

Page 50

1          C E R T I F I C A T E
2              I hereby certify that the
3   proceedings and evidence noted are contained
4   fully and accurately in the notes taken by me on
5   the deposition of the above matter, and that
6   this is a correct transcript of the same.
7
8
9
10         Denise D. Bach
11         DENISE D. BACH
           Registered Professional Reporter
12         Certified Court Reporter
           Notary Public - Expires March 2018
13         DATE OUT:  October 20, 2014
14
15
16
17
18             (The foregoing certification of
19  this transcript does not apply to any
20  reproduction of the same by any means, unless
21  under the direct control and/or supervision of
22  the certifying reporter.}
23
24





PLAINTIFF'S
EXHIBIT
D

BRADFORD CHAIR REPORT   April 6, 2015

BY Jeffrey Keefer

Edward Biniek Case

On March 11, 2013 Mr. Edward Biniek suffered an injury as a direct result of the collapse of a dining chair on display at the TJ Maxx store located in Wilkes-Barre, PA

This writer was retained by Richard M. Jurewicz, Esquire in connection with his legal representation of Mr. Edward Biniek regarding the incident (chair collapse) that is the subject of the lawsuit filed by Mr. Biniek and his wife. This writer was requested to evaluate the design, workmanship and assembly of the incident dining chair to determine if the design, workmanship quality and assembly were contributing causes of the chair collapse.

As set forth in my Curriculum Vitae more fully, I am the owner of Classic Cabinetry. I have had more than 25 years of professional experience in the woodworking industry. In my professional experience I have designed residential and commercial office furniture. My design experience includes conference tables, chairs, desks and office tables. In addition, my professional woodworking experience includes the selection of hardware and fastening devices for the residential and commercial furniture that I have designed. Classic Cabinetry is also responsible for assembling and installing commercial and residential furniture it designs. This writer is very familiar with the design, chosen hardware and assembly required for the dining chair involved in Mr. Biniek's accident.

INFORMATION AVAILABLE FOR REVIEW:

1. Deposition of Edward Biniek taken on February 4, 2015
2. Deposition of Marla Biniek taken February 4, 2015
3. Deposition of Joffrey Aaron Roy taken October 23, 2014
4. Deposition of Tara Hughes taken October 8, 2014
5. Deposition of Mary Lucille Murtha taken October 8, 2014
6. Deposition of Jarrod Fanelli taken October 8, 2014
7. Affidavit of Edward J. Biniek, III
8. My inspection of the chair on March 11, 2015
9. Photographs produced by the parties during this litigation
10. Exhibits marked and identified in the depositions listed above



## THE INCIDENT:

On March 11, 2013 Mr. Edward Biniek, his wife, and son were in the TJ Maxx store looking at floor displayed dining chairs. Upon sitting on the display chair the right front leg buckled under the seat snapping the wooden leg in the area where hangar bolts were used to fasten the leg to the seat. The unexpected failure of the chair sent Mr. Biniek to the floor and caused him to be injured.

## THE PARTIES:

According to its website and description from the Internet, Jofran, Inc. is a manufacturer of home furnishings. Its products and services include "furniture manufacturers." A list of various collections it offers, including dining chairs, describe it as a manufacturer. The corporate representative of Jofran, Inc. qualifies its website products and services as an importer of home furnishings primarily casual dining sets, consoles, accent chairs and tables. Its products are imported primarily from Vietnam, Malaysia and China.

T.J. Max is a retail department store chain with stores located throughout the United States. While a good portion of T.J. Maxx product line inventory is clothing apparel and shoes, it does offer for sale home furnishings including chairs, stools and tables.

From materials reviewed by this writer, the Bradford Side Chair Line was imported by Jofran, Inc. from Thanh Phu Phat, a company located in Vietnam. Prior to deciding to carry the Bradford Side Chair line of products, Jofran, Inc. representative Joffrey Aaron Roy had reviewed and evaluated Bradford Side Chair line exemplars. Jofran, Inc.'s evaluation included not only the design of the chair but the knowledge and understanding of the quality and type of wood species selected for that type of chair and its manner of construction. Although intended to be a "knocked down" chair (partially assembled) for most of its customers, the arrangement with T.J. Maxx, was that the Bradford Side Chairs would be assembled at Jofran, Inc.'s facility. Jofran, Inc. would also be responsible for the packing of these chairs in corrugated boxes for shipment to T.J. Maxx's Distribution Centers.

