UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD BINIEK and <br> MARLA BINIEK, <br><br> Plaintiffs <br><br> v <br><br> MARMAXX OPERATING <br> CORPORATION d/b/a TJ MAXX and <br> JOFRAN, INC., <br><br> Defendants | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )   CASE NO. 3:14-1154 <br><br> (JUDGE MANNION) |

## PLAINTIFFS' RESPONSE TO DEFENDANT JOFRAN SALES, INC.'S MOTION IN LIMINE TO PRECLUDE LAY WITNESS TESTIMONY REGARDING ALLEGED PRODUCT DEFECT

Plaintiffs, by and through their attorneys Galfand Berger LLP, hereby respond to the

Motion in Limine of Defendant Jofran Sales, Inc. to preclude lay opinion testimony regarding

product defect and in support thereof aver as follows:

1. Denied. Ms. Hughes does not offer, and Defendant Jofran does not identify, any

opinion that falls under F.R.E. 701.

2. Denied. See Plaintiffs' Response to Paragraph 1.

3. Denied. Defendants' mischaracterize Ms. Hughes' testimony and cannot and do

not point to any quote from her deposition testimony in which Ms. Hughes stated this.

4. Denied. Ms. Hughes' testimony was limited to factual matters of which she had

personal knowledge. At no point did Ms. Hughes offer any opinion. Ms. Hughes simply testified

as to the condition of the subject chair and other display chairs that she observed on the day of

Plaintiff-Husband's accident and whether the photographs depict that same condition. For

instance, Ms. Hughes stated, "I can **see** where the word is **damaged**. ... I can see hairline

1

[cracks]. And then this would be where a bolt was put through **and obviously put through too tight, because <u>the wood around it is cracking</u>.**" (Hughes Dep., Ex. A, at 36-37). Throughout her deposition, Ms. Hughes made it clear that she was **<u>not</u> offering her opinion**, but rather only stating her **observations** from her recollections, as well as pointing out obvious cracks in the wood to Defense counsel who tried to lead the witness into turning a blind eye to the clear cracks in the subject chair. Ms. Hughes was not confused and offered no opinion, rather she provided her firsthand knowledge of the chair conditions she observed.

5.      Denied. Ms. Hughes' deposition transcript, as a written document, speaks for itself and no response is required. By way of further response, Ms. Hughes offered ample clarification of all her statements that Defense Counsel for Jofran struggled to understand.

6.      Denied. Ms. Hughes' deposition transcript, as a written document, speaks for itself and no response is required. By way of further response, Defendant Jofran still has not pointed to a portion of Ms. Hughes' testimony that is an "opinion" as opposed to her recollection of the condition of the chair, which is a matter of fact, not opinion.

7.      Denied. Ms. Hughes' deposition transcript, as a written document, speaks for itself and no response is required. By way of further response, Defendant Jofran still has not pointed to a portion of Ms. Hughes' testimony that is an "opinion" as opposed to her recollection of the condition of the chair, which is a matter of fact, not opinion.

8.      Denied. Ms. Hughes' deposition transcript, as a written document, speaks for itself and no response is required. Plaintiffs particularly deny that it is "demonstrably false" that Ms. Hughes' observation on the day of the accident that the subject chair and other display chairs had the same cracks. Defendants offer no proof of such falsity. Further, Ms. Hughes' statement is yet again a statement of fact, not opinion, that does not fall within the purview of Rule 701. At

2

most, Defendant Jofran's Motion points out areas in which it may cross-examine Ms. Hughes, but nothing that Defendant can preclude. See Ghee v. Marten Transp., Ltd., 570 Fed. Appx. 228, 231 (3d Cir. 2014) (explaining opposing counsel can cross-examine on certain topics of "lay opinion" but cannot have them excluded).

9.     Denied. Ms. Hughes responded honestly to Defendant's question concerning a very up close picture of a particular corner of a particular chair in which it was unclear whether that particular area had any cracks. Ms. Hughes testified that there were cracks in each of the chairs on display. (Hughes Dep., Ex. A, at 31). In a different picture of the chair referenced in Defendant's Paragraph 9, Ms. Hughes pointed out the cracks in that chair. Id. at 37. The particular picture shown to Ms. Hughes referenced in this paragraph may not have shown any cracks, hence Ms. Hughes' honest answer. However, her earlier statement of identifying cracks in the subject chair and each display chair remains unquestionably true, as Ms. Hughes identified said cracks. If anything, this paragraph of contradicts Defendant Jofran's earlier contention in Paragraph 4 in which Defendant's unnecessarily and without reason called into question the veracity of Ms. Hughes.

10.     Denied as stated. Plaintiffs do not present Ms. Hughes as an expert and she offers no opinion that requires training or specialized knowledge. Rather, to the extent that she offers any opinion at all—and Plaintiffs maintain her testimony is limited to factual observations outside the purview of Rule 701—those opinions "result from a process of reasoning familiar in everyday life," thus making it permissible witness opinion. F.R.E. 701 Advisory Committee Notes (2000).

11.     Denied. Ms. Hughes does not offer such an opinion. Rather, she states the condition in which she saw the chairs: riddled with cracks. Defendant Jofran is drawing its own

3

conclusion from those statements that the chairs are defective. Plaintiffs would agree with that conclusion. However, it is not Ms. Hughes making the statement that the chairs are defective and therefore there is no testimony of hers that should be precluded.

12.    Denied. The averments of this Paragraph are denied as conclusions of law to which no response is required. By way of further response, "[t]he modern trend favors admission of lay opinion testimony, provided that it is well founded on personal knowledge and susceptible to cross-examination." Ghee v. Marten Transp., Ltd., 570 Fed. Appx. 228, 231 (3d Cir. 2014). Lay opinion is permissible if it is based on firsthand knowledge and would be helpful to the jury in understanding the witness's testimony. Hirst v. Inverness Hotel Corp., 544 F.3d 221, 225-26 (3d Cir. 2008). If any portion of Ms. Hughes' testimony is considered opinion, it must be determined to be proper lay opinion as it is based solely on her personal knowledge and does not stray into any area of specialized knowledge. Observing cracks in wood is a topic any adult individual, especially one who has previously put together chairs and other wood furniture, can readily attest to. (Hughes Dep., Ex. A at 31). At her deposition, as will be the case at trial, Defense counsel had every opportunity to fully cross-examine Ms. Hughes concerning her observations on the day of the accident and how the pictures reflect what she witnessed that day. Her statements concerning cracks in the wood and the position of screws and bolts are matters appropriate for cross-examination, not exclusion.

13.    Denied. The averments of this Paragraph are denied as conclusions of law to which no response is required. By way of further response, see Plaintiffs' Response to Paragraph 12 in which Plaintiff explains why Ms. Hughes' testimony, to the extent this Court finds any of it to be opinion testimony, must be admitted as proper lay testimony.

4

14.    Denied as stated. Plaintiffs would agree that Ms. Hughes cannot testify as to the
ultimate question of whether the product is defective. However, Ms. Hughes does not do so and
she is more than capable to testify to her observations as to the condition of the subject chair and
other display chairs. Ms. Hughes is not "choosing up sides" or "tell[ing] the jury what result to
reach." See U.S. v. Stadtmauer, 620 F.3d 238, 263 (3d Cir. 2010) (explaining under what
circumstances lay opinion should be excluded); U.S. v. Muhammad, 512 Fed. Appx. 154, 161
(3d Cir. 2013) (lay testimony permitted where the assertions were not meaningless and were
more than "choosing up sides"). Rather, she relies on her personal knowledge of the matter at
hand and states her observations in a manner that will help assist the jury—she goes no further
than that.

15.    Admitted.

16.    Denied. Ms. Hughes does not offer any opinions, she testifies to her observations.
Her observations, or any statements that she made that may be construed as opinions, need only
be based on firsthand knowledge and be helpful to the jury in understanding the witness's
testimony. Hirst v. Inverness Hotel Corp., 544 F.3d 221, 225-26 (3d Cir. 2008). Ms. Hughes'
testimony is clearly based on firsthand knowledge as she was present at the scene of Plaintiff-
Husband's accident and immediately examined the subject chair and the other display chairs.
(Hughes Dep., Ex. A, at 26).

