UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD BINIEK and<br>MARLA BINIEK,<br><br>            Plaintiffs<br><br>      v<br><br>MARMAXX OPERATING<br>CORPORATION d/b/a TJ MAXX and<br>JOFRAN, INC.,<br><br>            Defendants | CASE NO.  3:14-1154<br><br>(JUDGE MANNION) |

## PLAINTIFFS' RESPONSE TO DEFENDANT MARMAXX OPERATING CORP.'S MOTION IN LIMINE TO PRECLUDE PORTIONS OF THE REPORT OF JEFFREY KEEFER

Plaintiffs, by and through their attorneys Galfand Berger LLP, hereby respond to the Motion in Limine of Marmaxx Operating Corp. to preclude portions of the report of Jeffrey Keefer and in support thereof aver as follows:

1.      Denied as stated. This matter arises out of an incident that occurred on March 11, 2013 in which Plaintiff-Husband was shopping in a T.J. Maxx store for new chairs and sat on one of those chairs to test its comfort when said chair collapsed due to being defectively imported, manufactured, assembled, and sold. Plaintiffs have brought a products liability action against Defendant Jofran, Inc. and Defendant Marmaxx Operating Corp. (T.J. Maxx). Trial is set to begin October 5, 2015. Defendant Marmaxx Operating Corp., the seller of the subject chair, placed the subject chair on display in its store without doing any sort of inspection knowing customers may sit on it to test its comfort.

2.      Denied as stated. Mr. Keefer's expert report, as a written document, speaks for itself. Plaintiffs have offered the expert report of Mr. Jeffrey Keefer on the issue of liability.

6

(Exhibit A). Among other conclusions, Mr. Keefer opined that Defendant Marmaxx should have inspected the subject chair prior to placing it on display in its store, where it knew customers would sit on it to test its comfort. (Keefer Report, Exhibit A, at p. 9, ¶ 8). Mr. Keefer refers to this inspection as a "Quality Assurance Inventory." Id. In rendering each and every one of his opinions, Mr. Keefer drew on his training, knowledge, expertise, and experience of 25-plus years of designing, constructing, assembling, installing, and selling furniture. (Keefer CV, Ex. B).

      3.     Denied as stated. Mr. Keefer, who can be cross-examined on his qualifications and any opinion he offers, will testify in accordance to what is in his report, all of which are proper admissible opinions.

      4.     Denied as stated. Mr. Keefer's CV, as a written document, speaks for itself. Contrary to Defendant Marmaxx's contention that Mr. Keefer has no experience in the "retail" industry, Mr. Keefer's CV clearly shows that he makes and sells furniture for a living at Classic Cabinetry and has done so for decades. (Ex. B). As a result, he is qualified to opine on the proper measures to be taken by a seller to ensure product safety before the product is presented to consumers.

      5.     Denied. Classic Cabinetry, the business that Mr. Keefer owns and operates, is obviously a retail business. Mr. Keefer, in his role at Classic Cabinetry, designs, fabricates, assembles, and then sells furniture, including residential furniture like the subject chair. Defendant Marmaxx offers no explanation as to how this renders Mr. Keefer anything other than a direct participant in the retail industry; he sells furniture.

      6.     Denied. See Plaintiffs' Response to Paragraph 5. Mr. Keefer is clearly part of the furniture retail industry. It is utterly befuddling to Plaintiffs how Defendant Marmaxx can contend otherwise. Apparently, Defendant Marmaxx draws some sort of distinction between the

standard of care that applies to Marmaxx when it sells furniture and the standard Mr. Keefer is experienced with in operating his business at Classic Cabinetry. Such a distinction is merely a figment of the imagination of Counsel for Defendant Marmaxx. Obviously no such distinction in the standard of care exists in the law, otherwise Defendant Marmaxx would have pointed it out in its Brief, but it has not done so.

7. Denied. Mr. Keefer's CV (Ex. B) demonstrates his lengthy history Apart from Defendant Marmaxx's unintelligible distinction between the retail nature of Mr. Keefer's business and that of Defendant Marmaxx, what is further damning to its Motion is how the Third Circuit interprets the qualification requirement for expert opinion, the sole ground upon which Defendant Marmaxx attempts to attack Mr. Keefer. The Third Circuit interprets Rule 702's qualification requirement liberally. Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008) (citing Schneider ex rel. Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003)). "This liberal policy of admissibility extends to the substantive as well as the formal qualifications of experts. 'It is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.'" Id. (quoting Holbrook v. lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996)). "We have **eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications.**" In re Paoli R.R. Yard Pcb Litig., 35 F.3d 717, 741 (3d Cir. 1994) (citing Hammond v. International Harvester Co., 691 F.2d 646, 652-53 (3d Cir. 1982) (holding that an engineer, whose only qualifications were sales experience in the field of automotive and agricultural equipment and teaching high school automobile repair, nevertheless could testify in a products liability action involving tractors)). Under this rule in the Third Circuit, it would be unthinkable to preclude the