T.J. Maxx would then have a supply of Bradford Side Chairs shipped from its Distribution Centers to a Regional Distribution Center for delivery to local retail stores serviced by the Regional Distribution Center. The chairs would be delivered with other merchandise via a commercial tractor/trailer to the store location. The corrugated boxes containing the chairs and other merchandise would be off loaded and processed by T.J. Maxx store employees. Once removed from their corrugated boxes, the chairs would receive a cursory inspection to look for aesthetic defects that would render the chair undesirable for purchase. Otherwise, the chairs would be stocked on the display floor in accordance with inventory replenishment policies of T.J. Maxx.

PLAINTIFF'S
EXHIBIT
E
tabbies

## THE CHAIR:

The chair is described by Jofran (the manufacturer / importer / distributor) as a "Bradford Side Chair – KD" The KD stands for "knock down". This chair generally comes only partially assembled and can either be assembled by the distributor ( Jofran ) or the end user ( retail consumer ) The chair consists of the following components:

1. Seat back / back leg assembly
2. Seat box and attached seat
3. (2) Front Legs
4. Hardware pack and 1 page assembly instructions (ROY-8)

Referencing ROY-4, the Jofran Product Specification sheet states that the chair is made from Solid Rubber Wood. Rubber wood is a tropical hardwood originating from countries such as Brazil and Southeast Asia and has also been cultivated in other tropical climates and is commonly used in low end or economy furniture.

Referencing ROY-8, the Jofran Assembly Instructions, the chair is assembled by attaching the seat box / seat assembly to the chair back assembly using machine bolts that run through the seat box rails and corner blocks into threaded inserts in the seat back assembly. The front legs have hangar bolts preinstalled that protrude from the legs. These bolts are guided through predrilled holes in the seat box corner blocks and secured with washers, lock washers, and machine nuts.

## KD FURNITURE:

KD or "knock down" furniture is not rare, especially in economy furniture imported from abroad. It keeps shipping costs down and is especially popular with tables and chairs. With the proper design, assembly, hardware, and maintenance these chairs can be safe and functional. These types of chairs, however, rely heavily on the hardware used during assembly in the absence of traditional joinery and adhesives. Proper and correct assembly is critical to the integrity and safety of the chair.

Proper chair assembly was acknowledged by the Jofran, Inc. corporate representative in his deposition when he testified that the safety of the Bradford Chair is dependent upon its proper assembly. If the chair is not assembled in accordance with the Assembly Instructions there



PLAINTIFF'S
EXHIBIT
E

exists potential for one of the legs to separate causing a failure in the chair. Consequently, it is imperative that the Assembly Instructions are strictly adhered to ensuring that these chairs are properly assembled. Other than testifying that the Bradford Chairs would have been assembled by Jofran employees for the T.J. Maxx account, the Jofran corporate designee was not intimately familiar with what tools would have been used by his employees for assembly of these chairs. The Jofran Assembly Instructions call out the use of an Allen wrench and key wrench as the only tools needed for assembly.

THE INSPECTION:

On March 11, 2015 I was able to inspect and photograph the chair involved in the incident and 3 exemplar chairs of the same construction and style. The chair involved in the incident was found to have both front legs broken from the seat box. I was informed that the right front leg was the leg that was broken as a result of the incident and it had been marked with an "A". The other front leg was supposedly damaged during the transportation of the chair from the store to wherever it was stored before this inspection. It was the left front leg and it was marked with a "B".   For the purposes of this report I will only be referring to the leg marked "A" when discussing damage to this chair involving the front leg.