17.    Denied as stated. Defendant Jofran's Motion in Limine must be denied because
Ms. Hughes does not offer any impermissible testimony and Defendant Jofran's apparent
characterization of what is opinion is grossly mistaken. To the extent Ms. Hughes offered any
opinion, it is permissible lay opinion, as explained herein and in the accompanying brief.

5

WHEREFORE, Plaintiffs Edward and Marla Biniek respectfully request that this Honorable Court DENY Defendant Jofran, Inc.'s Motion in Limine.

Respectfully submitted,

**GALFAND BERGER, LLP**

By:

**RICHARD M. JUREWICZ, ESQUIRE**
**Attorney for Plaintiffs**
**Attorney I.D. No.:  39436**
**1835 Market Street, Suite 2710**
**Philadelphia, PA 19103**
**215-665-6829**
**rjurewicz@galfandberger.com**

6

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDWARD BINIEK and | ) | CASE NO. 3:14-1154 |
| MARLA BINIEK, | ) | |
| | ) | (JUDGE MANNION) |
| Plaintiffs | ) | |
| | ) | |
| v | ) | |
| | ) | |
| MARMAXX OPERATING | ) | |
| CORPORATION d/b/a TJ MAXX and | ) | |
| JOFRAN, INC., | ) | |
| | ) | |
| Defendants | ) | |

## PLAINTIFFS' BRIEF IN RESPONSE TO DEFENDANT JOFRAN SALES, INC.'S MOTION IN LIMINE TO PRECLUDE LAY WITNESS TESTIMONY REGARDING ALLEGED PRODUCT DEFECT

### I.   MATTER BEFORE THE COURT

Before this Honorable Court is Defendant Jofran, Inc.'s Motion in Limine to Preclude Lay Witness Testimony Regarding Alleged Product Defect. While lay witnesses cannot opine on technical matters, it is common and necessary for witnesses to relay their observations. Plaintiffs would agree with Defendant Jofran that lay witnesses cannot testify as to technical matters requiring specialized knowledge, but Jofran's Motion is overbearing and seeks to censor the testimony of Tara Hughes who is simply prepared to testify as to what she saw. Defendant Jofran is essentially seeking to preclude Ms. Hughes from testifying to any facts she observed that are adverse to Jofran's position. Jofran cannot classify all of Ms. Hughes' observations as "opinion" just because it realizes Ms. Hughes' observations represent bad facts for them.

### II.   QUESTIONS PRESENTED

1.  Should this Honorable Court DENY Defendant Jofran's Motion in Limine where it seeks to preclude as "opinion" the mere observations made by witness Tara Hughes?

Suggested Answer: YES

1

## III.   FACTS

This matter arises out of an incident that occurred on March 11, 2013 in which Plaintiff-Husband was shopping in a T.J. Maxx store for new chairs and sat on one of those chairs to test its comfort when said chair collapsed due to being defectively imported, manufactured, assembled, and sold. Plaintiffs have brought a products liability action against Defendant Jofran, Inc. and Defendant Marmaxx Operating Corp. (T.J. Maxx). Trial is set to begin October 5, 2015. The deposition of T.J. Maxx employee Tara Hughes was taken on October 8, 2014. Ms. Hughes was the first to respond to Plaintiff-Husband after his accident and observed that the subject chair and other display chairs all had cracks in them. (Hughes Dep., Ex. A, at 21, 26).

At her deposition, counsel for Defendant Jofran tried to mislead Ms. Hughes several times and tried to have her admit that she was only giving her opinion. To her credit, Ms. Hughes, who is not nearly as experienced a deponent as counsel is at taking depositions, corrected Defendant Jofran's counsel on each occasion.

> By Mr. Stofko:
> Q:    Okay. So does that refresh your recollection? Because this piece isn't cracked, correct?
> A:    **IT IS. I CAN SEE WHERE THE WOOD IS DAMAGED.**
> Q:    Where?
>        Mr. Lynn: Just so the record -- she's still pointing to Murtha Exhibit 1E.
> By Mr. Stofko:
> Q:    Where is that piece of wood cracked?
> A:    I can **see** hairline. And then this would be where a bolt was put through **and obviously put through too tight, because the wood around it is cracking.**
> Q:    When you say --
>        Mr. Lynn: She's referring to where one of the upper right-hand wood screw is placed, saying it's in too tight.
> By Mr. Stofko:
> Q:    A screw and not a bolt, correct?
> A:    Yes, yes, a screw.

> Q:     But it's your <u>opinion</u> that that screw cracked this wood and
> there's a hairline crack there?
> A:     Yes, **THIS IS WHAT I SEE** in the black and white. Two,
> actually, yes.

(Hughes Dep., Ex. A at 36-37).

Throughout her deposition, Ms. Hughes made it clear that she was **<u>not</u> offering her opinion**, but rather only stating her **observations** from her recollections, as well as pointing out obvious cracks in the wood to Defense counsel who tried to lead the witness into turning a blind eye to the clear cracks in the subject chair. In its motion, Defendant Jofran is unable to point to even one instance in which Ms. Hughes did anything other than state a plain factual observation.

Defense counsel also attempted to mischaracterize Ms. Hughes' testimony, but again, she corrected him:

> A:     No, I'm talking about the three other chairs that we took off
> the floor, they were cracked. That's what I was talking about.
> **When we pulled the other chairs, like cracked, like streaming
> out like a river cracked**, that were in the exhibits from the other
> chairs. That's what I was talking about, from the other chairs.

(Hughes Dep., Ex. A at 42).

Contrary to Defendant Jofran's Motion, Ms. Hughes identified cracks in each chair she was asked about. She did not identify cracks in a close up picture showing only a portion of the subject chair. However, she identified where there were cracks in that very same chair elsewhere in other pictures that better represented the condition of the chair. (Ex. A at 37). Ms. Hughes' testimony was not contradictory on this matter and was in fact unwavering, despite Defense counsel attempting to lead her astray.

## IV.    ARGUMENT

Defendant Jofran's Motion in Limine cannot possibly be granted because Defendant Jofran is attempting to use the prohibition against lay opinion on technical matters to censor the

3

observations and statements of fact offered by witness Tara Hughes. Rule 701 applies only to opinions, not observations. Ms. Hughes' testimony quoted in Defendant Jofran's Motion in Limine is patently factual observations, not opinions. Ms. Hughes' testimony concerning whether she witnessed cracking and the position of the screws and bolts are simply things she saw, not conclusions or extrapolations that would render her testimony impermissible opinion. Defendant Jofran cannot prevent Ms. Hughes from testifying to her personal knowledge obtained through observation. At most, Defendant Jofran's motion is an outline for cross-examination of Ms. Hughes, but it does not properly attack any of her testimony in such a manner as to render it inadmissible.

F.R.E. 701 deals exclusively with opinion testimony by lay witnesses, not with observations by lay witnesses. In full, F.R.E. 701 states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Witness Tara Hughes offers no opinions in her testimony that would fall under Rule 701. Plaintiffs would agree that Ms. Hughes is not an expert in furniture-making or woodworking and cannot render an opinion that the chair is "defective." However, Ms. Hughes' testimony is simply what she observed. F.R.E. 701 does not exclude a lay person from offering objective testimony concerning their observations.

While Plaintiffs maintain that Ms. Hughes merely testifies as to her observations and does not offer any opinion, to the extent that this Court believes Ms. Hughes does offer opinion,

4

it is must be found to be permissible lay opinion. "The modern trend favors admission of lay opinion testimony, provided that it is well founded on personal knowledge and susceptible to cross-examination." Ghee v. Marten Transp., Ltd., 570 Fed. Appx. 228, 231 (3d Cir. 2014). Lay opinion is permissible if it is based on firsthand knowledge and would be helpful to the jury in understanding the witness's testimony. Hirst v. Inverness Hotel Corp., 544 F.3d 221, 225-26 (3d Cir. 2008). If any portion of Ms. Hughes' testimony is considered opinion, it must be determined to be proper lay opinion as it is based solely on her personal knowledge and does not stray into any area of specialized knowledge. Observing cracks in wood is a topic any adult individual, especially one who has previously put together chairs and other wood furniture, can readily attest to. (Hughes Dep., Ex. A at 31). At her deposition, as will be the case at trial, Defense counsel had every opportunity to fully cross-examine Ms. Hughes concerning her observations on the day of the accident and how the pictures reflect what she witnessed that day. Her statements concerning cracks in the wood and the position of screws and bolts are matters appropriate for cross-examination, not exclusion.