8

opinion of Mr. Keefer, an experienced, successful, and knowledgeable owner and operator of a manufacturing and retail furniture store, on the basis of not having qualifications to opine on retail furniture. The case law in the Third Circuit is such that even if Defendant Marmaxx were correct—which it is not—that Mr. Keefer did not have retail experience relevant to Marmaxx, he would still be able to offer his expert opinion on whether an inspection should have been done on a chair that turned out to be defective as a result of his other experience in woodworking and furniture sales.

WHEREFORE, Plaintiffs respectfully request this Honorable Court DENY Defendant Marmaxx Operating Corp.'s Motion in Limine.

Respectfully submitted,

GALFAND BERGER, LLP

By:

RICHARD M. JUREWICZ, ESQUIRE
Attorney for Plaintiffs
Attorney I.D. No.: 39436
1835 Market Street, Suite 2710
Philadelphia, PA 19103
215-665-6829
rjurewicz@galfandberger.com

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD BINIEK and<br>MARLA BINIEK,<br><br>         Plaintiffs<br><br>   v<br><br>MARMAXX OPERATING<br>CORPORATION d/b/a TJ MAXX and<br>JOFRAN, INC.,<br><br>         Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO.  3:14-1154<br><br>(JUDGE MANNION) |

## PLAINTIFFS' BRIEF IN RESPONSE TO DEFENDANT MARMAXX OPERATING CORP.'S MOTION IN LIMINE TO PRECLUDE PORTIONS OF THE REPORT OF JEFFREY KEEFER

### I.  MATTER BEFORE THE COURT

Before this Honorable Court is Defendant Marmaxx Operating Corp.'s (hereinafter "Marmaxx") Motion in Limine to Preclude Portions of the Report of Jeffrey Keefer. Apparently this Motion in Limine is premised on some imagined distinction in the standard of care between Marmaxx and the rest of the retail industry, in which Plaintiffs' Expert Jeffrey Keefer has decades-worth of experience, contrary to Defendant Marmaxx's contention. Mr. Keefer has spent decades working with and selling wood furniture and therefore is qualified to opine on the standard of care a furniture seller must be held to before selling a piece of furniture. Defendant's approach to the qualification element is so narrow that it seemingly suggests that to have an expert opine on the relevant standard of care, Plaintiffs would have had to find a former Marmaxx employee. The qualification requirement for an expert is not nearly so restrictive, and is in fact construed liberally. Defendant Marmaxx's absurd Motion must be denied.

1

## II.     QUESTIONS PRESENTED

1.  Should this Honorable Court <u>deny</u> Defendant Marmaxx's Motion in Limine where Plaintiffs' expert Jeffrey Keefer has ample experience in woodworking and furniture retail so as to make him well-qualified to render an opinion as to whether Defendant Marmaxx should have inspected the subject chair prior to putting it on display?

Suggested Answer: YES

## III.    FACTS

This matter arises out of an incident that occurred on March 11, 2013 in which Plaintiff-Husband was shopping in a T.J. Maxx store for new chairs and sat on one of those chairs to test its comfort when said chair collapsed due to being defectively imported, manufactured, assembled, and sold. Plaintiffs have brought a products liability action against Defendant Jofran, Inc. and Defendant Marmaxx Operating Corp. (T.J. Maxx). Trial is set to begin October 5, 2015. Defendant Marmaxx Operating Corp., the seller of the subject chair, placed the subject chair on display in its store <u>without doing any sort of inspection,</u> knowing customers may sit on it to test its comfort.

Plaintiffs have offered the expert report of Mr. Jeffrey Keefer on the issue of liability. (Exhibit A). Among other conclusions, Mr. Keefer opined that Defendant Marmaxx should have inspected the subject chair prior to placing it on display in its store, where it knew customers would sit on it to test its comfort. (Keefer Report, Exhibit A, at p. 9, ¶ 8). Mr. Keefer refers to this inspection as a "Quality Assurance Inventory." <u>Id.</u> In rendering each and every one of his opinions, Mr. Keefer drew on his training, knowledge, expertise, and experience of 25-plus years of designing, constructing, assembling, installing, and <u>selling</u> furniture. (Keefer CV, Ex. B). Contrary to Defendant Marmaxx's contention that Mr. Keefer has no experience in the "retail" industry, Mr. Keefer's CV clearly shows that he makes and <u>sells</u> furniture for a living at Classic Cabinetry and has done so for decades. (Ex. B). As a result, he is qualified to opine on the proper

2

measures to be taken by a seller to ensure product safety before the product is presented to consumers.