When the damaged chair is handled this writer's first observation is the severe amount of lateral movement between the seat box and the back assembly. In photograph 14F the (6) machine screws that hold the entire seat box, wooden seat, and front legs to the back assembly can be seen. They are black in color and are arranged so that the two in the center go directly through the seat box frame rails into threaded inserts in the seat back stretcher. At each corner a pair of bolts arranged vertically pass through wooden corner blocks, then through the seat box frame and into the back assembly where it's presumed there are threaded inserts.  The most obvious flaw in the design of this area are the corner blocks. Unlike the 45 degree corner blocks that are used to attach the front legs to the seat box these are actually a wedge cut out of solid wood with the grain running parallel to the seat box back rail.  Wood screws are used to attach the wedge to the seat box frame rails. No adhesives are apparent. There are serious flaws in the design and attachment of these wedges. The wood screws that attach the wedge to the side rails of the seat box are too close to the edge of the wedge shaped block and are also drilled parallel to the grain of the block. Screw holes should be perpendicular to the grain of the wood or splitting is almost certain and can clearly be observed in photos 14F, 14G, 14H, and 14I. To further add to the design flaw the black machine screws are drilled only a fraction of an inch from the wood screws further weakening and contributing to the splitting of the wooden


PLAINTIFF'S EXHIBIT

E

wedge. This is significant because as soon as the wedge shaped blocks crack and fail the entire seat, seat box, and front leg assembly become loose and are relying on just the two black center bolts for structural integrity. This area where the seat box attaches to the seat back is supporting the bulk of the weight of the occupant.

In general the wood used in the chair involved in the incident seems to have coarse "curly" grain and seems to be prone to cracking. See referenced pictures.

EXEMPLAR CHAIRS:

At the time of inspection on March 11th, 2015 I was able to not only inspect the chair that was damaged as a result of the incident but also 3 chairs that were undamaged and preserved by T.J. Maxx following the Biniek incident. Upon inspection these chairs were found to have front leg and also seat box joints with excessive amounts of play and lateral movement. The bolts that connected the seat box to the back assembly were not properly and securely tightened and allowed a remarkable amount of lateral movement. With the chair upside down and resting on a conference table in the room, this writer naturally also checked the front legs for lateral play. Several of the (6) front legs on the (3) exemplar chairs had an alarming amount of side to side play in the area where the legs attach to the seat box. With just this writer's thumb and forefinger I could easily turn the (4) machine nuts that hold the two front legs in place. The nuts were clearly not properly and securely tightened. It is my opinion that these chairs were not properly assembled in accordance with the Jofran Assembly Instructions and industry custom and practice and prone to future failure if put into service.

FRONT LEG JOINT:

Unlike traditional chair joinery that would feature mortise and tenon joints with adhesives or wooden dowels and adhesives this Bradford KD chair used no adhesives or wooden joinery between the leg and seat box rails.

Legs are drawn into the corner through tightening ordinary machine nuts on hangar bolts that pass through the corner blocks and are supported completely by the pressurized contact between the leg and the seat box rails. The integrity of this joint relies completely on the constant pressure the nuts apply to the corner block. If either of the two nuts are not properly



PLAINTIFF'S
EXHIBIT
E

and securely tightened during assembly the leg is immediately able to move laterally. As the leg tilts the hangar bolts make contact with the corner blocks putting vertical pressure on them. The bolts generally will not fail (shear off) and the wooden leg splits as it did in the incident.

The holes drilled in the blocks for the hangar bolts to pass through were observed to be much larger than the bolt. If these holes were drilled to the nominal diameter of the bolts then lateral movement of the leg would be minimized and loosening of the nuts would be far less likely to occur.

Given the fact that this front leg joint heavily relies on these two nuts to keep constant pressure on the corner block, the choice of hardware by Jofran to perform this function is an inadequate one. While flat and lock washers are included they are light duty, thin, and ineffective. When a standard machine nut isn't properly tightened or begins to loosen over time during use the lock washer does nothing to prevent the nut from freely spinning on the bolt. When a nyloc type locking nut is secured it never gets loose. Even if space between the wood and the nuts were created the nut never spins freely. Locking nuts are readily available worldwide and there use could have easily been specified by Jofran to the manufacturer for nearly no cost increase.