In no way has Ms. Hughes relied on scientific, technical, or otherwise specialized knowledge to identify the cracks she has seen in person and in photographs of the same chairs. Because her testimony is not technical in nature, there is no "aura of expertise" and no possibility that the jury will be misled and mistake her for an expert. Donlin v. Philips Lighting N. Am. Corp., 564 F.3d 207 (3d Cir. 2009). Defendant Jofran has pointed to no point in Ms. Hughes' testimony in which she purports to be offering scientific, technical, or otherwise specialized knowledge that would be within the scope of F.R.E. 702. Estate of Edward W. Knoster v. Ford Motor Company, 200 Fed. Appx. 106, 111 (3d Cir. 2006).

Ms. Hughes' observations of cracking in the wood "result from a process of reasoning familiar in everyday life," thus making it permissible witness opinion. F.R.E. 701 Advisory Committee Notes (2000). Such reasoning is distinguished from expert testimony that can only be offered when a field has been mastered by a specialist. Id. Identifying cracks in wood is not something that requires specialized knowledge and can readily be performed by a lay person who viewed the subject chair and adjacent display chairs on the day of the accident and again in photographs at her deposition. Ms. Hughes is not "choosing up sides" or "tell[ing] the jury what result to reach." See U.S. v. Stadtmauer, 620 F.3d 238, 263 (3d Cir. 2010) (explaining under what circumstances lay opinion should be excluded); U.S. v. Muhammad, 512 Fed. Appx. 154, 161 (3d Cir. 2013) (lay testimony permitted where the assertions were not meaningless and were more than "choosing up sides"). Rather, she relies on her personal knowledge of the matter at hand and states her observations in a manner that will help assist the jury—she goes no further than that.

## V. CONCLUSION

For the reasons set forth at length above, Plaintiffs respectfully request this Honorable Court DENY Defendant Jofran's Motion in Limine to Preclude Lay Witness Testimony Regarding Alleged Product Defect.

6

Respectfully submitted,

GALFAND BERGER, LLP

By: _____

RICHARD M. JUREWICZ, ESQUIRE
Attorney for Plaintiffs
Attorney I.D. No.:  39436
1835 Market Street, Suite 2710
Philadelphia, PA 19103
215-665-6829
rjurewicz@galfandberger.com

7

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDWARD BINIEK and<br>MARLA BINIEK, | ) | CASE NO. 3:14-1154 |
| | ) | |
| | ) | (JUDGE MANNION) |
| Plaintiffs | ) | |
| | ) | |
| v | ) | |
| | ) | |
| MARMAXX OPERATING | ) | |
| CORPORATION d/b/a TJ MAXX and | ) | |
| JOFRAN, INC., | ) | |
| | ) | |
| Defendants | ) | |

## CERTIFICATION OF SERVICE

I, Richard M. Jurewicz, Esquire, do hereby certify that service of a true and correct copy of the within PLAINTIFFS' RESPONSE TO DEFENDANT JOFRAN SALES, INC.'S MOTION IN LIMINE TO PRECLUDE LAY WITNESS TESTIMONY REGARDING ALLEGED PRODUCT DEFECT was made on September 28, 2015, Electronic E-Filing upon the following:

EMAIL: dstofko@c-wlaw.com
Daniel D. Stofko, Esquire
Cipriani & Werner
Oppeheim Building, Suite 402
409 Lackawanna Avenue
Scranton, Pa. 18503-0600

EMAIL: jlynn@bonnerkiernan.com
James F. Lynn, Esquire
Bonner Kiernan
1801 Market Street, Suite 770
Ten Penn Center
Philadelphia, Pa. 19103

GALFAND BERGER, LLP

By:  _____

RICHARD M. JUREWICZ, ESQUIRE
Attorney for Plaintiffs
Attorney I.D. No.: 39436
1835 Market Street, Suite 2710
Philadelphia, PA 19103
215-665-6829
rjurewicz@galfandberger.com

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT

 2      FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

 3    --------------------------x
      EDWARD and MARLA BINIEK,   :  CIVIL ACTION
 4        Plaintiff(s),          :

 5            v.                 :

 6    MARMAXX OPERATING CORP.    :
            and                  :
 7    JOFRAN SALES, INC.         :
          Defendant(s).          :  NO. 3:14-CV-1154
 8    --------------------------x

 9                    - - -
                 October 8, 2014
10                    - - -

11         Oral deposition of TARA HUGHES, held

12   at the LAW OFFICES OF NEIL T. O'DONNELL, 267

13   Wyoming Avenue, Kingston, Pennsylvania 18704,

14   beginning at 2:51 p.m., on the above date,

15   before Denise D. Bach, a Federally Approved

16   Registered Professional Reporter and Notary

17   Public.

18

19

20

21          ESQUIRE DEPOSITION SOLUTIONS
22              1835 Market Street
                   Suite 2600
23          Philadelphia, Pennsylvania 19103
                 (215) 988-9191
24
```

**Page 2**

```
 1   APPEARANCES:

 2

 3      GALFAND BERGER, LLP
        BY: RICHARD M. JUREWICZ, ESQUIRE
 4      Suite 2710
        1835 Market Street
 5      Philadelphia, PA 19103
        215.665.1600
 6      rjurewicz@galfandberger.com
        --Representing the Plaintiff(s)
 7

 8      BONNER KIERNAN TREBACH & CROCIATA LLP
        BY: JAMES F. LYNN, ESQUIRE
 9      Ten Penn Center, Suite 770
        1801 Market Street
10      Philadelphia, PA 19103
        215.569.4433
11      jlynn@bonnerkiernan.com
        --Representing the Defendant(s),
12         Marmaxx Operating Corp.

13      CIPRIANI & WERNER
        BY: DANIEL D. STOFKO, ESQUIRE
14      409 Lackawanna Avenue
        Suite 402
15      Scranton, Pennsylvania 18503
        dstofko@c-wlaw.com
16      --Representing the Defendant(s),
           Jofran Sales, Inc.
17

18

19

20

21

22

23

24
```

**Page 3**

```
 1              I N D E X

 2   WITNESS                             PAGE
     TARA HUGHES
 3     By Mr. Jurewicz                    5, 47
       By Mr. Stofko                       32
 4

 5          E X H I B I T S

 6   MARKED       DESCRIPTION            PAGE

 7   Hughes-1   Color Photocopy of Photograph   40
                of Under Seat of Chair
 8
     Hughes-2   Color Photocopy of Photograph   41
 9              of Under Seat of Chair

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**Page 4**

```
 1         DEPOSITION SUPPORT INDEX

 2

 3   DIRECTION TO WITNESS NOT TO ANSWER

 4   Page  Line        Page  Line        Page  Line

 5    (None)

 6

 7

 8   REQUEST FOR PRODUCTION OF DOCUMENTS

 9   Page  Line        Page  Line        Page  Line

10    (None)

11

12

13              STIPULATIONS

14   Page  Line        Page  Line        Page  Line

15    5     2

16

17

18            QUESTIONS MARKED

19   Page  Line        Page  Line        Page  Line

20    (None)

21

22

23

24
```





PLAINTIFF'S EXHIBIT
A

Page 5

1           - - -
2           (It is hereby stipulated and agreed
3   by and among counsel that signing, sealing,
4   filing and certification are waived; and that
5   all objections, except as to the form of
6   questions, be reserved until the time of trial.)
7           - - -
8           TARA HUGHES, having been first duly
9   sworn, was examined and testified as follows:
10          - - -
11          EXAMINATION
12          - - -
13  BY MR. JUREWICZ:
14      Q.    My name is Rick Jurewicz and I
15  represent Mr. and Mrs. Biniek in a lawsuit
16  filed as a result of a chair collapse incident
17  that took place in the T.J.Maxx Arena Hub store
18  in Wilkes-Barre back in March of 2013.
19          Do you know anything about the
20  accident?
21      A.    I do.  I -- actually, I saw the
22  gentleman previous to the accident.  I saw in
23  the general vicinity where he was, he was there
24  with two children.  I didn't recall boy or girl,