## IV.    ARGUMENT

Mr. Keefer, who owns and operates a store that designs, manufactures, and <u>sells</u> residential furniture like the subject chair, has ample qualifications to offer an opinion as to whether Defendant Marmaxx violated its standard of care in failing to inspect a product it subsequently put on display for sale in its store. The Third Circuit interprets Rule 702's qualification requirement liberally. <u>Pineda v. Ford Motor Co.</u>, 520 F.3d 237, 244 (3d Cir. 2008) (<u>citing</u> <u>Schneider ex rel. Schneider v. Fried</u>, 320 F.3d 396, 404 (3d Cir. 2003)). "This liberal policy of admissibility extends to the substantive as well as the formal qualifications of experts. 'It is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.'" <u>Id.</u> (quoting <u>Holbrook v. lykes Bros.</u> <u>S.S. Co.</u>, 80 F.3d 777, 782 (3d Cir. 1996)). "We have **eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications.**" <u>In re Paoli R.R. Yard Pcb Litig.</u>, 35 F.3d 717, 741 (3d Cir. 1994) (<u>citing</u> <u>Hammond v. International Harvester Co.</u>, 691 F.2d 646, 652-53 (3d Cir. 1982) (holding that an engineer, whose only qualifications were sales experience in the field of automotive and agricultural equipment and teaching high school automobile repair, nevertheless could testify in a products liability action involving tractors)).

Time and time again, the Third Circuit has found experts qualified when opposing parties have attempted to attack the expert's qualifications by narrowing the issue to an impossibly small degree. This is exactly what Defendant Marmaxx does here and what the defendant in <u>Pineda</u>,

supra attempted to do. The defendant in <u>Pineda</u> attempted to preclude plaintiff's expert, who was educated as an engineer and worked in an engineering lab for decades, from offering opinions on rear liftgates and drafting service manual instructions. <u>Pineda</u>, <u>supra</u> at 244-45. The <u>Pineda</u> defendant's reasoning is exactly the same as that of Defendant Marmaxx here: the plaintiff's expert did not have prior experience dealing with precisely the matter on which he was offering an opinion. <u>Id.</u> Defendant Marmaxx's Motion is even less compelling because Mr. Keefer does in fact have experience in furniture retail and therefore has experience with and knows what a seller should do before transferring a product to a consumer or placing a product on display where a consumer would use it. However, even if Defendant Marmaxx were correct that Mr. Keefer doesn't have retail experience, Defendant Marmaxx's Motion would still necessarily have to be denied because Mr. Keefer's more general qualifications render him capable of offering an opinion on the need for a Quality Assurance Inventory evaluation, just like the plaintiff's expert in <u>Pineda</u>, <u>supra</u>.

Under this rule of the Third Circuit, it would be unthinkable to preclude the opinion of Mr. Keefer, an experienced, successful, and knowledgeable owner and operator of a manufacturing and retail furniture store, on the basis of not having qualifications to opine on retail furniture. The case law in the Third Circuit is such that even if Defendant Marmaxx were correct—which it is not—that Mr. Keefer did not have retail experience relevant to Marmaxx, he would still be able to offer his expert opinion on whether an inspection should have been done on a chair that turned out to be defective as a result of his other experience in woodworking and furniture sales.

In its foolhardy Motion, Defendant Marmaxx calls into the qualifications of Mr. Keefer, stating it believes Mr. Keefer has "no retail experience." <u>This is simply not true.</u> Mr. Keefer's

4

CV demonstrates that he has owned and operated a business that sells—i.e., is in retail—furniture. (Ex. B). Defendant Marmaxx offers no explanation as to how this renders Mr. Keefer anything other than a direct participant in the retail industry; he sells furniture. As a result, Mr. Keefer possesses the requisite qualifications to opine on whether or not Defendant Marmaxx should have inspected a piece of furniture that they placed on display to sell.

Mr. Keefer's opinion that Defendant Marmaxx seeks to have precluded is that Defendant Marmaxx should have inspected the subject chair before it put it on display for sale in a location in its store where customers would sit on it to test its comfort, as did Plaintiff-Husband. Mr. Keefer referred to this inspection as a "Quality Assurance Inventory." As an individual who has sold pieces of furniture, including chairs and residential furniture like the subject chair, Mr. Keefer is fully qualified to opine on what the proper procedure of a seller is to ensure safety before releasing the product to the public. (See Keefer CV, Ex. B).