WOOD EXPANSION AND CONTRACTION:

Anyone who manufactures wood furniture has to understand the cause and effect of expansion and contraction in furniture design and build and how it could affect the performance of the furniture during its life cycle. All wood absorbs and releases moisture based on the surrounding humidity or lack thereof. When wood is exposed to high humidity it absorbs moisture and expands or swells and when exposed to low humidity or dry air moisture is sucked out of the wood and the wood contracts or shrinks. In climates like the northeast United States furniture goes through cycles as we go through the seasons. In the humid summer months wood expands and in the dry winter months it contracts.

In the United States most furniture wood is kiln dried to 6-8% moisture levels before manufacturing. At these low levels of moisture if the furniture is put into service in dry climates the moisture loss would be minimal and shrinking minimal as well. In humid areas the wood will certainly absorb moisture and swell some but the thinking is that the swelling is better than shrinking as at least joints tend to tighten rather than loosen.

According to the Jofran quality audits marked ROY-6 and ROY-7 moisture readings on the chairs checked and passed ranged from 10.1% to 14.4%. Certainly the 14.4% reading is high and furniture with this level of moisture put into service in dry winter climates would be expected to suffer from contracting or wood shrinkage.



PLAINTIFF'S EXHIBIT E

As this subject relates to these chairs my observations are as follows.

The design of the wedge shaped corner blocks and the method of attachment don't allow for expansion and contraction and could contribute to cracking of the blocks as they are "pinned" in place by the screws that attach them. There are also multiple layers of wood that the corner bolts pass through and when that wood contracts loose bolts are predictable.

When the wood shrinks in the front leg area the metal nuts and washers are simply no longer applying the needed pressure to keep the leg firmly against the seat box rails and not only do you get slop or movement of the leg but the nut can spin freely and continue to loosen more and more as the chair is used eventually leading to the failure of the wood leg as was seen in this incident. This is again where the locking type nuts provide huge benefits both in safety and structural integrity over standard nuts. The shrinkage of the wood could still allow some movement but the nuts will not spin and further loosen so the movement is minimized.  If the front leg hangar bolts are installed in wood with a high moisture content, such as with the incident chair, wood shrinkage will inevitably occur leading to cracking around these bolts which in turn will weaken the legs in the area that eventually failed on the incident chair.


SUMMARY:

These chairs rely on 6 bolts to attach and safely hold the seat to the back / leg assembly and the poor design of the corner blocks and machining of the holes render 4 of these bolts nearly useless when the corner blocks predictably fail. The front legs rely on 4 hangar bolts that mount to corner blocks with excessively large holes and ineffective lock washers and nuts. For less than 10 cents per chair nyloc (locking) nuts can be used that cannot loosen without tools. It's also clear from inspecting 3 exemplar chairs that the assembly by Jofran was not done properly as these brand new chairs had loose sloppy joints and leg nuts that could be loosened without tools. When the nuts that hold the front legs loosen, they spin freely and easily just through the vibration of normal usage of the chair. The farther the nuts spin away from the joint the more the leg moves laterally applying leverage to the hangar bolts and eventually causing the leg to split and fail.



Based on my review of the file materials, inspection of the failed chair and other chairs of T.J. Maxx made available at my inspection of March 11, 2015, I offer the following opinions within a reasonable degree of certainty in my experience in woodworking design and assembly:

1.      The blocks through which the front leg hanger bolts were inserted and passed through were excessive in size allowing for lateral movement of the front legs that would compromise the structural integrity of the incident chair;

2.      Failure to implement the use of readily available locking nuts and failing to properly secure and tighten the lock washer and nut to the hanger bolts will result in the chair legs losing their structural rigidity with the seat box compromising the structural integrity and safety of the incident chair;

3.      During the examination of the three exemplar chairs this writer could see a clear disregard for competent and consistent assembly practices. Loose hardware and the resulting lateral motion prevalent in both the front leg joints and the joints between the seat box and the chair back shows a lack of adherence to the Jofran Assembly Instructions by Jofran assembly personnel;