Page 6

1   but they were two children.  And right when I
2   walked past him, there was a clothing, like a
3   clothing rack.  We were -- where they were
4   displayed, it was near the lingerie, so there
5   was a clothing rack.  So as soon as I passed
6   him, I didn't see him sit, I heard -- I heard
7   him go down, like immediately.  So I, I just
8   walked right back and he was on the ground.  So
9   that's, that's how I found him.
10          But he was -- him and the two
11  children were the only two -- like three people
12  in the vicinity.  So it was probably half a
13  second when I walked and walked back and he was
14  on the ground.
15      Q.    When you saw them for the first
16  time, it obviously was before the accident?
17      A.    Yes.
18      Q.    Were they walking toward a
19  particular area of the store?
20      A.    They were in the -- they were in
21  the back where that display was, it was in the
22  right-hand corner of the store near the offices
23  and the break room and the bathrooms.  So it
24  was, it was behind the lingerie, so it was in

Page 7

1   that vicinity.
2       Q.    If I showed you some pictures,
3   would that help you out?
4       A.    Sure.
5       Q.    Take a look at what's been marked
6   as 1A, Fanelli, and there's a series of
7   photographs.
8       A.    Okay.
9       Q.    And you obviously recognize what's
10  in 1A, right?
11      A.    The front.
12      Q.    That's where you go get your pay?
13      A.    Not anymore.
14      Q.    And when did you stop working at
15  T.J.Maxx?
16      A.    August of --
17      Q.    And why did you stop working --
18          MR. LYNN: August of what?
19          THE WITNESS:  Of 2013.
20  BY MR. JUREWICZ:
21      Q.    Why?
22      A.    Misunderstanding between
23  Mr. Fanelli and I.
24      Q.    Was your decision to leave a

Page 8

1   voluntary --
2       A.    Yes.
3       Q.    -- or involuntary one?
4       A.    Voluntary.
5       Q.    What did you think of Mr. Fanelli
6   as a manager?
7       A.    If I'm under oath, very
8   inappropriate.
9       Q.    Enough said.
10      A.    Um-hmm.
11      Q.    If you take a look at --
12      A.    This is right where the display
13  was.
14          MR. LYNN: You're referring to --
15  BY MR. JUREWICZ:
16      Q.    1E.
17          MR. LYNN: -- Fanelli Exhibit 1E.
18          THE WITNESS: Oh, 1E.  I thought
19  you said 1A, I'm sorry.
20  BY MR. JUREWICZ:
21      Q.    That's all right.  It wouldn't
22  surprise me if I did.
23      A.    Okay.
24      Q.    Putting aside what merchandise is





Page 9

1  now on display, the area of the store is the
2  area where you understand that Mr. Biniek had
3  his accident?
4      A.    Yes.
5      Q.    And at the time, or I should say
6  on the evening of his accident, did the store
7  have what is referred to as those four elevated
8  display areas?
9      A.    Yes.
10     Q.    And if we can use Exhibit Fanelli
11 1E, where was it that you saw Mr. Biniek and his
12 two children for the first time?
13     A.    For the first time, it was not
14 even in this area.  It was like I was greeting
15 him throughout the store.  Like I saw lots of
16 people, so I saw him walking through the store.
17 That was the first time.
18     Q.    Maybe I should take a step back
19 and ask you, in March of 2013, what was your
20 position with T.J.Maxx?
21     A.    I was -- I was associate.  I was
22 going for front-end coordinator.  So they were
23 ready to like -- they were training me for
24 front-end coordinator.

Page 10

1      Q.    And in March of 2013, although you
2  were training for a new position --
3      A.    Um-hmm.
4      Q.    -- was there an area of the store
5  that you were assigned as a store associate?
6      A.    I was in men's and kids.
7      Q.    And men's and kids, does that
8  include the home furnishing?
9      A.    No, no.
10     Q.    Do you know if there was someone
11 that was assigned to the home furnishings or
12 home décor department?
13     A.    There always is.
14     Q.    Do you know who the store
15 associate was that evening or that shift?
16     A.    No, no.
17           MR. LYNN: Are --
18           MR. JUREWICZ: I'm on the day of
19 the accident.
20           MR. LYNN: Okay.  Well, earlier
21 you were just asking her about March of 2013.
22 So I don't know if she's answering just for the
23 month or for the day.
24           THE WITNESS: No, I was trying to

Page 11

1  recall the day.
2  BY MR. JUREWICZ:
3      Q.    You understand that that's where
4  my questions were directed?
5      A.    Um-hmm, yes.
6      Q.    Fair enough.
7            Was there what would be referred
8  to as a merchandise coordinator that worked in
9  March of 2013 for each -- that held the position
10 as merchandise coordinator for each of the
11 different departments?
12     A.    Yes, but I don't recall.
13     Q.    Karen Nagle, does that sound
14 familiar?
15     A.    Yes, yes.
16     Q.    Was she there at the time of the
17 accident?
18     A.    I don't recall.
19     Q.    Who was the head person, or who
20 was running the store at the time?
21           MR. LYNN: Of the accident?
22           MR. JUREWICZ: Of course.
23           THE WITNESS: The manager that you
24 said that I was -- I did the report with.  I

Page 12

1  can't recall her name.  Murtha or Nash.  Murtha?
2  Mary Lu Murtha, yes.
3  BY MR. JUREWICZ:
4      Q.    And was she an assistant store
5  manager?
6      A.    Yes, yes.  They're all like --
7  Jerry Fanelli is the head and I guess there was
8  like three like supervisors type.
9      Q.    So when you first saw Mr. Biniek
10 for the first time with his kids, where in the
11 store were they?
12     A.    They were in, in this particular
13 area, because I was actually walking out of the
14 break room, which is out of the picture, but
15 it's like right in the corner.  This is the
16 right-hand corner of the store and the break
17 room and the restrooms are like right here.
18     Q.    If we, if we take a look at 1G,
19 you'll see a sign that says "Restrooms"?
20     A.    Yep.  I was walking out of that
21 area.
22     Q.    In the area where the sign
23 "Restrooms" is located?
24     A.    Yes.

 

Page 13

1    Q.    And in what direction were you
2  walking?
3    A.    Towards the four displays.
4    Q.    And at what point in time did you
5  see Mr. Biniek and his two children?
6    A.    Right in front of the display.
7    Q.    Which display?
8    A.    It was one of the front two. I
9  can't recall.
10   Q.    Were they still walking towards
11  the front display or had they stopped at that
12  point?
13   A.    They stopped to look, to shop, to
14  look.
15   Q.    Was that the first time you saw
16  them in the store that evening?
17   A.    No. I think that's what I was
18  trying to say. Like I saw them just shopping
19  earlier, like just in passing. I recognized him
20  when I saw him again in that area.
21   Q.    All right. Having seen him in the
22  store earlier that evening?
23   A.    Um-hmm, yes.
24   Q.    And then you went your way?

Page 14

1    A.    Yep. It was -- yep. He did
2  shopping, I had my break, so that would have
3  been a half an hour, and then I saw him again.
4    Q.    And then when you saw him at the
5  display, had he stopped at that point to look
6  like he was observing something?
7    A.    Yeah, yes.
8    Q.    Do you know what he was looking
9  at?
10   A.    The chairs.
11   Q.    Do you know how many chairs that
12  were there?
13   A.    I believe four. There were three
14  or four.
15   Q.    And what kind of chairs were they?
16   A.    That's what I was trying to
17  remember. They were like, they were -- they
18  were table chairs, like that you would use at a
19  table, not like a living room or anything. I
20  couldn't remember if they were wicker or wood,
21  but I'm seeing the picture, they're obviously --
22  that must be the picture. I was trying to
23  recall all morning. But they were like, just
24  like pull-in chairs for a table. That's --

Page 15

1  that's my recollection.
2    Q.    That's important what your
3  recollection is, not necessarily what's shown
4  here.
5    A.    No, I know, I know. They were
6  definitely chairs that were bolt -- put
7  together, like bolted.
8    Q.    How do you know that?
9    A.    Because when he did -- after he
10  did his paperwork, I said to Mary Lu Murtha, why
11  don't we check the rest of the chairs. And we
12  went out and we turned the rest of the chairs
13  over and they were all defective. So we took
14  them all back, me and her.
15   Q.    And what was defective about the
16  chairs?
17   A.    Where the bolts were going, they
18  weren't -- they weren't meeting like where the
19  wood would crisscross, and I guess -- the wood
20  would crisscross like this and then there was
21  a -- I'm not very much of a carpenter, but --
22   Q.    Well, hold on a second. Go ahead,
23  I'll make you a carpenter when your deposition
24  is over.