## V.    CONCLUSION

For the reasons set forth at length above, Plaintiffs respectfully request this Honorable Court DENY Defendant Marmaxx's Motion in Limine to Preclude Portions of the Report of Jeffrey Keefer.

Respectfully submitted,

GALFAND BERGER, LLP

By:    _____

RICHARD M. JUREWICZ, ESQUIRE
Attorney for Plaintiffs
Attorney I.D. No.:  39436
1835 Market Street, Suite 2710
Philadelphia, PA 19103
215-665-6829
rjurewicz@galfandberger.com

5

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

EDWARD BINIEK and          )    CASE NO. 3:14-1154
MARLA BINIEK,              )
                           )    (JUDGE MANNION)
          Plaintiffs       )
                           )
                           )
     v                     )
                           )
MARMAXX OPERATING          )
CORPORATION d/b/a TJ MAXX and )
JOFRAN, INC.,              )
                           )
          Defendants       )

## CERTIFICATION OF SERVICE

I, Richard M. Jurewicz, Esquire, do hereby certify that service of a true and correct copy of the within PLAINTIFFS' RESPONSE TO DEFENDANT MARMAXX OPERATING CORPORATION'S MOTION TO IN LIMINE TO PRECLUDE PORTIONS OF THE REPORT OF JEFFREY KEEFER was made on September 28, 2015, Electronic E-Filing upon the following:

EMAIL: dstofko@c-wlaw.com
Daniel D. Stofko, Esquire
Cipriani & Werner
Oppeheim Building, Suite 402
409 Lackawanna Avenue
Scranton, Pa. 18503-0600

EMAIL: jlynn@bonnerkiernan.com
James F. Lynn, Esquire
Bonner Kiernan
1801 Market Street, Suite 770
Ten Penn Center
Philadelphia, Pa. 19103

**GALFAND BERGER, LLP**

**By:** _____

**RICHARD M. JUREWICZ, ESQUIRE**
**Attorney for Plaintiffs**
**Attorney I.D. No.: 39436**
**1835 Market Street, Suite 2710**
**Philadelphia, PA 19103**
**215-665-6829**
**rjurewicz@galfandberger.com**

BRADFORD CHAIR REPORT    April 6, 2015

BY Jeffrey Keefer

Edward Biniek Case

On March 11, 2013 Mr. Edward Biniek suffered an injury as a direct result of the collapse of a dining chair on display at the TJ Maxx store located in Wilkes-Barre, PA

This writer was retained by Richard M. Jurewicz, Esquire in connection with his legal representation of Mr. Edward Biniek regarding the incident (chair collapse) that is the subject of the lawsuit filed by Mr. Biniek and his wife. This writer was requested to evaluate the design, workmanship and assembly of the incident dining chair to determine if the design, workmanship quality and assembly were contributing causes of the chair collapse.

As set forth in my Curriculum Vitae more fully, I am the owner of Classic Cabinetry. I have had more than 25 years of professional experience in the woodworking industry. In my professional experience I have designed residential and commercial office furniture. My design experience includes conference tables, chairs, desks and office tables. In addition, my professional woodworking experience includes the selection of hardware and fastening devices for the residential and commercial furniture that I have designed. Classic Cabinetry is also responsible for assembling and installing commercial and residential furniture it designs. This writer is very familiar with the design, chosen hardware and assembly required for the dining chair involved in Mr. Biniek's accident.

INFORMATION AVAILABLE FOR REVIEW:

1. Deposition of Edward Biniek taken on February 4, 2015
2. Deposition of Marla Biniek taken February 4, 2015
3. Deposition of Joffrey Aaron Roy taken October 23, 2014
4. Deposition of Tara Hughes taken October 8, 2014
5. Deposition of Mary Lucille Murtha taken October 8, 2014
6. Deposition of Jarrod Fanelli taken October 8, 2014
7. Affidavit of Edward J. Biniek, III
8. My inspection of the chair on March 11, 2015
9. Photographs produced by the parties during this litigation
10. Exhibits marked and identified in the depositions listed above



PLAINTIFF'S
EXHIBIT
tabbies
A

## THE INCIDENT:

On March 11, 2013 Mr. Edward Biniek, his wife, and son were in the TJ Maxx store looking at floor displayed dining chairs. Upon sitting on the display chair the right front leg buckled under the seat snapping the wooden leg in the area where hangar bolts were used to fasten the leg to the seat. The unexpected failure of the chair sent Mr. Biniek to the floor and caused him to be injured.