4.      Mr. Biniek did not misuse or abuse the chair and sat on it in a manner and method that would be expected.  Further, the incident chair was not overloaded by Mr. Biniek sitting on it;

5.      The incident chair demonstrated poor workmanship in the pattern, location and position of the pre-drilled holes for the wood screws and machine bolts that connect the entire seat box and front leg assembly to the chair back.  When the poorly designed and constructed corner blocks cracked and split apart, 4 of the 6 bolts connecting the seat box to the chair back were no longer applying the pressure required to maintain a rigid connection. This entire connection point became excessively loose and allowed the chair to rock back and forth putting excessive lateral force on the front legs and compromising the structural integrity of the chair;

6.      The failure of the rear corner blocks based on the design alone is predictable and this design should have been rejected by Jofran at time of initial Quality Audits. You simply cannot drill wood screw holes this close to the edges of the blocks and in the direction of the wood grain and not expect the blocks to crack and fail. Aside from the wood screw holes being drilled in a manner destined for failure the bolt holes were then drilled only a fraction of an inch



PLAINTIFF'S
EXHIBIT

E

away from the outside wood screws further weakening the blocks and nearly guaranteeing the cracking and failing of these blocks. These blocks are critical to maintaining a rigid connection between the seat and the chair back.

7.      While Jofran lot inspected chairs as reflected by its Quality Audit Reports, no such Quality Assurance was followed with respect to inspecting the Bradford KD chairs that were assembled for its customer T.J. Maxx. Had an effective Quality Assurance Program been implemented at the time of the incident chair was assembled and prior to it being boxed for shipment, Jofran would have discovered the cracked and failing rear corner blocks and any loose front leg hardware that clearly led to the failure of this chair to reliably support the body weight of an average sized occupant during normal usage.

8.      Similarly, had the same Quality Assurance Inventory evaluation been done by T.J. Maxx upon receiving the chair after it was removed from its corrugated container and again when it was placed on the display floor, an inspection would have determined that the rear corner blocks were cracked and broken and the hardware for the failed leg was not properly and securely tightened. This chair should have never made it to the display floor;

9.      That the use of lock nuts was a far superior and safer choice of hardware to maintain the integrity of pressure between the chair legs and seat bottom and would not have impaired the function or utility of the incident chair had lock nuts been utilized. Lock nuts would not have backed out or loosened like the standard hardware nuts Jofran used to assemble the subject chair. Incorporating lock nuts would have prevented the incident chair leg from separating.

10.     Excessive moisture levels in the wood used to manufacture the Bradford chairs led to shrinking of the chair parts and contributed to the cracking and failure of these parts.

The above design flaws, poor workmanship, improper assembly and lack of Quality Control Inspection Procedures caused the chair collapse and Mr. Biniek's accident.

I reserve the right to supplement this report upon receipt of further file materials.

Sincerely yours,

Jeffrey Keefer





PLAINTIFF'S
EXHIBIT
E



PLAINTIFF'S
EXHIBIT
E



CRACKING OF WOOD RAIL IN AREA OF FRONT LEG "A"

PLAINTIFF'S
EXHIBIT
E



PLAINTIFF'S
EXHIBIT

E

tabbies



LARGE GAP BETWEEN RAIL AND BACK LEG ALLOWS EXCESSIVE MOVEMENT BETWEEN SEAT AND BACK OF CHAIR.