Page 16

1    A.    The bolts weren't meeting where
2  the legs would go in. So the bolt went through,
3  like the chairs are square and then they have
4  like, this is where the leg would be right here,
5  and then there's like, kind of like a, like a
6  little piece of wood.
7    Q.    Like a block of wood?
8    A.    Yes. And they were going in
9  through the block of wood and it looked like
10  they were directed towards each side of the leg
11  and they weren't meeting the legs.
12        So we, both of us, took the rest
13  of the chairs off the floor.
14   Q.    And let's start first with the
15  chair that was involved in Mr. Biniek's
16  accident.
17   A.    Um-hmm.
18   Q.    And we'll get back to what you
19  heard and how soon you got over there, but since
20  you were on to the defective chairs, I want to
21  explore that issue with you.
22   A.    Okay.
23   Q.    Okay. After you -- after you
24  heard the sound, did you know what it was when

ESQUIRE
SOLUTIONS

PLAINTIFF'S
EXHIBIT
A

800.211.DEPO (3376)
EsquireSolutions.com

Page 17

1  you heard the sound?
2      A.    I definitely knew it was somebody
3  fell. Like because we have like those shiny
4  concrete floors, it was just like a thump. And
5  like right after these displays, there's a
6  lingerie cart right here, and there was
7  nothing -- nobody except three people, a man and
8  two little children. So definitely knew it was
9  somebody went down. And I was only like a split
10 second ahead of the -- so I knew, I knew
11 somebody went down.
12         MR. STOFKO:  When you say "right
13 here," I don't want to cut you off, but the
14 record can't reflect that. When you said "right
15 here," as far as the lingerie rack, could you
16 explain with respect to this?
17         THE WITNESS:  Oh, I was pointing
18 kind of to the picture. Where the four like --
19         MR. LYNN:  Platforms?
20         THE WITNESS:  -- platforms are,
21 right after, probably a good four or five feet,
22 that's where the lingerie racks would start.
23         MR. STOFKO:  Would it be down and
24 to the right if you're looking at the picture --

Page 18

1          MR. LYNN:  Don't mark that,
2  though.
3          MR. JUREWICZ:  I'm not, I'm not.
4  It's already been marked. This is --
5          MR. LYNN:  I mean, don't have her
6  mark somebody else's exhibit.
7          MR. JUREWICZ:  She's not.
8  BY MR. JUREWICZ:
9      Q.    This has been marked Fanelli
10 Number 2.
11     A.    Okay.
12     Q.    You're going to see, there's a red
13 square box and, within that box, there's four
14 small black boxes.
15     A.    Um-hmm.
16     Q.    Are you with me?
17     A.    Um-hmm.
18     Q.    Now, using this exhibit as a point
19 of reference, can you tell me where you were
20 when you heard the thud?
21     A.    Probably about right here.
22     Q.    So you're more towards, we'll say,
23 going towards the front of the store?
24     A.    Yes, I was walking out of this

Page 19

1  door, so going this way. I went around actually
2  because you have to go around the platforms and
3  then I was walking down this way, but it was
4  like the vicinity of like right there.
5      Q.    And you said you were about four
6  feet away from the platform?
7      A.    Yes, yes.
8      Q.    And your back was to the platform?
9      A.    Yes.
10     Q.    And when you passed the platform,
11 Mr. Biniek was there with his two children?
12     A.    Yes.
13     Q.    And at that point in time, were
14 any chairs on the floor?
15     A.    No. Not at that time, no.
16     Q.    Can you give me an idea, after you
17 passed Mr. Biniek, how many steps, if you would
18 want to do it by steps, or if you would want to
19 do it by seconds, where you passed him and then
20 heard a thud or a sound to indicate to you that
21 something happened?
22     A.    It was only like three or four
23 steps.
24     Q.    And how loud — if you could,

Page 20

1  describe the sound that you heard.
2      A.    Well, he wasn't, as I recall, he
3  wasn't a big man, because I kept saying, how
4  could he break that chair? You know, I knew
5  something was wrong. So it wasn't like a huge
6  thud, but it was like out of the ordinary sound
7  in a department store.
8      Q.    Sure.
9          And when you turned around, what
10 did you see?
11     A.    I saw him on the floor. And I
12 believe one of the children was reaching for him
13 already. But I, I tried to get over to him.
14 And he said he was okay. But he hit pretty
15 loud, you know, like I know I fell on those
16 floors before, I know what that feels like.
17         So like he stood up. And I told
18 him not to go anywhere, because I wanted to get
19 my manager. So he stood up and I asked him if
20 he -- he first didn't want to do an accident
21 report. And I said, no, you have to do an
22 accident report. You know, I knew you had the
23 accident. So I made him stay in the vicinity
24 until I got Mary Lu and she came to him and then




TARA HUGHES
BINIEK vs. MARMAXX OPERATING CORP

October 08, 2014
21–24

Page 21

1 she asked him if he needed an ambulance. And he
2 was fine walking. So they walked up to the
3 front and then did the paperwork.
4    Q.    And when you first saw him, was he
5 still on the floor?
6    A.    Yes.
7    Q.    And what was his position? Was he
8 prone, was he sitting up, was he kneeling? I'm
9 not trying to put words in your mouth.
10   A.    No, I'm trying to remember. I
11 think he was on one knee, like actually like he
12 was like he went down and like -- and he caught
13 himself a little bit, but like he didn't like
14 fall, like fall like completely. Like he fell,
15 but like he caught himself with one knee type of
16 thing.
17   Q.    How do you know that if you didn't
18 see it?
19   A.    I think -- I recall him -- well,
20 when I saw him on one knee, so within the three
21 seconds. I don't know, I don't recall his age,
22 but I think he was older than me. I don't know
23 if he could have got from the sitting position
24 to a knee at that time.

Page 22

1    Q.    What was the position of the
2 chair?
3    A.    On the ground. Well, the leg was
4 off. So it was like three legs, three legs and
5 then the one down, so --
6    Q.    All right. And I get it that one
7 of the legs was not connected to the chair
8 anymore, right?
9    A.    Um-hmm, um-hmm.
10   Q.    So what was the position of the
11 chair? Was it on the -- was it still upright,
12 was it on its side, was it --
13   A.    It was tilted, it like fell to
14 where the leg fell off, so it was tilted to the
15 ground.
16   Q.    And when you called for your
17 assistant store manager, did you do it by
18 intercom, radio, cellphone?
19   A.    I ran up. I didn't -- we didn't
20 have -- we didn't use the radios at the time, so
21 I told him, please stay right where you are, and
22 I ran to get her.
23   Q.    Did you touch the chair at all?
24   A.    No.