## THE PARTIES:

According to its website and description from the Internet, Jofran, Inc. is a manufacturer of home furnishings. Its products and services include "furniture manufacturers." A list of various collections it offers, including dining chairs, describe it as a manufacturer. The corporate representative of Jofran, Inc. qualifies its website products and services as an importer of home furnishings primarily casual dining sets, consoles, accent chairs and tables. Its products are imported primarily from Vietnam, Malaysia and China.

T.J. Max is a retail department store chain with stores located throughout the United States. While a good portion of T.J. Maxx product line inventory is clothing apparel and shoes, it does offer for sale home furnishings including chairs, stools and tables.

From materials reviewed by this writer, the Bradford Side Chair Line was imported by Jofran, Inc. from Thanh Phu Phat, a company located in Vietnam. Prior to deciding to carry the Bradford Side Chair line of products, Jofran, Inc. representative Joffrey Aaron Roy had reviewed and evaluated Bradford Side Chair line exemplars. Jofran, Inc.'s evaluation included not only the design of the chair but the knowledge and understanding of the quality and type of wood species selected for that type of chair and its manner of construction. Although intended to be a "knocked down" chair (partially assembled) for most of its customers, the arrangement with T.J. Maxx, was that the Bradford Side Chairs would be assembled at Jofran, Inc.'s facility. Jofran, Inc. would also be responsible for the packing of these chairs in corrugated boxes for shipment to T.J. Maxx's Distribution Centers.

T.J. Maxx would then have a supply of Bradford Side Chairs shipped from its Distribution Centers to a Regional Distribution Center for delivery to local retail stores serviced by the Regional Distribution Center. The chairs would be delivered with other merchandise via a commercial tractor/trailer to the store location. The corrugated boxes containing the chairs and other merchandise would be off loaded and processed by T.J. Maxx store employees. Once removed from their corrugated boxes, the chairs would receive a cursory inspection to look for aesthetic defects that would render the chair undesirable for purchase. Otherwise, the chairs would be stocked on the display floor in accordance with inventory replenishment policies of T.J. Maxx.

PLAINTIFF'S
EXHIBIT
tables
A

## THE CHAIR:

The chair is described by Jofran (the manufacturer / importer / distributor) as a "Bradford Side Chair – KD" The KD stands for "knock down". This chair generally comes only partially assembled and can either be assembled by the distributor ( Jofran ) or the end user ( retail consumer ) The chair consists of the following components:

1. Seat back / back leg assembly
2. Seat box and attached seat
3. (2) Front Legs
4. Hardware pack and 1 page assembly instructions (ROY-8)

Referencing ROY-4, the Jofran Product Specification sheet states that the chair is made from Solid Rubber Wood. Rubber wood is a tropical hardwood originating from countries such as Brazil and Southeast Asia and has also been cultivated in other tropical climates and is commonly used in low end or economy furniture.

Referencing ROY-8, the Jofran Assembly Instructions, the chair is assembled by attaching the seat box / seat assembly to the chair back assembly using machine bolts that run through the seat box rails and corner blocks into threaded inserts in the seat back assembly. The front legs have hangar bolts preinstalled that protrude from the legs. These bolts are guided through predrilled holes in the seat box corner blocks and secured with washers, lock washers, and machine nuts.

## KD FURNITURE:

KD or "knock down" furniture is not rare, especially in economy furniture imported from abroad. It keeps shipping costs down and is especially popular with tables and chairs. With the proper design, assembly, hardware, and maintenance these chairs can be safe and functional. These types of chairs, however, rely heavily on the hardware used during assembly in the absence of traditional joinery and adhesives. Proper and correct assembly is critical to the integrity and safety of the chair.

Proper chair assembly was acknowledged by the Jofran, Inc. corporate representative in his deposition when he testified that the safety of the Bradford Chair is dependent upon its proper assembly. If the chair is not assembled in accordance with the Assembly Instructions there



exists potential for one of the legs to separate causing a failure in the chair. Consequently, it is imperative that the Assembly Instructions are strictly adhered to ensuring that these chairs are properly assembled. Other than testifying that the Bradford Chairs would have been assembled by Jofran employees for the T.J. Maxx account, the Jofran corporate designee was not intimately familiar with what tools would have been used by his employees for assembly of these chairs. The Jofran Assembly Instructions call out the use of an Allen wrench and key wrench as the only tools needed for assembly.

## THE INSPECTION:

On March 11, 2015 I was able to inspect and photograph the chair involved in the incident and 3 exemplar chairs of the same construction and style. The chair involved in the incident was found to have both front legs broken from the seat box. I was informed that the right front leg was the leg that was broken as a result of the incident and it had been marked with an "A". The other front leg was supposedly damaged during the transportation of the chair from the store to wherever it was stored before this inspection. It was the left front leg and it was marked with a "B".  · For the purposes of this report I will only be referring to the leg marked "A" when discussing damage to this chair involving the front leg.