PLAINTIFF'S
EXHIBIT
E
tabbies



WEAK LOCK WASHERS

PLAINTIFF'S
EXHIBIT
E



795 Cromwell Park Drive, Suite N
Glen Burnie, MD 21061
410.766.2390 • 800.635.9507
Fax 410.768.0749
www.SEAlimited.com

## Duane R. Ferguson, P.E.
*dferguson@SEAlimited.com*

### Education

*West Virginia University*                                      *Morgantown, West Virginia*
Bachelor of Science Civil Engineering

### Experience

**Senior Project Engineer**                                            **2002 to Present**
*S-E-A, Ltd.*                                                    *Glen Burnie, Maryland*
Investigative engineering directed toward analyzing projects in the areas of construction site safety and OSHA compliance. Highway and roadway investigations for design, work zone safety, roadway and roadside safety, maintenance of traffic, pedestrian systems, construction and maintenance -related issues, and parking lot design and safety. Evaluation of buildings, structures, and premises for code compliance, accessibility for the physically handicapped (ADA), ingress/egress analysis, and walkway surface investigations. Evaluation of building envelope issues relating to moisture intrusion and construction, review and evaluation of buildings and structures for design and construction-related deficiencies, project management, and construction scheduling and delay evaluation. Roof evaluations relating to construction issues as well as damage from wind, snow, hail, etc. Analyzing and investigating flooding and backups, storm drainage, storm water management (quantity and quality), hydraulics and hydrology, and water and sewer systems for design, construction and maintenance-related issues. Investigating structural failures in concrete, steel, timber, roofing, and masonry products and applications.

**Project Manager**                                                    **2001 to 2002**
*Patton Harris Rust & Associates*                               *Columbia, Maryland*
(formerly Riemer Muegge & Associates)
Responsible for managing and designing of underground fiber optic and electrical conduit systems and cell tower site plans in the telecommunications field. Preparation of scopes of work and specifications for the construction of the conduit systems and cell tower sites. Design of traffic control plans for the construction of the conduits and cell sites.



PLAINTIFF'S
EXHIBIT
F

**Project Manager**                                                                                          **2000 to 2001**
*Storage USA*                                                                                          *Columbia, Maryland*
Responsible for overseeing and managing the construction of Storage USA's projects ensuring
compliance with the plans and specifications, maintaining the construction schedule, ensuring
construction site safety compliance, and ensuring budgets were met. Preparation of scopes
of work, specifications and budgets for the construction projects. Prepare contracts and bid
documents, and hire subcontractors, engineers and architects to complete the projects. Responsible
for the release of contractor payments for work completed and for change order processing and
overseeing the completion of construction punch list items. Supervision of the site manager.

**Project Manager**                                                                                          **1995 to 2000**
*Crown Central Petroleum*                                                                                          *Millersville, Maryland*
Responsible for overseeing and managing the construction and maintenance of Crown
Petroleum's gas and retail facilities ensuring compliance with plans and specifications;
maintaining the construction schedules and budgets; ensuring construction site safety compliance;
preparing scopes of work, specifications and budgets; hiring contractors and subcontractors;
ordering store equipment, underground tanks and dispensers; overseeing removal of underground
storage tanks; and coordinating environmental testing, inspections and disposal of contaminated
material. Also responsible for the release of contractor payments for work completed and for
change order processing and overseeing the completion of construction punch list items.

**Project Manager**                                                                                          **1989 to 1995**
*Riemer Muegge & Associates*                                                                                          *Columbia, Maryland*
Responsible for the management and design of highways, water and sewer systems, parking
facilities, storm drainage systems, storm water quantity and quality management facilities,
sediment and erosion control, floodplain analysis, grading, cut and fill quantities, noise abatement
studies, and traffic control plans for residential and commercial land, development and public
utility projects. This work also entails site layout for commercial and residential development to
ensure ADA compliance. Preparation of scopes of work, specifications and cost estimates for
construction.

**Project Manager**                                                                                          **1987 to 1989**
*Progressive Engineering Consultants*                                                                                          *Laurel, Maryland*
Responsible for the management and design of highways, water and sewer systems, parking
facilities, storm drainage systems, storm water quantity and quality management facilities,
sediment and erosion control, floodplain analysis, grading, cut and fill quantities, and traffic
control plans for residential and commercial land development and public utility and highway
projects. This work also involves site layout for commercial and residential development to ensure
accessibility compliance. Responsible for the design of highway and storm water rehabilitation
projects and preparation of scopes of work, specifications and cost estimates for construction.