Page 23

1    Q.    And how long did it take you to
2 get your assistant store manager?
3    A.    Not even two minutes. She was --
4 she ran back.
5    Q.    And was the chair in still the
6 same location and position?
7    A.    Yes, um-hmm.
8    Q.    And was Mr. Biniek still there?
9    A.    Yes.
10   Q.    And at what point in time, if any,
11 did you take a look at the chair that was
12 involved in his accident?
13   A.    Well, I recall all three of us
14 actually turning it over. Like he was there
15 when we looked at it.
16   Q.    I see.
17   A.    And so he saw the defect in that
18 chair with us. So like we all looked, because
19 we were all in shock, because he's not a very
20 big man. So we all looked, so we saw and then
21 we left it go and then we did our paperwork and
22 stuff and then that's when we saw the other
23 ones. We went and looked.
24   Q.    And what were your observations of

Page 24

1 the actual chair itself that was missing the
2 leg?
3    A.    It was the same. The bolts were
4 aimed, but not hitting wood.
5    Q.    And could you tell from looking at
6 the bolts whether the bolts were fully recessed
7 or were any part of the bolts --
8    A.    They weren't coming out, no. They
9 were -- they were fully into the piece of wood
10 that it's supposed to go in, but never connected
11 to the other part.
12   Q.    And what -- you were referring to
13 the bolts?
14   A.    Um-hmm.
15   Q.    When you turned the chair over,
16 did it have an area where there were four bolts?
17   A.    Every leg had a bolt. So,
18 actually, like the leg that cracked, like it
19 just -- like it didn't have any -- like it
20 didn't have anything in it to hold it, it was
21 just like, like from the top, it was bolted, I
22 guess. That's how they were made. But it
23 didn't have anything to hold it. So it could
24 have happened on any leg the same thing. If the

 

800.211.DEPO (3376)
EsquireSolutions.com

Page 25

1 gentleman sat down and leaned to that way, it
2 could have went any way if -- because they were
3 all -- none of them were bolted the right way.
4    Q.    And were you surprised by what you
5 saw?
6    A.    Yes.
7    Q.    Did you tell your assistant store
8 manager what your own impression was when you
9 looked at the chair?
10    A.    I told her I was embarrassed.
11    Q.    Why were you personally
12 embarrassed if it wasn't your chair?
13    A.    Because I was representing the
14 store.
15    Q.    Are chairs -- have you ever been
16 involved where merchandise is taken off of a
17 trailer and then taken to the floor for display?
18    A.    Not in that particular store, no.
19 Like clothing. Not like chairs or anything.
20    Q.    Had you ever been involved in
21 taking merchandise from a trailer and then
22 inspecting the merchandise before it goes on the
23 floor?
24    A.    I was in clothing in that store,

Page 26

1 and so I started in August of 2012. And from
2 August -- probably a good six months, we didn't
3 even inspect the clothes. And then they got on
4 us in the back to inspect the clothes. So I
5 don't know the practice of the furniture.
6    Q.    Fair enough.
7    A.    But the clothing, like we had -- I
8 guess somebody got in trouble and then all of a
9 sudden we had to inspect the clothing. So I
10 don't know if they follow the same policy with
11 everything that came in.
12    Q.    When were the other chairs
13 inspected after Mr. Biniek's accident?
14    A.    Immediately. I said, I said to
15 Mary Lu, I said, let's look at these chairs.
16 And she was in shock also. So both of us
17 carried them back to the room.
18    Q.    And what, if anything, did Mary Lu
19 say to you after you inspected the other chairs?
20    A.    She -- like I can even recall her
21 personality, she's like, oh, my gosh, Tar, she
22 was just -- it was candid, but almost in a
23 little bit of embarrassment, shock herself. I
24 can't speak for her emotion, but --

Page 27

1    Q.    I'm going to show you what's been
2 marked as Murtha Exhibit 1, and there's a series
3 of photographs there.
4    A.    Okay.
5    Q.    And take a look at each of the
6 photographs.
7    A.    Yeah, that's -- yeah, my --
8       MR. LYNN: Just wait for a
9 question.
10       THE WITNESS: Okay.
11 BY MR. JUREWICZ:
12    Q.    Let's start first --
13       MR. LYNN: He wants you to look at
14 them all first.
15       MR. JUREWICZ: Well, no, we'll go
16 in order this way.
17       MR. LYNN: Oh, okay.
18 BY MR. JUREWICZ:
19    Q.    Let's start with the first
20 photograph. Do you recognize what's shown in
21 Murtha-1A?
22    A.    Yes.
23    Q.    What's that?
24    A.    That's the chair the gentleman

Page 28

1 fell off of.
2    Q.    And if you take a look at
3 Murtha-1B, what's shown in this photograph?
4    A.    That's the chair.
5    Q.    Does this appear to resemble the
6 condition of the chair when you saw it that
7 evening?
8    A.    Yes, yes. These are the good
9 legs, actually. Yes.
10    Q.    All right. And you can see -- can
11 you see, if you look in the photograph, any type
12 of damage to any of the wood that's in the
13 chair?
14    A.    Yes, that was -- that's what I'm
15 recalling with the straight -- I knew there was
16 a crack with the bolts. I knew something didn't
17 match up. That's what I was trying to recall,
18 but that's exactly what I recall now. It was
19 the bolts damaged the wood. I guess my
20 recollection was --
21    Q.    Yeah, you're doing good.
22    A.    -- of the --
23    Q.    And if you take a look at 1C.
24    A.    Yep, I remember that.





PLAINTIFF'S
EXHIBIT
A

Case 3:14-cv-01154-MEM   Document 49   Filed 09/28/15   Page 22 of 27

TARA HUGHES                                    October 08, 2014
BINIEK vs. MARMAXX OPERATING CORP                      29—32

Page 29

1    Q.    And 1D.
2          Now, you said something about the
3    bolt didn't go all the way through. I'm going
4    to show you a different photograph of what's
5    been identified as Exhibit Fanelli 3C.
6          And do you see the front of the
7    chair?
8    A.    Yep.
9    Q.    All right. Was there -- I mean,
10   does that represent -- I realize that this
11   picture now shows two legs rather than four
12   legs --
13   A.    Um-hmm.
14   Q.    -- but is that what you meant,
15   that there was a portion where the bolt didn't
16   go through the entire wood? I wasn't sure by
17   your answer what you said.
18         MR. LYNN: Objection to form.
19         You can answer.
20         THE WITNESS: Actually, no. My
21   recollection was -- like I recalled the bolts
22   were not in the right way, but I recall them now
23   that way. They were in too far, that the wood
24   was cracking.

Page 30

1          MR. LYNN: Let the record reflect
2    that the witness was pointing to the corner of
3    the chair in the upper left-hand corner on
4    Exhibit Fanelli-3C.
5    BY MR. JUREWICZ:
6    Q.    If we go to Fanelli-3G, all right,
7    you mentioned that now you believe that the
8    hardware was too far in?
9    A.    Too far. Yeah, I knew it was the
10   hardware and I knew it was the part of the wood
11   that I saw. But, yeah, it was that, definitely.
12   I recall that.
13   Q.    All right. And does this
14   illustrate what you meant by when you say the
15   hardware was too far in?
16   A.    Yes.
17         MR. LYNN: Objection. She clar --
18   that's not what she meant. She clarified that
19   earlier, Counsel, and corrected it.
20   BY MR. JUREWICZ:
21   Q.    Is that what you meant?
22   A.    Yes, that -- yes.
23   Q.    And to you, is this what you
24   believe rendered the chair defective?

Page 31

1    A.    Yes.
2    Q.    And the other chairs you looked
3    at, did they have a similar defect?
4    A.    All -- yep. They all had the same
5    exact -- exact cracks where the bolts were.
6    Q.    Did it appear to you that there
7    was poor workmanship in assembling the chairs?
8          MR. LYNN: Objection.
9          THE WITNESS: Can I answer?
10         MR. LYNN: Yes, you can answer.
11   BY MR. JUREWICZ:
12   Q.    Yes.
13   A.    Yes.
14   Q.    Have you ever put together
15   anything?
16   A.    Yes.
17   Q.    Ever put any chairs together that
18   you got for Christmas or anything else like
19   that?
20   A.    Yes. And I would do that.
21   Absolutely. And it would soften the wood and
22   crack faster.
23         MR. JUREWICZ: Thank you. That's
24   all I have.