When the damaged chair is handled this writer's first observation is the severe amount of lateral movement between the seat box and the back assembly. In photograph 14F the (6) machine screws that hold the entire seat box, wooden seat, and front legs to the back assembly can be seen. They are black in color and are arranged so that the two in the center go directly through the seat box frame rails into threaded inserts in the seat back stretcher. At each corner a pair of bolts arranged vertically pass through wooden corner blocks, then through the seat box frame and into the back assembly where it's presumed there are threaded inserts. The most obvious flaw in the design of this area are the corner blocks. Unlike the 45 degree corner blocks that are used to attach the front legs to the seat box these are actually a wedge cut of solid wood with the grain running parallel to the seat box back rail. Wood screws are used to attach the wedge to the seat box frame rails. No adhesives are apparent. There are serious flaws in the design and attachment of these wedges. The wood screws that attach the wedge to the side rails of the seat box are too close to the edge of the wedge shaped block and are also drilled parallel to the grain of the block. Screw holes should be perpendicular to the grain of the wood or splitting is almost certain and can clearly be observed in photos 14F, 14G, 14H, and 14I. To further add to the design flaw the black machine screws are drilled only a fraction of an inch from the wood screws further weakening and contributing to the splitting of the wooden



wedge. This is significant because as soon as the wedge shaped blocks crack and fail the entire seat, seat box, and front leg assembly become loose and are relying on just the two black center bolts for structural integrity. This area where the seat box attaches to the seat back is supporting the bulk of the weight of the occupant.

In general the wood used in the chair involved in the incident seems to have coarse "curly" grain and seems to be prone to cracking. See referenced pictures.

EXEMPLAR CHAIRS:

At the time of inspection on March 11th, 2015 I was able to not only inspect the chair that was damaged as a result of the incident but also 3 chairs that were undamaged and preserved by T.J. Maxx following the Biniek incident. Upon inspection these chairs were found to have front leg and also seat box joints with excessive amounts of play and lateral movement. The bolts that connected the seat box to the back assembly were not properly and securely tightened and allowed a remarkable amount of lateral movement. With the chair upside down and resting on a conference table in the room, this writer naturally also checked the front legs for lateral play. Several of the (6) front legs on the (3) exemplar chairs had an alarming amount of side to side play in the area where the legs attach to the seat box. With just this writer's thumb and forefinger I could easily turn the (4) machine nuts that hold the two front legs in place. The nuts were clearly not properly and securely tightened. It is my opinion that these chairs were not properly assembled in accordance with the Jofran Assembly Instructions and industry custom and practice and prone to future failure if put into service.

FRONT LEG JOINT:

Unlike traditional chair joinery that would feature mortise and tenon joints with adhesives or wooden dowels and adhesives this Bradford KD chair used no adhesives or wooden joinery between the leg and seat box rails.

Legs are drawn into the corner through tightening ordinary machine nuts on hangar bolts that pass through the corner blocks and are supported completely by the pressurized contact between the leg and the seat box rails. The integrity of this joint relies completely on the constant pressure the nuts apply to the corner block. If either of the two nuts are not properly



and securely tightened during assembly the leg is immediately able to move laterally. As the leg tilts the hangar bolts make contact with the corner blocks putting vertical pressure on them. The bolts generally will not fail (shear off) and the wooden leg splits as it did in the incident.

The holes drilled in the blocks for the hangar bolts to pass through were observed to be much larger than the bolt. If these holes were drilled to the nominal diameter of the bolts then lateral movement of the leg would be minimized and loosening of the nuts would be far less likely to occur.

Given the fact that this front leg joint heavily relies on these two nuts to keep constant pressure on the corner block, the choice of hardware by Jofran to perform this function is an inadequate one. While flat and lock washers are included they are light duty, thin, and ineffective. When a standard machine nut isn't properly tightened or begins to loosen over time during use the lock washer does nothing to prevent the nut from freely spinning on the bolt. When a nyloc type locking nut is secured it never gets loose. Even if space between the wood and the nuts were created the nut never spins freely. Locking nuts are readily available worldwide and there use could have easily been specified by Jofran to the manufacturer for nearly no cost increase.