**Design Engineer**                                                                                          **1985 to 1987**
*Frederick County Engineering Department*                                                                                          *Frederick, Maryland*
Responsible for design, design review and quality control of water and sewer projects,
preparation of scopes of work, specifications and budgets. Assisted in developing design and
construction standards for water and sewer projects.


PLAINTIFF'S
EXHIBIT
F

## Professional Registration

State of Maryland Registration No. 19203
State of Alabama Registration No. 27908-E
District of Columbia Registration No. PE 900326
State of Florida Registration No. PE 61978
State of Georgia Registration No. 31189
State of Louisiana Registration No. 36415
State of Michigan Registration No. 1865127
State of Mississippi Registration No. 17130
State of New Jersey Registration No. GE51835
State of North Carolina Registration No. 029285
Commonwealth of Pennsylvania Registration No. PE062664
State of South Carolina Registration No. 25035
State of Texas Registration No. 104004
Commonwealth of Virginia Registration No. 038448
State of West Virginia Registration No. 15926

## Professional Affiliations

American Society of Civil Engineers (ASCE) No. 365127
International Code Council (ICC) No. 5276096
National Association of Safety Professionals
National Parking Association (NPA)

## Additional Training

- 2015 - Level I Thermography
- 2014 - Intersection Signing
- 2014 - Curb and Pedestrian Control Devices
- 2014 - Construction Site Safety and Risk Liability
- 2014 - Surface Parking Lot Functional Design
- 2014 - Driver, Pedestrian, Vehicle, and Traffic Design Characteristics
- 2013 - ADA Guidelines 2010:  Achievable Barrier Removal and Accessibility
- 2013 - ADA Guidelines 2010:  General Site and Building Elements
- 2013 - OSHA Worksite Safety:  Scaffolds
- 2013 - Means of Egress
- 2013 - Window Installation:  Wood Frame Construction, Techniques and Standards
- 2013 - Swimming Pools:  Aquatic Design & Construction
- 2013 - Flashing for Brick
- 2012 - Highway Rumble Strips
- 2012 - Septic System Design
- 2012 - OSHA Demolition
- 2012 - OSHA Worksite Safety:  Fall Protection
- 2012 - Leak Detection for Roofs
- 2012 - OSHA Concrete and Masonry Construction
- 2012 - Parking Lots - Parking Geometrics
- 2012 - Deck Building Advanced
- 2012 - OSHA Cranes, Derricks, Hoists, Elevators and Conveyors



PLAINTIFF'S
EXHIBIT
F

Professional Resume
Duane R. Ferguson, P.E. (7/2015)                                                                    Page 4

- 2010 – ADA Title III: Public Accommodations and Complying with the ADA
- 2010 – ADA Guidelines: Accessible Routes
- 2010 – ADA Guidelines: General Site and Building Elements
- 2009 – ASCE seminar: Structural Condition Assessment of Existing Structures
- 2009 – MOSH: Construction Site Safety
- 2008 – MOSH: Construction Site Safety – Scaffolding
- 2008 – MOSH: Crane Safety
- 2006 – OSHA: 10-hour Safety Class Certification
- 2004 – Roofing Technology Educational Institute seminar on Roofing Technology covering decks, thermal insulation, vapor control, roof surface materials, flashings, fire and wind damage, and maintenance and repair, sponsored by the National Roofing Contractors Association



PLAINTIFF'S EXHIBIT
F
tabbies

Page 1

1                IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF PENNSYLVANIA
2                  - - - - - - - - - - -
3        EDWARD and MARLA BINIEK,  :
         h/w,                      :
4                 Plaintiffs       :
                                   :
5                 - vs -           :
                                   :
6        MARMAXX OPERATING CORP.   :
         for T.J. MAXX/THE T.J.    :
7        MAXX COMPANIES, INC. and  :
         JOFRAN SALES, INC.        :
8                 Defendants       :  NO. 3:14-1154
9
10                        Oral deposition of EDWARD BINIEK,
11       JR., taken pursuant to notice, was held at
12       CIPRIANI & WERNER, PC, 409 Lackawanna Avenue,
13       Suite 402, Scranton, Pennsylvania 18503, on
14       Wednesday, February 4, 2015, commencing at 11:13
15       a.m., before CHRISTINE R. COOPERMAN, a
16       Professional Reporter and Notary Public in and for
17       the Commonwealth of Pennsylvania.
18
19       A P P E A R A N C E S:
20         GALFAND BERGER, LLP
           BY:  RICHARD M. JUREWICZ, ESQUIRE
21           1835 Market Street, Suite 2710
             Philadelphia, PA 19103
22           (800) 222-8792
             -- Counsel for the Plaintiffs
23
24                        - - -
25       Job No. CS1996980