Page 32

1          MR. LYNN: Dan may have some.
2          - - -
3          EXAMINATION
4          - - -
5    BY MR. STOFKO:
6    Q.    My name is Dan Stofko. I
7    represent Jofran in this matter.
8          You just testified that there
9    were -- you saw cracks in all the other chairs?
10   A.    Yes.
11   Q.    Were all the other chairs this
12   same particular model?
13   A.    They were a set. Like we would --
14   like if you would have purchased like four
15   chairs for a table, like the same, they were all
16   the same.
17   Q.    And did you discuss those cracks
18   with Mary Lu Murtha?
19   A.    Yes. That's why she and I took
20   them off the floor.
21   Q.    And did you take any photographs
22   of those chairs?
23   A.    I didn't personally, but that -- I
24   don't know if that was my job as an associate or





ESQUIRE
SOLUTIONS

PLAINTIFF'S
EXHIBIT
A

800.211.DEPO (3376)
EsquireSolutions.com

Page 33

1  if that was her job as a manager.
2      Q.    All right. Do you know if those
3  chairs were preserved?
4      A.    I don't know what -- I didn't know
5  what they do at the time to any of that stuff.
6      Q.    When you took them off the floor,
7  where did you take them?
8      A.    Into the back room.
9      Q.    When you say back room --
10     A.    No, no, we didn't. There was like
11  a storage closet actually like where we kept our
12  soda locked up and we took them back there.
13  Like we didn't even take them to the back room
14  where all our merchandise was. We took them to
15  like a ten-by-ten room type of like locked.
16     Q.    Did you ever see the chairs after
17  that?
18     A.    No.
19     Q.    Did you ever hear from anyone what
20  happened to those chairs?
21     A.    No.
22     Q.    How long did you work at T.J.Maxx
23  after that incident?
24     A.    Until August of 2013.

Page 34

1      Q.    Were you ever in that storage room
2  again?
3      A.    Yes. For --
4      Q.    And did you --
5      A.    That's where we would go, they
6  locked the soda up, to bring the soda out to the
7  soda machine. And they weren't there, like --
8  they weren't -- like they weren't there the
9  whole time, so I don't know when they left or --
10  that's where we just took them that night.
11     Q.    Do you remember ever seeing them
12  at any time after the incident?
13     A.    No.
14     Q.    Can you tell me specifically where
15  the cracks were located on the other chairs?
16  Not on the chair that broke, but on the other
17  chairs.
18     A.    They were in the same, the same
19  place where the bolts met the legs; in all four
20  legs, in all the chairs.
21     Q.    Front and back?
22     A.    Um-hmm. Yes.
23     Q.    This was 1E. I think I have that
24  marked right.

Page 35

1              MR. LYNN: Why don't we just show
2  her the same one.
3              MR. JUREWICZ: Yeah, yep.
4  BY MR. STOFKO:
5      Q.    On 1E, and I'll represent --
6              MR. LYNN: Just so -- we say 1E,
7  it's Murtha-1E.
8              THE WITNESS: Okay.
9  BY MR. STOFKO:
10     Q.    On Murtha-1E, I'll represent this
11  shows the front corner, this is one of the legs
12  that was broken off, either originally or, as
13  you can see from these pictures, subsequently a
14  second leg was broken off this chair?
15              MR. LYNN: Objection to form. The
16  photographs that you're showing, Murtha
17  Exhibit 1, were taken at a time when only the
18  subject leg was broken off. So this is the
19  subject leg. I just don't want the witness to
20  be misled.
21              MR. STOFKO: No, that's good.
22  Thanks for clarifying.
23              THE WITNESS: Okay. What was the
24  question?

Page 36

1  BY MR. STOFKO:
2      Q.    This shows the inner corner of
3  that area where the leg broke off. I believe
4  your testimony was that all four corners had
5  cracked wood?
6      A.    I meant like all legs, all these
7  pieces.
8              MR. LYNN: And she's referring to
9  the piece that the bolt goes into before it
10  reaches the actual leg itself.
11  BY MR. STOFKO:
12     Q.    Okay. So does that refresh your
13  recollection? Because this piece isn't cracked,
14  correct?
15     A.    It is. I can see where the wood
16  is damaged.
17     Q.    Where?
18              MR. LYNN: Just so the record --
19  she's still pointing to Murtha Exhibit 1E.
20  BY MR. STOFKO:
21     Q.    Where is that piece of wood
22  cracked?
23     A.    I can see hairline. And then this
24  would be where a bolt was put through and



ESQUIRE
SOLUTIONS

PLAINTIFF'S
EXHIBIT
A

800.211.DEPO (3376)
EsquireSolutions.com

Page 37

1  obviously put through too tight, because the
2  wood around it is cracking.
3      Q.    When you say --
4          MR. LYNN: She's referring to
5  where one of the upper right-hand wood screw is
6  placed, saying it's in too tight.
7  BY MR. STOFKO:
8      Q.    A screw and not a bolt, correct?
9      A.    Yes, yes, a screw.
10     Q.    But it's your opinion that that
11  screw cracked this wood and there's a hairline
12  crack there?
13     A.    Yes, this is what I see in the
14  black and white. Two, actually, yes.
15     Q.    You said two. Where do you see
16  the two cracks?
17     A.    The upper right hand where, where
18  the screw would go, that was -- it appears to me
19  that it went through too tightly, so it cracked
20  the wood a little bit. And underneath it, I can
21  see it's the same markings as where the -- where
22  the wood is pulling up, it's -- it's darker in
23  the black and white. I don't know if you have a
24  color one over there. I have black and white.

Page 38

1          MR. LYNN: He's looking for one
2  for you.
3          THE WITNESS: Okay.
4          MR. LYNN: Do you know which one
5  this is?
6          MR. STOFKO: I don't.
7          MR. LYNN: Unless you want to mark
8  it as a separate exhibit, but we shouldn't have
9  to.
10             Is that one of the Fanelli
11  exhibits?
12         MR. STOFKO: Yeah. This is when
13  the two legs are off.
14         MR. LYNN: All right. Is that the
15  one you have here?
16         MR. STOFKO: Yes.
17         MR. LYNN: But this is the leg.
18         THE WITNESS: Yeah.
19         MR. LYNN: So you want her to
20  focus on --
21         MR. STOFKO: No, that's fine, she
22  can focus on the other one. She said they were
23  all cracked.
24  BY MR. STOFKO:

Page 39

1      Q.    Look at this corner in that one,
2  please.
3          MR. LYNN: Let me see if there's a
4  closer one. Yeah, I guess that's all we got for
5  you right now.
6          THE WITNESS: Okay.
7          MR. LYNN: I'm sorry.
8          THE WITNESS: That's all right.
9  BY MR. STOFKO:
10     Q.    That inside corner?
11     A.    This one? Yep.
12         MR. LYNN: So the record reflects,
13  just that we're looking at Fanelli-3D right now.
14  Is that what you have? Okay. All right.
15         THE WITNESS: Now, in the colored,
16  I only see the one damaged area, because I guess
17  it was a darker part of the wood.
18         MR. LYNN: She's pointing to the
19  upper right-hand corner next to the wood screw.
20         THE WITNESS: Right.
21  BY MR. STOFKO:
22     Q.    Have you ever seen any photographs
23  of any of the other chairs?
24     A.    No.

Page 40

1      Q.    Now, earlier --
2          MR. STOFKO: I'm sorry, Jim, are
3  you ready?
4          MR. LYNN: Yeah, I'm listening.
5  I'm just trying to see if I can help you out
6  here, believe it or not.
7  BY MR. STOFKO:
8      Q.    Earlier you testified that you saw
9  where the bolts didn't connect in the leg. Did
10  we now clarify?
11     A.    Yes, I'm definitely clarified. I
12  was -- I knew there was that angle. I knew it
13  was a bolt or metal that was causing the
14  problem, but this clearly clarifies my memory
15  from a couple years ago.
16         MR. LYNN: Dan, just so you know,
17  these are the photos your adjuster took. It's
18  my only copy, though.
19             Does he have a color copier out
20  there, you want to ask him, in case you want to
21  mark this? Especially maybe this one?
22         MR. STOFKO: Yes. And the one
23  before, I think.
24         (Exhibit No. Hughes-1, Color




PLAINTIFF'S EXHIBIT A

TARA HUGHES
BINIEK vs. MARMAXX OPERATING CORP

October 08, 2014
41–44

Page 41

1   Photocopy of Photograph of Under Seat of Chair;
2   Exhibit No. Hughes-2, Color Photocopy of
3   Photograph of Under Seat of Chair, were marked
4   for identification.)
5   BY MR. STOFKO:
6       Q.    If we reference Number 1 --
7       A.    Okay.
8       Q.    -- and this shows one of the
9   corners of the subject chair, can you identify
10  any cracks in the wood there?
11      A.    No cracks. Just -- it just
12  appears that the screws went too tight in.
13      Q.    What do you base that opinion on?
14      A.    How all four holes were, the wood
15  was like torn or shredded, whatever. I don't
16  know the word. But, I mean, if you put a screw
17  in the wood and you keep screwing and the wood
18  kind of like butterflies out.
19      Q.    Do you mean like the shavings in
20  the hole?
21      A.    Yes, yes.
22      Q.    All right. But it's your -- I'm
23  sorry, just so we're clear, when you say
24  "butterfly out," you're talking about the

Page 42

1   shavings?
2       A.    The shavings, yes.
3       Q.    All right. And then same question
4   on Number 2, when you look at the joint there on
5   the left in that photograph, do you see any
6   cracks there?
7       A.    Yes. Coming off the right, upper
8   right-hand hole, there's a crack.
9       Q.    Okay. And you believe that to be
10  a crack in the wood itself?
11      A.    That's what it appears to be.
12      Q.    All right. So when you say that
13  you saw cracks on all of the joints on all of
14  the chairs, are we talking about actual cracks
15  in the wood, or like you referenced in
16  Exhibit 1, some shavings near the hole?
17      A.    No, I'm talking about the three
18  other chairs that we took off the floor, they
19  were cracked. That's what I was talking about.
20  When we pulled the other chairs, like cracked,
21  like streaming out like a river cracked, that
22  were in the exhibits from the other chairs.
23  That's what I was talking about, from the other
24  chairs.