WOOD EXPANSION AND CONTRACTION:

Anyone who manufactures wood furniture has to understand the cause and effect of expansion and contraction in furniture design and build and how it could affect the performance of the furniture during its life cycle. All wood absorbs and releases moisture based on the surrounding humidity or lack thereof. When wood is exposed to high humidity it absorbs moisture and expands or swells and when exposed to low humidity or dry air moisture is sucked out of the wood and the wood contracts or shrinks. In climates like the northeast United States furniture goes through cycles as we go through the seasons. In the humid summer months wood expands and in the dry winter months it contracts.

In the United States most furniture wood is kiln dried to 6-8% moisture levels before manufacturing. At these low levels of moisture if the furniture is put into service in dry climates the moisture loss would be minimal and shrinking minimal as well. In humid areas the wood will certainly absorb moisture and swell some but the thinking is that the swelling is better than shrinking as at least joints tend to tighten rather than loosen.

According to the Jofran quality audits marked ROY-6 and ROY-7 moisture readings on the chairs checked and passed ranged from 10.1% to 14.4%. Certainly the 14.4% reading is high and furniture with this level of moisture put into service in dry winter climates would be expected to suffer from contracting or wood shrinkage.

PLAINTIFF'S
EXHIBIT
tabbies®
A

As this subject relates to these chairs my observations are as follows.

The design of the wedge shaped corner blocks and the method of attachment don't allow for expansion and contraction and could contribute to cracking of the blocks as they are "pinned" in place by the screws that attach them. There are also multiple layers of wood that the corner bolts pass through and when that wood contracts loose bolts are predictable.

When the wood shrinks in the front leg area the metal nuts and washers are simply no longer applying the needed pressure to keep the leg firmly against the seat box rails and not only do you get slop or movement of the leg but the nut can spin freely and continue to loosen more and more as the chair is used eventually leading to the failure of the wood leg as was seen in this incident. This is again where the locking type nuts provide huge benefits both in safety and structural integrity over standard nuts. The shrinkage of the wood could still allow some movement but the nuts will not spin and further loosen so the movement is minimized. If the front leg hanger bolts are installed in wood with a high moisture content, such as with the incident chair, wood shrinkage will inevitably occur leading to cracking around these bolts which in turn will weaken the legs in the area that eventually failed on the incident chair.

SUMMARY:

These chairs rely on 6 bolts to attach and safely hold the seat to the back / leg assembly and the poor design of the corner blocks and machining of the holes render 4 of these bolts nearly useless when the corner blocks predictably fail. The front legs rely on 4 hanger bolts that mount to corner blocks with excessively large holes and ineffective lock washers and nuts. For less than 10 cents per chair nyloc (locking) nuts can be used that cannot loosen without tools. It's also clear from inspecting 3 exemplar chairs that the assembly by Jofran was not done properly as these brand new chairs had loose sloppy joints and leg nuts that could be loosened without tools. When the nuts that hold the front legs loosen, they spin freely and easily just through the vibration of normal usage of the chair. The farther the nuts spin away from the joint the more the leg moves laterally applying leverage to the hanger bolts and eventually causing the leg to split and fail.


PLAINTIFF'S EXHIBIT
tabbies
A

Based on my review of the file materials, Inspection of the failed chair and other chairs of T.J. Maxx made available at my inspection of March 11, 2015, I offer the following opinions within a reasonable degree of certainty in my experience in woodworking design and assembly:

1.      The blocks through which the front leg hanger bolts were inserted and passed through were excessive in size allowing for lateral movement of the front legs that would compromise the structural integrity of the incident chair;

2.      Failure to implement the use of readily available locking nuts and failing to properly secure and tighten the lock washer and nut to the hanger bolts will result in the chair legs losing their structural rigidity with the seat box compromising the structural integrity and safety of the incident chair;

3.      During the examination of the three exemplar chairs this writer could see a clear disregard for competent and consistent assembly practices. Loose hardware and the resulting lateral motion prevalent in both the front leg joints and the joints between the seat box and the chair back shows a lack of adherence to the Jofran Assembly Instructions by Jofran assembly personnel;

4.      Mr. Biniek did not misuse or abuse the chair and sat on it in a manner and method that would be expected. Further, the incident chair was not overloaded by Mr. Biniek sitting on it;

5.      The incident chair demonstrated poor workmanship in the pattern, location and position of the pre-drilled holes for the wood screws and machine bolts that connect the entire seat box and front leg assembly to the chair back. When the poorly designed and constructed corner blocks cracked and split apart, 4 of the 6 bolts connecting the seat box to the chair back were no longer applying the pressure required to maintain a rigid connection. This entire connection point became excessively loose and allowed the chair to rock back and forth putting excessive lateral force on the front legs and compromising the structural integrity of the chair;

6.      The failure of the rear corner blocks based on the design alone is predictable and this design should have been rejected by Jofran at time of initial Quality Audits. You simply cannot drill wood screw holes this close to the edges of the blocks and in the direction of the wood grain and not expect the blocks to crack and fail. Aside from the wood screw holes being drilled in a manner destined for failure the bolt holes were then drilled only a fraction of an inch



PLAINTIFF'S
EXHIBIT
tabbies
A

away from the outside wood screws further weakening the blocks and nearly guaranteeing the cracking and failing of these blocks. These blocks are critical to maintaining a rigid connection between the seat and the chair back.