PLAINTIFF'S
EXHIBIT
tabbies®
G

Page 2

```
 1    A P P E A R A N C E S:

 2

 3      BONNER KIERNAN
        BY:  JAMES F. LYNN, ESQUIRE

 4        1801 Market Street, Suite 770
          Philadelphia, PA 19103

 5        (215) 569-4433
          -- Counsel for Defendant, Marmaxx

 6            Operating Corp.

 7

 8      CIPRIANI & WERNER, PC
        BY:  DANIEL D. STOFKO, ESQUIRE

 9        409 Lackawanna Avenue, Suite 402
          Scranton, PA 18503

10        (570) 347-0600
          -- Counsel for Defendant, Jofran Sales, Inc.

11

12

13

14

15

16

17

18    A L S O   P R E S E N T:

19      MARLA BINIEK

20

21

22

23

24

25
```

PLAINTIFF'S
EXHIBIT
G
tabbies®

Page 3

1                        I N D E X

2     Testimony of:  EDWARD BINIEK, JR.

3       By:  Mr. Stofko ............... 4, 115

        By:  Mr. Lynn ................. 47

4

5

6

                         E X H I B I T S

7

8     NUMBER                DESCRIPTION            MARKED

9     Biniek 1              Photograph               14

10    Biniek 2              Photograph               17

11    Biniek 3              Photograph               48

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFF'S
EXHIBIT
tabbies
G

Page 4

1               (It is hereby stipulated and

2    agreed by and among counsel for the respective

3    parties that signing, sealing, certification and

4    filing are waived and that all objections, except

5    as to the form of the question, be reserved until

6    the time of trial.)

7                    EDWARD BINIEK, JR., having been

8    first duly sworn, was examined and testified as

9    follows:

10                        - - -

11                      EXAMINATION

12                        - - -

13   BY MR. STOFKO:

14        Q.      Good morning, Mr. Biniek.

15        A.      Good morning.

16        Q.      My name is Daniel Stofko, and I

17   represent Jofran, Inc., in this matter.  We're

18   here for your deposition today.

19        Let me start with some instructions or

20   ground rules just so everyone is clear on the

21   process and how it works.

22        First of all, you understand that you're

23   under oath, correct?

24        A.      Yes.

25        Q.      Even though we're in a conference

PLAINTIFF'S
EXHIBIT
G

Page 57

1    wasn't looking for a platform.  I don't know.

2         Q.     Well, I want -- you don't know?

3                MR. JUREWICZ:  Well, no, he didn't

4    say that, Jim.  He said that the leg kicked out.

5                THE WITNESS:  Right.

6    BY MR. LYNN:

7         Q.     Let me ask -- I'll ask it this

8    way:  After -- when you first sat upon it, was

9    there any movement in the positioning of the

10   chair, whether it be a half an inch, an inch --

11        A.     No.

12        Q.     -- before the leg gave out?

13        A.     Not that I can recall.

14        Q.     So would you then be able to

15   eliminate the possibility that the chair had moved

16   after you had sat upon it?

17        A.     I could say -- I don't recall.

18   No.  The chair did not move.  The chair did not

19   move.

20        Q.     The chair did not move at any

21   point in time after you sat upon it and before it

22   collapsed, correct?

23        A.     Correct.

24        Q.     Now, sir, at any point in time

25   while you were checking out the chair for possible

PLAINTIFF'S
EXHIBIT
G