Page 43

1       Q.    Okay. I just want to go back to
2   the incident itself.
3            And you had testified that you
4   came out from the back?
5       A.    Yes.
6       Q.    And walked around the furniture
7   area, correct?
8       A.    Um-hmm.
9       Q.    And in that time, you saw Mr.
10  Biniek?
11      A.    Um-hmm.
12      Q.    And his children?
13      A.    Yes.
14      Q.    And then was it correct that you
15  turned left to go down an aisle toward the front
16  of the store?
17      A.    Well, I didn't turn necessarily.
18  Like you come out the back door and there's like
19  the four platforms, so you kind of like have to
20  snake around. I didn't make any turns, I'm just
21  snaking. Like here's the four platforms --
22  here's the four platforms, and right here is
23  when I kind of snaked around, and that was the
24  first lingerie rack right here. And I was like

Page 44

1   feet, like just a couple steps away from where
2   he was.
3       Q.    And then I believe it was your
4   testimony that at that time there were no chairs
5   on the floor, they were on the platforms?
6       A.    No. I didn't see it on the floor
7   when I walked past, no.
8       Q.    And then three or four steps later
9   is when you heard the sound?
10      A.    Yes.
11      Q.    Do you believe Mr. Biniek sat in
12  the chair while it was on the platform or on the
13  ground?
14      A.    Definitely on the ground. Because
15  if he was on the platform, he would have hit his
16  head. He would have -- because the chairs are
17  always kind of towards the front or the side of
18  the platform, so like you would fall right off
19  the platform also and they're like a lift up.
20  So he would have hit his head. He was -- he
21  wouldn't have fell on his -- on his knees.
22      Q.    Other than the fact that he -- the
23  way he fell, do you have any other basis for
24  believing the chair was put on the floor?





PLAINTIFF'S
EXHIBIT

TARA HUGHES
BINIEK vs. MARMAXX OPERATING CORP

October 08, 2014
45–48

Page 45

1   A.   Other than he told me so. He
2 said, all I did was take it off and I wanted to
3 try it out. And there's --
4   Q.   Okay. So do you believe in that
5 three or four steps from when you saw him and
6 there was no chair on the floor until the
7 accident happened, that he had time to take it
8 off the platform, sit it on the ground and then
9 sit down in it and the chair broke?
10   A.   Yes, because it was -- it doesn't
11 take that long. They're not that heavy, you
12 just pick it up, put it down, sit. That's it.
13   Q.   Did you hear him put the chair
14 down on the ground?
15   A.   Yes.
16   Q.   Can you describe generally your
17 circumstances for leaving T.J.Maxx's employment?
18   A.   And why is that relevant?
19     MR. STOFKO: Jim, do you want to
20 direct her to answer the question?
21     MR. LYNN: I can't direct her to
22 answer the question. I'm not directing her not
23 to answer the question.
24     MR. STOFKO: I'm not going to get

Page 46

1 into a back-and-forth with your witness. It's a
2 discovery deposition.
3     THE WITNESS: I don't know, is
4 that relevant?
5     MR. LYNN: It's something he's
6 allowed to ask. I can't force you to answer a
7 question you don't want to answer. If he wants
8 to go to a judge and ask a judge that you answer
9 the question, that's up to him.
10     THE WITNESS: Oh, okay. Well,
11 Mr. Fanelli was too overly friendly. He got his
12 wife from the other store to get my daughter a
13 job. He got my husband some nonprofit money for
14 his, and then he asked me what I'm going to do
15 for him. There you go.
16 BY MR. STOFKO:
17   Q.   And then shortly after that, I
18 assume you voluntarily resigned?
19   A.   Yep. And I never told my husband
20 because my daughter still worked with his wife.
21 My daughter was -- after that, on Facebook,
22 social network, Mary Lu Murtha, they all took me
23 off of Facebook and then my daughter was fired
24 from the other store, the associate store, where

Page 47

1 Mr. Fanelli got my daughter the job.
2     So he asked me for a favor and I
3 kept it quiet. So now I'm meeting my lawyer
4 that maybe I'll be contacting.
5   Q.   Did you ever take any concerns to
6 management at T.J.Maxx?
7   A.   Absolutely not; because he was
8 married and he had a life and I was not about to
9 do anything. Nope.
10   Q.   How about with respect to your
11 daughter being fired, did you ever --
12   A.   My daughter wasn't fired for
13 months later. And they called her up and told
14 her, she was under 18, told her that she took a
15 picture on social network while she was on the
16 clock, and everybody does, and they fired her.
17     MR. STOFKO: I have no further
18 questions.
19     - - -
20     FURTHER EXAMINATION
21     - - -
22 BY MR. JUREWICZ:
23   Q.   Have the answers that you gave
24 here today been truthful and honest?

Page 48

1   A.   Absolutely.
2   Q.   And despite whatever disagreement
3 you had with your store manager, has that
4 affected your ability to be fair, true and
5 impartial?
6   A.   It has not affected my ability.
7   Q.   And you have no axe to grind with
8 T.J.Maxx?
9   A.   Nope. I walked away. I mean, it
10 was a part-time job. I don't need it.
11   Q.   No axe to grind with Jofran?
12   A.   I don't even know who Jofran is.
13   Q.   And you're not here to try and
14 help out Mr. Biniek unnecessarily?
15   A.   Don't even know him.
16   Q.   And can I have your home address,
17 please?
18   A.   Sure. 394 East Washington Street,
19 Nanticoke, 18634.
20   Q.   And I got a funny feeling I'll be
21 getting ahold of you at some point in time if
22 this case doesn't settle, so could I have your
23 cell phone number, please?
24   A.   804-1003.

ESQUIRE
SOLUTIONS

PLAINTIFF'S EXHIBIT A

800.211.DEPO (3376)
EsquireSolutions.com

Page 49

1    Q.      And I promise I won't contact you
2  unless this case does go to trial.
3    A.      Okay.
4           MR. JUREWICZ:  All right.  Thank
5  you very much.
6           THE WITNESS:  Okay.
7           MR. LYNN:  Thank you very much.
8           THE WITNESS:  Thank you.
9           MR. JUREWICZ:  Nice meeting you.
10          THE WITNESS:  You too.
11          (Deposition is concluded at
12  3:37 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24

Page 50

1          C E R T I F I C A T E
2          I hereby certify that the
3  proceedings and evidence noted are contained
4  fully and accurately in the notes taken by me on
5  the deposition of the above matter, and that
6  this is a correct transcript of the same.
7
8
9
10          Denise D. Bach
11          DENISE D. BACH
            Registered Professional Reporter
12          Certified Court Reporter
            Notary Public - Expires March 2018
13          DATE OUT:  October 20, 2014
14
15
16
17
18          (The foregoing certification of
19  this transcript does not apply to any
20  reproduction of the same by any means, unless
21  under the direct control and/or supervision of
22  the certifying reporter.)
23
24





PLAINTIFF'S
EXHIBIT
A

tabbies

800.211.DEPO (3376)
EsquireSolutions.com