7.    While Jofran lot inspected chairs as reflected by its Quality Audit Reports, no such Quality Assurance was followed with respect to inspecting the Bradford KD chairs that were assembled for its customer T.J. Maxx. Had an effective Quality Assurance Program been implemented at the time of the incident chair was assembled and prior to it being boxed for shipment, Jofran would have discovered the cracked and failing rear corner blocks and any loose front leg hardware that clearly led to the failure of this chair to reliably support the body weight of an average sized occupant during normal usage.

8.    Similarly, had the same Quality Assurance Inventory evaluation been done by T.J. Maxx upon receiving the chair after it was removed from its corrugated container and again when it was placed on the display floor, an inspection would have determined that the rear corner blocks were cracked and broken and the hardware for the failed leg was not properly and securely tightened. This chair should have never made it to the display floor;

9.    That the use of lock nuts was a far superior and safer choice of hardware to maintain the integrity of pressure between the chair legs and seat bottom and would not have impaired the function or utility of the incident chair had lock nuts been utilized. Lock nuts would not have backed out or loosened like the standard hardware nuts Jofran used to assemble the subject chair. Incorporating lock nuts would have prevented the incident chair leg from separating.

10.    Excessive moisture levels in the wood used to manufacture the Bradford chairs led to shrinking of the chair parts and contributed to the cracking and failure of these parts.

The above design flaws, poor workmanship, improper assembly and lack of Quality Control Inspection Procedures caused the chair collapse and Mr. Biniek's accident.

I reserve the right to supplement this report upon receipt of further file materials.

Sincerely yours,

Jeffrey Keefer

PLAINTIFF'S
EXHIBIT
A



PLAINTIFF'S
EXHIBIT
A





CRACKING OF WOOD RAIL
IN AREA OF FRONT LEG "A"

PLAINTIFF'S
EXHIBIT
A







jeffkeefer@ptd.net • 610-754-0725

# Jeffrey G Keefer

## Accomplishments

- 25 continuous years in the professional woodworking industry
- 18 years as the owner / operator of Classic Cabinetry
- Expert in the design, CAD drawing, and fabrication of high end commercial and residential office and home furniture
- Extensive experience in the operation use and maintenance of various types of woodworking tools and machinery, including but not limited to table saws, radial arm saws, band saws, routers, shapers, joiners, planers, veneer presses, guillotines, and circular saws
- Classic Cabinetry office furniture can be found in over 18 large US cities as well as several locations abroad
- A trusted furniture supplier for Knoll International, one of the largest and most prestigious furniture manufacturers in the world
- 20 year designer and supplier of reception desks, conference tables, credenzas, work stations, benches, stools, chairs , work tables and other office furniture for one of the largest law firms in the United States

## Professional Experience

### Owner Operator of Classic Cabinetry – Barto, PA • 1997– Present

- Design, layout, fabricate, assemble and install custom high end office and residential and business furniture
- Responsible for all phases of project management from bidding, estimating , designing scheduling, CAD, fabrication, to installation and project completion
- Supervise and schedule tasks for all woodshop employees. Training of woodshop employees on the safe use, operation, set up of power tools and woodworking equipment and machinery
- Proficient with DeltaCad, Quickbooks, and Microsoft Office

### Projects Manager at Theabault Cabinetry – Telford, PA • 1993–1997

- Responsibilities included bidding, design, drafting, fabrication and installation of custom kitchen cabinetry, countertops, and custom office furniture, desks and chairs
- Supervise and schedule tasks for all woodshop employees. Training of woodshop employees on the safe use, operation, set up of power tools and woodworking equipment and machinery
- All purchasing of project materials
- Work with staff designers to bring their projects to life

### Assistant Machining Dept. Supervisor at Woodrite Inc. –, Willow Grove, PA • 1990 – 1993

- Responsible for the machining phase of the most complicated custom projects in house. Assist in overseeing the department and in teaching new employees, including safe protocol of work layout, equipment set up and safe operation and use of woodworking machinery

## Education

Quakertown Community High School Graduate– 1979
Upper Bucks Technical School for Cabinetmaking -1979



PLAINTIFF'S
EXHIBIT
B
tabbies